Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Capstone Law APC
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:  (310) 943-0396

Attorneys for Plaintiffs Humberto Daniel Klee
and David Wallak

FILED
CLERK, U.S. DISTRICT COURT

DEC 1 4 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| HUMBERTO DANIEL KLEE and DAVID WALLAK, individually, and on behalf of a class of similarly situated individuals,<br><br>          Plaintiffs,<br><br>     v.<br><br>NISSAN NORTH AMERICA, INC.,<br><br>          Defendant. | Case No.: CV12-08238 DDP (PJWx)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1)   Violations of California Consumer Legal Remedies Act<br>(2)   Violations of Unfair Business Practices Act<br>(3)   Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act<br>(4)   Breach of Implied Warranty pursuant to Magnuson-Moss Warranty Act<br>(4)   Breach of Implied Warranty of Merchantability<br>(5)   Negligent Misrepresentation<br>(6)   Violation of the Arizona Consumer Fraud Act<br><br>**Jury Trial Demanded As to All Claims So Triable** |

FIRST AMENDED CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      The Nissan Leaf is an electric car marketed, distributed, sold, warranted and serviced by Nissan North America, Inc. ("NNA" or "Nissan").  As further alleged below, Defendant made materially misleading representations and omissions regarding the Leaf's battery capacity and driving range.  Defendant also failed to disclose and/or intentionally omitted to reveal a uniform design defect in the Leaf's battery system that causes all Nissan Leaf Class Vehicles to prematurely lose battery life and driving range.

2.      To remedy Defendant's misconduct, Plaintiff Humberto Daniel Klee brings this action for injunctive relief, pursuant to California's consumer protection statutes, on behalf of himself and all current owners or lessees in the United States of 2011-2012 Nissan Leaf vehicles (collectively, "Class Vehicles").  Plaintiff Klee seeks an order, *inter alia*, (1) enjoining Nissan from using misleading information in connection with selling the Leaf; (2) compelling Nissan to issue corrective disclosures to Leaf owners and lessees; (3) compelling Nissan to remove and replace Plaintiffs and Class Members' battery systems with a suitable alternative product; (4) compelling Nissan to provide class members with a new battery for the Leaf that does not contain the defects alleged herein; and/or (5) compelling Nissan to reform its Leaf battery warranty, in a manner deemed to be appropriate by the Court, to cover the loss of battery capacity under warranty as alleged herein and to notify all class members that such warranty has been reformed.

3.      Plaintiff David Wallak brings this action for damages, pursuant to Arizona law, on behalf of himself and all current and former owners or lessees in Arizona of 2011-2012 Nissan Leaf vehicles.

4.      The Nissan Leaf is an electric vehicle propelled by an electric motor and powered by a rechargeable lithium ion ("Li-ion") battery pack.  Instead of

adding gasoline or diesel fuel to a gas tank, Nissan Leaf owners charge their vehicles at charging stations or using at-home chargers.

5.     Whereas owners of typical gasoline vehicles can expect a range of around 300 miles per tank, Nissan advertises the Leaf's range at 100 miles or less, depending on "a number of variables, including road conditions and the weather."

6.     Nissan's advertised driving range was a material, and perhaps the most important, factor for Plaintiffs and Class Members who purchased a Nissan Leaf.  Consumers who use their Nissan Leaf for daily commutes must, as a practical matter, charge their vehicles on a daily basis, a process that can take approximately seven (7) hours for a full charge.  Any reduction in vehicle range can have a substantial impact on the vehicle's viability as a practical mode of transportation.

7.     As further alleged herein, Nissan's representations regarding the Leaf's driving range were misleading.  Unbeknownst to purchasers, the advertised driving range is based on the vehicle's performance only after fully charging the battery to 100% capacity.  In fact, however, charging the battery to 100% causes battery damage, and Nissan expressly recommends that owners *not* charge their vehicles to 100% in order to maximize battery life and that the battery be charged to only 80% capacity.

8.     Before purchase or lease, Nissan failed to disclose its own recommendation that owners avoid charging the battery beyond 80% in order to mitigate battery damage and failed to disclose that Nissan's estimated 100 mile range was based on a full charge battery, which is contrary to Nissan's own recommendation for battery charging.  Consumers thus were misled by Nissan's representations regarding driving range without being aware that these ranges were only achievable by charging the battery in a manner contrary to Nissan's

1    own guidance.

2         9.    Second, Nissan failed to disclose and/or intentionally omitted to

3    reveal a design defect in the Leaf's battery system (the "thermal management

4    defect") which is causing all Class Vehicles to suffer widespread, severe and

5    premature loss of driving range, battery capacity and battery life.

6         10.   Other electric vehicles equipped with lithium ion batteries in North

7    America, including the Chevrolet Volt, the Toyota RAV4 EV, and the Ford

8    Focus Electric, are equipped with active thermal management systems.  These

9    systems circulate cooling fluid throughout the battery array, actively cooling the

10   batteries.

11        11.   Nissan, however, opted not to include an active thermal

12   management system in the Leaf.  The lack of an adequate active cooling system

13   is a design defect that fails to adequately cool the batteries, causing the batteries

14   to suffer heat-related damage and causing premature battery capacity loss, well

15   in excess of Nissan's own guidelines.

16        12.   While Nissan's owner's manual provides that the Leaf may lose

17   *20%* of battery capacity over *five (5) years* of operation, in fact, class members'

18   vehicles, especially those vehicles exposed to warm climates, are losing over

19   *27.5%* battery capacity within the first *one (1) to two (2) years of operation*.

20   This battery capacity loss results in a reduction in the vehicle's driving range.

21        13.   As described below, Nissan was well aware of the active thermal

22   management defect and failed to disclose it.  Moreover, Nissan exacerbated its

23   wrongful conduct, by expressly *excluding* loss of battery capacity under its

24   8 year/100, 000 mile battery warranty, even though it knew of the thermal

25   management defect and propensity of the battery to lose capacity in excess of the

26   amounts disclosed.

27        14.   To remedy the wrongful conduct alleged herein as to the Nationwide

28

1  Class, as defined below, Plaintiff Klee seeks injunctive relief as provided by
2  California's consumer protection statutes.  Any damages or monetary relief that
3  might be awarded with respect to the Nationwide Class is incidental to the
4  injunctive relief sought.

5      15.    To remedy the wrongful conduct alleged herein as to the Arizona
6  Class, Plaintiff Wallak seeks damages pursuant to Arizona law.

7                                      **PARTIES**

8      16.    Plaintiff Humberto Daniel Klee is a California citizen who resides in
9  Pomona, California.  In June 2011, Plaintiff leased a new 2011 Nissan Leaf from
10  Nissan dealer Empire Nissan, in Ontario, California.

11      17.    Mr. Klee leased his vehicle primarily for his personal, family, or
12  household use.  Nissan manufactured, sold, distributed, advertised, marketed,
13  and warranted the vehicle.

14      18.    In July 2012, only thirteen (13) months into his lease, Mr. Klee's
15  battery capacity level gauge lost one bar on the vehicle's internal Battery
16  Capacity Level gauge.  In September 2012, Plaintiff lost a second bar from his
17  battery capacity level gauge.  A loss of two battery capacity level gauge bars
18  represents a capacity reduction of at least 21.5%.

19      19.    Mr. Klee has also noticed a substantial drop in driving range since
20  the beginning of the lease.

21      20.    Were Mr. Klee aware of the misrepresentations and omissions
22  described herein, he would not have leased his vehicle as further alleged herein.

23      21.    At all times, Mr. Klee, like all Class Members, drove his vehicle in a
24  foreseeable manner and in the manner in which it was intended to be used.

25      22.    Plaintiff David Wallak is an Arizona citizen who resides in Phoenix,
26  Arizona.  In July 2012, Mr. Wallak purchased a used 2011 Nissan Leaf in
27  Tolleson, Arizona with 7,063 miles on the odometer.  Mr. Wallak purchased his

28

vehicle primarily for his personal, family, or household use.  Nissan sold, distributed, advertised, marketed, and warranted the vehicle.

23.    At the time of purchase, Mr. Wallak's vehicle had 11 out of 12 capacity bars remaining on his battery capacity level gauge.

24.    Within two (2) weeks of purchase, two (2) bars disappeared from Mr. Wallak's battery capacity level gauge, bringing his vehicle's loss of capacity level bars to three (3) total. A loss of three bars represents a battery capacity reduction of at least 27.5%.

25.    Were Mr. Wallak aware of the misrepresentations and omissions described herein, he would not have purchased his vehicle as further alleged herein.

26.    At all times, Mr. Wallak, like all Class Members, drove his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

27.    Defendant Nissan North America, Inc. is an automobile distribution, and/or servicing corporation doing business in all 50 states.  Defendant distributes, markets, services, repairs, sells and leases passenger vehicles, including the Class Vehicles, nationwide.

28.    Defendant, Nissan North America Inc., is a corporation organized and in existence under the laws of the State of California and registered with the California Department of Corporations to conduct business in California. NNA's Corporate Headquarters were located at Gardena, California until on or about 2007 when NNA moved its Corporate Headquarters to Franklin, Tennessee.  Nissan North America, Inc. is the distributor and warrantor of the Class Vehicles in the United States.

29.    At all relevant times, Defendant was engaged in the business of marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Los Angeles County and throughout the United

FIRST AMENDED CLASS ACTION COMPLAINT

1   States of America.

2   **JURISDICTION**

3       30.    This is a class action.

4       31.    Some members of the Proposed Class are citizens of states different

5   from the home state of Defendant.

6       32.    On information and belief, the value of Class Members' aggregate

7   claims exceeds $5,000,000.00, exclusive of interest and costs.

8       33.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

9   **VENUE**

10      34.    Nissan, through its business of distributing, selling, and leasing the

11  Class Vehicles, has established sufficient contacts in this district such that

12  personal jurisdiction is appropriate.  Defendant is deemed to reside in this district

13  pursuant to 28 U.S.C. § 1391(a).

14      35.    In addition, a substantial part of the events or omissions giving rise

15  to these claims and a substantial part of the property that is the subject of this

16  action are in this district.  In addition, Plaintiff's Declaration, as required under

17  California Civil Code section 1780(d) but not pursuant to *Erie* and federal

18  procedural rules, which reflects that a substantial part of the events or omissions

19  giving rise to the claims alleged herein occurred, or a substantial part of property

20  that is the subject of this action, is situated in Los Angeles County, California, is

21  attached as Exhibit 1.

22      36.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

23  **FACTUAL ALLEGATIONS**

24  **Battery Capacity Loss**

25      37.    Nissan distributed, sold, and leased the Class Vehicles.  Nissan sold

26  thousands of Class Vehicles in California and Nationwide, directly or indirectly,

27  through dealers and other retail outlets.

28

38.     In 2010, Nissan brought the Class Vehicles to the market and repeatedly and consistently advertised an "up to 100 mile" driving range for the Nissan Leaf.

39.     Nissan's advertised driving range is based on the vehicle's performance after fully charging the battery to 100% capacity.  However, Nissan misrepresented and failed to disclose to Class Members prior to purchase that Nissan's estimated 100-mile range is based on a *full* charge; that Nisan itself recommended that vehicle owners *not* charge their batteries to 100%; that owners should charge their Leaf vehicles to only *80%* battery capacity to prevent damage to the battery and maximize the battery's longevity and maintain its capacity; and that charging to 100% capacity can cause battery damage.   As Nissan's own Leaf owner's manual admits:  "To extend the life span of the Li-ion battery, use long life mode by selecting [80% Charge (Improves Battery Longevity)]."

40.     Further, Nissan knew and failed to disclose that the Leaf suffers from a defect in the Leaf's battery system that causes all of the vehicles to lose battery capacity materially in excess of Nissan's described range.

41.     Lithium ion batteries experience a reduction in the amount of electricity or charge they can hold over time.  This battery capacity loss results in a reduction in the vehicle's driving range.  In the Nissan Leaf owner's manual, Nissan explicitly estimates that the Leaf may lose 20% of battery capacity over five (5) years of operation.  Nissan recently informed consumers on Facebook, "If a LEAF is treated as outlined in the Owner's Manual, you can expect 80 percent of the battery capacity after 5 years."[1]

_____

[1] Nissan Facebook Page (August 29, 2012), http://www.facebook.com/nissanleaf/posts/142423552561869?comment_id=282400&offset=0&total_comments=29

42.   Similarly, Mark Perry, Nissan's Director of Product Planning, stated in a 2010 interview, "We don't need thermal management for the U.S., but we are looking at the technology for Dubai and other locations like that.... **We've gone on the record saying that the pack has a 70 to 80 percent capacity after 10 years."**[2]

43.   However, in practice, class members especially those whose vehicles are exposed to warm climates, are finding their battery capacity reduced by 27.5% or more within the first *one (1) to two (2) years of operation*.

44.   Contrary to Nissan's public representations, many Class Members' vehicles have already reached Nissan's five (5) to ten (10) year capacity loss projections *after less than two (2) years of* operation.  As detailed below, scores of consumers online have already reported losses of one (1) to three (3) bars on the vehicle's internal Battery Capacity Level gauge, representing battery capacity losses of 15% to 27.5% or more.[3]  These losses of capacity are due to the thermal management defect.

45.   Other electric vehicles equipped with lithium ion batteries in North America, including the Chevrolet Volt, the Toyota RAV4 EV, and the Ford Focus Electric, are equipped with active thermal management systems.  These systems circulate cooling fluid throughout the battery array, actively cooling the batteries.  Nissan, however, opted not to include an active thermal management system in the Leaf.  The lack of an adequate active cooling system is a design defect that fails to adequately cool the batteries, causing the batteries to suffer heat-related damage and causing premature battery capacity loss in excess of

---

[2] Domenik Yoney, *Is the Nissan Leaf battery pack Underengineered?* (August 31, 2012) http://green.autoblog.com/2010/01/25/is-the-nissan-leaf-battery-pack-under-engineered/

[3] My Nissan Wiki, *Compendium of battery losses* (August 28, 2012). http://www.mynissanleaf.

Nissan's representations.

46.   Managing battery temperature is critical to maintaining capacity in lithium ion batteries.  In an article posted on Nissan's website in February 2012, Nissan admits that "The biggest cause of a battery's lifespan being shortened is overheating."[4]

47.   Plaintiffs and Class Members, particularly those residing in warmer climates, are experiencing precipitous drops in battery capacity well in excess of Nissan's stated estimates for rates of decline, due to the thermal management defect.

48.   As Nissan Leaf owners experience losses of battery capacity, they also experience proportionate losses of driving range.  Further, when Class Members complain to Nissan's authorized dealers about the problem, they are instructed to avoid charging their batteries beyond 80% of current capacity to avoid further damage.  Thus, Plaintiffs' and Class Members' driving ranges are dropping due to both the loss of battery capacity *as well as* Nissan's prescribed limitation on charging their batteries beyond 80% of current capacity.

49.   In February 2012, in an apparent attempt to address concerns about the thermal management defect, Nissan posted an article on its website stating:

> "**A battery that can control its heating temperature without a cooling mechanism is also longer lasting,** since the biggest cause of a battery's lifespan being shortened is overheating.  (Nissan Technology Magazine, *017 Why did Nissan Develop an EV Battery?* (August 28, 2012), http://www.nissan-global.com/EN/TECHNOLOGY/MAGAZINE/ev_battery.html) (emphasis added).

50.   In 2010, Wired magazine reported that, according to Nissan product

---

[4] Nissan Technology Magazine, *017 Why did Nissan Develop an EV Battery?* (August 28, 2012), http://www.nissan-global.com/EN/TECHNOLOGY/MAGAZINE/ev_battery.html.

planner Paul Hawson, Nissan decided to omit an active thermal management

system in order to save room in the car's interior:

> Asked why Nissan chose not to use active thermal management, Hawson explained the engineers experimented with it but found it required a central tunnel on top of the pack. That would intrude on cabin space, splitting the rear bench into two seats with a hump in the middle. Nissan, he said, decided to use only passive cooling to preserve passenger space. (Darryl Siry, *In Race to Market, Nissan's Electric Car Takes Shortcuts* (August 31, 2012), http://www.wired.com/autopia/2010/01/nissan-leaf-2/))

51.     Plaintiffs are informed and believe and based thereon allege that Defendant knew or should have known that the Class Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Defendant has actively concealed and failed to disclose this defect from Plaintiffs and the Class Members at the time of purchase or lease and thereafter.

52.     Since 2010, if not before, Nissan knew that the Class Vehicles and their battery systems were defectively designed. Rather than alerting Class Members and offering to repair the Class Vehicles, Nissan has concealed this problem from its customers at the time of purchase or lease and thereafter.

53.     Defendant knew of and concealed the thermal management defect that is present in every Class Vehicle, along with the attendant lack of warranty coverage and associated repair costs, from Plaintiffs and Class Members, at the time of sale, lease, and repair and thereafter. The existence of the thermal management defect is a fact that a reasonable consumer would consider material when deciding whether to purchase or lease an electric vehicle with an advertised range of 100 miles per charge or less.

54.     Reasonable consumers, like Plaintiffs, expect and assume that an electric vehicle will achieve range advertised by its manufacturer, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiffs

and Class Members further expect and assume that Nissan will not sell or lease vehicles with known defects, such as the thermal management defect, and will disclose any such defects to its consumers when it learns of them.  They do not expect Nissan to fail to disclose the thermal management defect to them or to continually deny the defect.

55.    As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

56.    As a result of the thermal management defect, Plaintiffs and the Class Members were harmed and suffered actual damages. Had Plaintiffs and other Class Members known of the thermal management defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Further, Plaintiffs and the Class Members were harmed in that the Class Vehicles suffer unexpected battery deterioration damage and resultant premature loss of battery and diminution in value.

**Nissan's Knowledge of the Thermal Management Defect**

57.    Dating back to 2010, if not before, Nissan was aware of the thermal management defect.  Nissan, however, failed and refused to disclose this known defect to consumers.  As a result of this failure, Plaintiffs and Class Members have been damaged.

58.    For example, in 2009, before the Leaf was released, Elon Musk, CEO of Tesla Motors, described the Leaf's thermal management system as "primitive," due to its failure to actively cool the batteries.  Musk predicted that due to Nissan's failure to include an active thermal management system in the Leaf, its battery would experience temperatures "all over the place," causing it to suffer "huge degradation" in cold environments and to basically "shut off" in hot environments.

59.     Nissan also has a long history of studying lithium ion electric batteries and is thus well versed in their chemical properties, limits, and tolerances.  According to a 2012 Nissan PowerPoint presentation entitled "EV / HEV Safety," Nissan has been studying batteries for electric vehicles since 1992:

> "We started Lithium battery research in 1992, beginning with a cobalt type battery in a cylindrical cell package.  In the late 90's, we started developing a [Manganese]-type cell and in the early 2000's developed a laminated cell.  This led to the current cell configuration."

60.     In 2010, battery expert Menahem Anderman was quoted in an Automotive Engineering Online article expressing skepticism over the Leaf battery and the thermal management defect herein alleged:

> Without proper cooling technology, "a pouch cell design with a manganese chemistry will perform very poorly" in hot climates, said Anderman of the Leaf battery.  "Can you expect 10 years from the battery? Definitely not in Phoenix, I'm pretty sure not in L.A., and I'm not sure about San Francisco and Atlanta." (Patrick Ponticel, *Battery guru a skeptic about Leaf, Volt batteries* (August 29, 2012), http://www.sae.org/mags/aei/8299).

61.     Nissan was contacted by Automotive Engineering online in 2010 to respond to the expert's concerns, and was thus aware of the thermal management defect:

> Contacted by AEI for comment, Nissan North America Manager of Technology Communications Colin Price stated:  "We are confident [the cells] will dissipate heat well and anticipate the battery pack will have 70 to 80% of capacity left after 10 years of automotive use." (*Id.*)

62.     In addition, complaints filed by consumers with the NHTSA and posted on the Internet demonstrate indicate Defendant's awareness of the defect and that problems with the thermal management system are widespread.

63.     Many purchasers and lessees of the Class Vehicles have experienced

problems with premature battery capacity loss.  The following are some complaints relating to thermal management system failure (spelling and grammar mistakes remain as found in the original) (Safecar.gov, *Search for Complaints* (August 28, 2012), http://www-odi.nhtsa.dot.gov/complaints/):

**NHTSA Complaints:**

a. [2011 NISSAN LEAF] LOST FIRST BATTERY CAPACITY BAR AFTER ONE YEAR OF OWNERSHIP. THIS RESULTS IN A 15% LOSS IN CAPACITY. DIFFICULTIES ARE OCCURING TO ACHIEVE DRIVING DISTANCES AND HABITS FROM THE PREVIOUS YEAR. VEHICLE WILL SOON NO LONGER FUNCTION AS AN FORM OF TRANSPORTATION IF RANGE CONTINUES TO DIMINISH. THE CAPACITY LOSS SEEMS TO BE A DEFECT IN THE BATTERY AND IS UNACCEPTABLE TO LOOSE A LARGE AMOUNT IN A SHORT TIME FRAME. *TR

b. 2011 NISSAN LEAF ELECTRIC VEHICLE, PURCHASED ON 8/6/2011, LOST A BATTERY CAPACITY BAR ON 06/21/2012 - 10 MONTHS, 15 DAYS AFTER PURCHASE. THIS IS A 15% LOSS OF BATTERY CAPACITY. NISSAN ADVERTISES AN EXPECTED 80% CAPACITY REMAINING AFTER 5 YEARS. I TOOK THE CAR TO THE DEALER THE NEXT DAY FOR INSPECTION AND WAS TOLD MY BATTERY IS "NORMAL." AND SO IS THE LOST CAPACITY. I DISAGREE AND BELIEVE THE BATTERIES NISSAN IS USING IN THIS CAR ARE UNFIT FOR THE HIGH TEMPERATURES IN MY LOCAL AREA OF PHOENIX, AZ. *TR

c. [2011 NISSAN LEAF] BATTERY CAPACITY HAS DECREASED OVER 15%, IN JUST 7200 MILES. PLEASE INVESTIGATE DEFECT IN NISSAN LEAF BATTERY. PLEASE HAVE NISSAN INSTITUTE RECALL FOR DEFECTIVE BATTERIES IN 2011/2012 NISSAN LEAF VEHICLES. *TR

d. [2011 NISSAN LEAF] THE NISSAN LEAF IS A 100% BATTERY OPERATED VEHICLE. THERE IS A BUILT-IN BATTERY CAPACITY INDICATOR THAT IS DISPLAYED AS 12 INDICATOR BARS. EACH BAR REPRESENTS A % OF THE BATTERIES CAPACITY TO HOLD A CHARGE. NISSAN CLAIMS THAT GRADUAL CAPACITY LOSS IS NORMAL AND THAT DRIVER SHOULD EXPECT TO HAVE 80% OF THEIR CAPACITY LEFT AFTER 5 YEARS

AND 70% AFTER 10. I LOST MY FIRST BAR AT THE BEGINNING OF APRIL, SECOND BAR FIRST WEEK OF JUNE, AND THIRD BAR FIRST WEEK OF JULY. NISSAN HAS NOT DEFINED WHAT THESE BARS MEAN, HOWEVER, I DO NOT BELIEVE THAT THE LOSS OF THREE BARS IN 4 MONTHS AFTER OWNING THE CAR FOR A YEAR IS GRADUAL. I HAVE SENT MY CAR TO 2 DIFFERENT NISSAN DEALERSHIPS AND EVEN LET NISSAN NORTH AMERICA TAKE MY CAR FOR 16 DAYS FOR TESTING. SO FAR, NISSAN HAS TOLD ME THAT EVERYTHING IS NORMAL. I BELIEVE THAT HAVING A 100% BATTERY OPERATED VEHICLE MARKETED TO A MASS CUSTOMER BASE AND BEING DRIVEN ON OUR STREETS AND HIGHWAYS SHOULD HAVE A DEPENDABLE BATTERY. *TR

e.  [2011 NISSAN LEAF] THE PROBLEM IS THE BATTERY, WE WHERE TOLD BY NISSAN THAT THERE WOULD BE A SLOW LOSS OF CAPACITY AND UP TO 20% LOSS AT 5 YEARS. THIS IS ONLY IN HOT CLIMATES LIKE ARIZONA, TX AND CA. THE CAR SHOULD HAVE HAD A BATTERY COOLING SYSTEM. *TR NOW AFTER PAY $40,000 FOR THE CAR IN THE FIRST YEAR MY DRIVING RANGE IS DOWN SO MUCH IN MY SECOND YEAR THE CAR WILL BE WORTHLESS TO DRIVE OR SELL. *TR

f.  [2011 NISSAN LEAF] MY NISSAN LEAF HAS EXPERIENCED A 1 CAPACITY BAR LOSS FOR IT'S LITHIUM-ION BATTERY, REDUCING THE AMOUNT OF AVAILABLE MILES TO DRIVE. I BELIEVE THAT THIS IS PREMATURE AND THAT THIS IS IN RELATION TO LIVING IN A HOT WEATHER CLIMATE AREA (SUMMER MONTHS). NISSAN HAS BEEN INFORMED BY ME OF THIS CONDITION. THIS IS NOT THE ONLY INSTANCE, IF POSSIBLE, PLEASE SEE ATTACHED SITE: HTTP://MYNISSANLEAF.COM/WIKI/INDEX.PHP?TITLE=REAL_WORLD_BATTERY_CAPACITY_LOSS. *TR

**Internet Postings:**

g.  I live in Phoenix, I lost my First bar at the beginning of April, Second bar first week of June, and Third bar First week of July. I still love my Leaf, but it will not get me to work 1-way in the next few weeks (45 miles). 2 different dealerships have told me this is normal . . . . Update! I got my car back today from Nissan's 2 week testing in Casa Grande. My Nissan Dealership was not able to tell me much about what was done to my car, but I still have 3 Battery Capacity Bars missing and the Leaf's

Mileage Guess-O-Meter is still reading on 48 mile estimated range on 100% charge with climate control on. I don't know when, or even if I will ever find out what was done to my car, or if Nissan has or is planning a fix. I was hoping to have better information from Nissan for this update, but alas, this is what I was given, or should I say not given. (Nissan Leaf Facebook Page, *Nissan North America on the Balancing Act* (August 29, 2012), http://www.facebook.com/nissanleaf/posts/ 142423552561869)

h. I lost my third capacity bar on my LEAF a few days ago and throught this might be interesting information to add to your list.I lost the first bar at 3500 miles after just 3.5 month (End of June to Beginning of October - so all through summer). I lost the second at 10500 miles after 12 month (just before the yearly battery check or just at the start of the next summer). I lost my third capacity bar at Aug 14, 12000miles, Chandler, AZ, 12000 miles, owned: 14 months (just after we hit 118F). I reported the first one immediately and they had the car for a cople of days and told me afterwards that this is "normal". I didn't get a case number for this, but I still have the initial email response, the battery report and the phone number of the engineer." (Nissan Leaf Facebook Page, *Nissan North America on the Balancing Act* (August 29, 2012), http://www.facebook.com/nissanleaf/posts/ 142423552561869 )

i. Lost 3rd Bar, down to 9 bars only! (My Nissan Wiki, *Real World Battery Capacity Loss*(August 29, 2012), http://www.mynissanleaf.com/wiki/index.php?title=Real_World_ Battery_Capacity_Loss)

j. Took delivery on my Leaf in July '11. Lost first bar around Aug 1st, 2012 and my second bar today (1 month and 850 miles later). I hope Nissan will get info out to Leaf owners soon. Living in Phoenix. (Nissan Leaf Facebook Page, *Nissan North America on the Balancing Act* (August 29, 2012), http://www.facebook.com/nissanleaf/posts/142423552561869 )

k. I live in Oklahoma and at the concern of having a huge 38k paper weight I am not driving my leaf. We are having temps between 105 - 110 for the next two weeks!!!!!! I am really irritated, I did not spend 38,000.00 for it to sit in my garage. That might not even help because my garage was 105 yesterday!!!! (Nikki Gordon- Bloomfield, *Nissan Responds to Wilting Arizona Leafs, Studies Lost Battery Capacity Page 2* (August 29, 2012), http://www.greencarreports.com/news/1077971 nissan-responds-to-wilting-arizonan-leafs-studies-lost-battery-capacity/page-2)

First Amended Class Action Complaint

l. 26 days between losing capacity bar one and bar two. (My Nissan Wiki, *Real World Battery Capacity Loss*(August 29, 2012), http://www.mynissanleaf.com/wiki/index.php?title=Real_World_Battery_Capacity_Loss)

m. [Lost second capacity bar] 3,446 miles from first bar loss. Estimated range: 12 bars (last summer) ~ mid 80's total range; 11 bars (early 2012 summer) ~ mid 70's range; 10 bars (end 2012 summer) ~ high 60's range..." (My Nissan Wiki, *Real World Battery Capacity Loss*(August 29, 2012), http://www.mynissanleaf.com/wiki/index.php?title=Real_World_Battery_Capacity_Loss)

n. [Lost second capacity bar] 90% of my charging is in my garage to 80% overnight with 6 temp bars at start. Car is garaged at work and never left outside baking in the sun for any extended period of time." (My Nissan Wiki, *Real World Battery Capacity Loss*(August 29, 2012), http://www.mynissanleaf.com/wiki/index.php?title=Real_World_Battery_Capacity_Loss)

64. Nissan also had superior and exclusive knowledge of the thermal management defect, and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

65. Plaintiffs are informed and believe and based thereon allege that before Plaintiffs leased and purchased their vehicles, and since 2010, if not before, Nissan knew about the thermal management defect through sources not available to consumers, including pre-release testing data, early consumer complaints about the thermal management defects to Nissan and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, aggregate data from Nissan dealers, technical automotive publications criticising the thermal management system in the Class Vehicles, among other internal sources of aggregate information about the problem.

66. While Nissan has been fully aware of the thermal management defect in the Class Vehicles, it actively concealed the existence and nature of the

defect from Plaintiffs and Class Members at the time of purchase, lease, service visit, and thereafter.  Specifically, Nissan failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

>   (a)   any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the battery systems;
>
>   (b)   that the Class Vehicles, including their battery systems, were not in good in working order, were defective, and were not fit for their intended purposes; and
>
>   (c)   that the Class Vehicles and the design of their battery systems were defective, despite the fact that Nissan learned of such defects through analysis as early as 2010, and through alarming capacity decline, customer complaints, and through other internal sources, as early as 2011.

67.   When consumers present the Class Vehicles to an authorized Nissan dealer complaining of premature battery capacity loss, consumers are typically told that the situation is "normal"[5] even where the battery has lost 27.5% or more of its capacity in less than two (2) years due to the thermal management defect.

68.   To this day, Nissan still has not notified Plaintiffs and the Class Members that the Class Vehicles suffer from a systemic defect that causes the batteries to prematurely lose capacity.

---

[5] For example, one consumer complained online as follows:  "I live in Phoenix, I lost my First bar at the beginning of April, Second bar first week of June, and Third bar First week of July. I still love my Leaf, but it will not get me to work 1-way in the next few weeks (45 miles). 2 different dealerships have told me this is normal." (My Nissan Wiki, *Real World Battery Capacity Loss* (August 29, 2012), http://www.mynissanleaf.com/wiki/index.php?title=Real_World_Battery_Capacity_Loss).

**CLASS ACTION ALLEGATIONS**

69.     Plaintiff Klee brings this lawsuit for injunctive relief, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), on behalf of himself and all persons in the United States who purchased or leased any 2011 through 2012 Nissan Leaf vehicles, excluding fleet and government purchasers and lessees (the "Nationwide Class" or "Class") and on behalf of a California Sub-Class defined as all  Class Members in California and/or California Class Members who are "consumers" within the meaning of California Civil Code § 1761(d) , excluding fleet and government purchasers and lessees ("the California Sub-Class" or "Sub-Class").

70.     To the extent that the Nationwide Class remedy involves any monetary relief, such monetary relief would be incidental to the injunctive relief sought.  As the wrongs alleged apply equally and identically to all class members and flow directly from liability to the class as a whole on the claims forming the injunctive relief, no individualized facts or additional hearings would be required.  Proof of purchase of the vehicle (i.e., proof of harm) entitles each class member to the same relief for the wrongs alleged.  Moreover, any restitution or monetary relief would be formulaic and objectively calculable and not dependent in any significant way on subjective differences between class members.

71.     Plaintiff Wallak brings this lawsuit as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of himself and all persons in Arizona who purchased or leased any 2011 through 2012 Nissan Leaf vehicles, excluding fleet and government purchasers and lessees (the "Arizona Class").

72.     Excluded from the Classes and Sub-Class are:  (1) Defendant and its parent Nissan Motor Co., Ltd., any entity or division in which they have a controlling interest, and their legal representatives, officers, directors, assigns,

and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

73.    Numerosity:  Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the California Department of Motor Vehicles and the Arizona Department of Transportation.

74.    Typicality:  The claims of representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, purchased and leased a Class Vehicle designed, manufactured, and distributed by Nissan and containing a battery power supply that suffers from the thermal management defect.  The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have purchased or leased a vehicle with an undisclosed thermal management system defect that has or will result in heat related damage to the battery and resulting battery capacity loss.  The representative Plaintiffs, like all Class Members, have also been damaged by Defendant's misrepresentations and omissions with regard to vehicle range in that they purchased vehicles which do not perform as advertised.  Furthermore, the factual bases of Nissan's misconduct are common to all Class Members and represent a common thread resulting in injury to all Class Members.

75.    Commonality:  There are numerous questions of law and fact

common to Plaintiffs and the Class that predominate over any question affecting only individual Class Members.  These common legal and factual issues include the following:

(a)    Whether Class Vehicles suffer from defects relating to the thermal management system;

(b)    Whether Defendant knows about the defects relating to the battery system and, if so, how long Defendant has known of the defect;

(c)    Whether the defective nature of the battery system constitutes a material fact;

(d)    Whether Defendant had a duty to disclose the defective nature of the battery system to Plaintiffs and Class Members;

(e)    Whether Defendant advertised the Class Vehicles to the Class throughout the United States with materially deceptive, untrue, or misleading statements regarding vehicle range;

(f)    Whether Defendant made materially untrue or misleading statements of facts to the Class concerning the advertised vehicle ranges;

(g)    Whether Defendant concealed from or omitted to state material facts to the Class concerning the actual vehicle ranges of the Class Vehicles;

(h)    Whether Defendant knew or, by the exercise of reasonable care, should have known, that the materially misleading statements of fact made to the Class about the vehicle ranges had the capacity or tendency to confuse and mislead;

(i)    Whether Plaintiff Klee and the Nationwide and/or California Sub-Class Members are entitled to equitable relief, including

but not limited to a preliminary and/or permanent injunction;

(j)     Whether Plaintiff Wallak and the other Arizona Class Members are entitled to damages;

(k)     Whether Defendant knew or reasonably should have known of the defects relating to the battery system before they sold and leased Class Vehicles to Class Members;

(l)     Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective battery systems; and

(m)     Whether Defendant breached the implied warranty of merchantability pursuant to the Song-Beverly Act as to the California Class.

76.     <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

77.     <u>Predominance and Superiority as to the Arizona Class</u>:  A class action for damages in Arizona is superior to other available methods for the fair and efficient adjudication of the controversy in Arizona as the Arizona Consumer Fraud Act does not provide for an injunction as statutory relief.  Absent a class action, most Arizona Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.  Absent a class action, Arizona Class Members will continue to incur damages, and Defendant's misconduct will

1 | continue without remedy.  Class treatment of common questions of law and fact
2 | would also be a superior method to multiple individual actions or piecemeal
3 | litigation in that class treatment will conserve the resources of the courts and the
4 | litigants, and will promote consistency and efficiency of adjudication.

5 |        78.    <u>23(b) (2) as to the Class and Sub Class</u>:  Final injunctive relief or
6 | corresponding declaratory relief, as expressly provided in California under the
7 | CLRA, the UCL and the Song Beverly Consumer Warranty Act, is appropriate
8 | respecting the class as a whole because Defendant has acted or refused to act on
9 | grounds that apply generally to the Class and Sub-Class.  A single injunction
10 | would provide relief to each member of the Class.  Defendant's
11 | misrepresentations and wrongful conduct was identical to each class member.  A
12 | determination as to the common issues under Rule 23(a) will, in one stroke,
13 | permit the fact finder to grant the injunctive relief sought.  Such requested relief
14 | does not preclude resolving this matter under Rule 23(b) and the notice and opt-
15 | out provisions thereunder.

**FIRST CAUSE OF ACTION**

**(Violation of California's Consumer Legal Remedies Act,**

**California Civil Code § 1750, *et seq*.**

**By Plaintiff Klee On Behalf of the Class and Sub-Class)**

20 |        79.    Plaintiffs hereby incorporate by reference the allegations contained
21 | in the preceding paragraphs of this Complaint.

22 |        80.    Plaintiff Humberto Daniel Klee ("Klee") brings this cause of action
23 | on behalf of himself and on behalf of the members of the Class and  Sub-Class.

24 |        81.    Defendant is a "person" as defined by California Civil Code
25 | § 1761(c).

26 |        82.    Klee and Class and Sub-Class Members are "consumers" within the
27 | meaning of California Civil Code § 1761(d) because they purchased their Class

1   Vehicles for personal, family or household use.

2        83.    By failing to disclose and concealing the defective nature of the

3   battery systems from Plaintiffs and prospective Class and Sub-Class Members,

4   Defendant violated California Civil Code § 1770(a), as they represented that the

5   Class Vehicles had characteristics and benefits that they do not have, and

6   represented that the Class Vehicles and their battery systems were of a particular

7   standard, quality, or grade when they were of another. *See* Cal. Civ. Code

8   §§ 1770(a)(5) and (7).

9        84.    Defendant violated section 1770(a)(9) of the CLRA by advertising

10   the vehicles with the intent not to sell the vehicles as advertised.

11        85.    Defendant's unfair and deceptive acts or practices occurred

12   repeatedly in Defendant's trade or business, were capable of deceiving a

13   substantial portion of the purchasing public, and imposed a serious safety risk on

14   the public.

15        86.    Defendant knew that the Class Vehicles and their batteries suffered

16   from an inherent defect, were defectively designed or manufactured, would fail

17   prematurely, and were not suitable for their intended use.

18        87.    Defendant was under a duty to Klee and the Class and Sub-Class

19   Members to disclose the defective nature of the battery systems because:

20              (a)    Defendant was in a superior position to know the true state of

21                     facts about the safety defect in the Class Vehicles' battery

22                     systems;

23              (b)    Plaintiff Klee and the Class and Sub-Class Members could not

24                     reasonably have been expected to learn or discover that their

25                     battery systems had a dangerous safety defect until

26                     manifestation or failure;

27              (c)    Defendant made partial disclosures about the quality of the

28

Class Vehicles without revealing the defective nature of the
Class Vehicles and their battery systems; and

(d)     Defendant knew that Plaintiff Klee and the Class and Sub-
Class and Sub-Class Members could not reasonably have
been expected to learn or discover the safety defect.

88.     In failing to disclose the defective nature of the Class Vehicles and
their batteries, Defendant knowingly and intentionally concealed material facts
and breached its duty not to do so.

89.     In representing that its vehicles would achieve an up to 100 mile
driving range without disclosing that its advertised ranges were only achievable
by charging the battery in a damaging, capacity-reducing manner that is against
Nissan's own recommendations, Defendant knowingly and intentionally
affirmatively misrepresented material facts to Plaintiff Klee and Class and Sub-
Class Members and breached its duty not to do so.

90.     The facts concealed or not disclosed by Defendant to Plaintiff Klee
and the Class and Sub-Class Members are material in that a reasonable consumer
would consider them important in deciding whether to purchase a Class Vehicles
or pay a lesser price.  Had Plaintiff Klee and other Class and Sub-Class Members
known that the Class Vehicles would exhibit heat related battery damage and
consequential loss of battery capacity and driving range due to the thermal
management defect, they would not have purchased the Class Vehicles or would
have paid less for them.  Had Plaintiff Klee and Class and Sub-Class Members
known that Nissan's advertised driving ranges were based on a 100% charge,
and that to mitigate capacity loss, they would need to limit charges to 80%, they
would not have purchased the Class Vehicles or would have paid less for them.

91.     Plaintiff Klee relied on Defendant's misrepresentations and
omissions. Plaintiff Klee and the Class and Sub-Class Members are reasonable

consumers who do not expect their driving ranges and battery capacities to precipitously drop due to a thermal management defect. This is the reasonable and objective consumer expectation relating to contemporary mass production vehicles.

92.     As a result of Defendant's conduct, Plaintiff Klee and Class and Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles have experienced and will continue to experience heat related battery damage and consequential loss of battery capacity and driving range due to the defect herein alleged.

93.     As a result of Defendant's conduct, Plaintiff Klee and Class and Sub-Class Members were harmed and suffered actual damages as a result of Defendant's misrepresentations and omissions with regard to vehicle range in that they purchased vehicles which do not perform as advertised.

94.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff Klee and Class and Sub-Class Members suffered and will continue to suffer actual damages.

95.     Plaintiff Klee and the Class are entitled to equitable relief.

96.     Plaintiff Klee provided Defendant with notice of its alleged violations of the CLRA pursuant to California Civil Code § 1782(a).

## SECOND CAUSE OF ACTION

**(Violation of California Business & Professions Code § 17200, *et seq.***

**By Plaintiff Klee**

**On Behalf of the Nationwide Class and California Sub-Class)**

97.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     Plaintiff Klee brings this cause of action on behalf of themselves and on behalf of all Nationwide Class Members and California Sub-Class

1  Members.

2      99.    California Business & Professions Code § 17200 prohibits acts of

3  "unfair competition," including any "unlawful, unfair or fraudulent business act

4  or practice" and "unfair, deceptive, untrue or misleading advertising."

5      100.   Plaintiff Klee and the Class and Sub-Class Members are reasonable

6  consumers who do not expect their vehicles to exhibit heat related battery

7  damage and consequential loss of battery capacity and driving range due to the

8  defect herein alleged.

9      101.   Plaintiff Klee and the Class and Sub-Class Members are reasonable

10 consumers who do not expect Nissan to base its advertised driving ranges on a

11 fully charged battery without disclosing that Class and Sub-Class Members

12 would need to avoid charging the battery beyond 80% capacity to mitigate long

13 term battery capacity loss.

14     102.   Defendant knew the Class Vehicles and their battery systems

15 suffered from inherent defects, were defectively designed or manufactured,

16 would fail prematurely, and were not suitable for their intended use.

17     103.   In failing to disclose the thermal management defect, Defendant

18 knowingly and intentionally concealed material facts and breached its duty not to

19 do so.

20     104.   In representing that its vehicles would achieve an up to 100 mile

21 driving range without disclosing that its advertised ranges were only achievable

22 by charging the battery in a damaging, capacity-reducing manner that is against

23 Nissan's own recommendations, Defendant has knowingly and intentionally

24 affirmatively misrepresented material facts and breached its duty not to do so.

25     105.   Defendant was under a duty to Plaintiff Klee and the Class and Sub-

26 Class Members to disclose the defective nature of the Class Vehicles and their

27 battery systems:

28

FIRST AMENDED CLASS ACTION COMPLAINT

(a)     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' battery systems;

(b)     Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their battery systems; and

(c)     Defendant actively concealed the defective nature of the Class Vehicles and their battery systems from Plaintiff Klee and the Class.

106.   Had Plaintiff Klee and other Class and Sub-Class Members known that the Class Vehicles would exhibit heat related battery damage and consequential loss of battery capacity and driving range due to the defect herein alleged, they would not have purchased the Class Vehicles or would have paid less for them.

107.   Plaintiff Klee relied on Defendant's misrepresentations and omissions.  Had Plaintiff Klee and Class and Sub-Class Members known that Nissan's advertised driving ranges were based on a 100% charge, but that to mitigate capacity loss, they would need to limit charges to 80%, they would not have purchased the Class Vehicles or would have paid less for them.

108.   Defendant continued to conceal the defective nature of the Class Vehicles and their battery systems even after Class and Sub-Class Members began to report problems.  Indeed, Defendant continues to cover up and conceal the true nature of the problem.

109.   By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

110.   Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business, and were capable of deceiving a

1   substantial portion of the purchasing public.

2       111.   Defendant's conduct was likely to deceive a reasonable consumer.

3       112.   Defendant's conduct was unlawful in that, among other things, it

4   violated the California Consumer Legal Remedies Act.

5       113.   As a direct and proximate result of Defendant's unfair and deceptive

6   practices, Plaintiff Klee and the Class have suffered and will continue to suffer

7   actual damages.

8       114.   Defendant has been unjustly enriched and should be required to

9   make restitution to Plaintiff Klee and the Class and Sub-Class pursuant to §§

10  17203 and 17204 of the Business & Professions Code.

11  ### THIRD CAUSE OF ACTION

12  ### (Breach of Implied Warranty Pursuant to

13  ### Song-Beverly Consumer Warranty Act,

14  ### California Civil Code §§ 1792 and 1791.1, *et seq.*

15  ### By Plaintiff Klee On Behalf of the California Sub-Class)

16      115.   Plaintiffs hereby incorporate by reference the allegations contained

17  in the preceding paragraphs of this Complaint.

18      116.   Plaintiff Klee brings this cause of action against Defendant on

19  behalf of himself and on behalf of the members of the California Sub-Class.

20      117.   Defendant was at all relevant times the manufacturer, distributor,

21  warrantor, and/or seller of the Class Vehicles.  Defendant knew or had reason to

22  know of the specific use for which the Class Vehicles were purchased.

23      118.   Defendant provided Plaintiff Klee and California Sub-Class

24  Members with an implied warranty that the Class Vehicles and any parts thereof

25  are merchantable and fit for the ordinary purposes for which they were sold.

26  However, the Class Vehicles are not fit for their ordinary purpose of providing

27  reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles

28

1  and their battery systems suffered from an inherent defect at the time of sale and

2  thereafter are not fit for their particular purpose of providing safe and reliable

3  transportation.

4        119.   Defendant impliedly warranted that the Class Vehicles were of

5  merchantable quality and fit for such use.  This implied warranty included,

6  among other things:  (i) a warranty that the Class Vehicles and their battery

7  systems were manufactured, supplied, distributed, and/or sold by Nissan were

8  safe and reliable for providing transportation; and (ii) a warranty that the Class

9  Vehicles and their battery systems would be fit for their intended use while the

10  Class Vehicles were being operated.

11        120.   Contrary to the applicable implied warranties, the Class Vehicles

12  and their battery systems at the time of sale and thereafter were not fit for their

13  ordinary and intended purpose of providing Plaintiff Klee and the California

14  Sub-Class Members with reliable, durable, and safe transportation.  Instead, the

15  Class Vehicles are defective, including but not limited to the defective design of

16  their battery systems.

17        121.   Defendant's actions, as complained of herein, breached the implied

18  warranty that the Class Vehicles were of merchantable quality and fit for such

19  use in violation of California Civil Code §§ 1792 and 1791.1.

**FOURTH CAUSE OF ACTION**

**(Breach of Implied Warranty Pursuant to Magnuson-Moss Warranty Act,**

**15 U.S.C. §§ 2301 *et seq.,* by Plaintiffs Klee and Wallak on Behalf of the**

**Nationwide Class)**

24        122.   Plaintiffs incorporate by reference each proceeding and succeeding

25  paragraph as applicable as though fully set forth at length herein.

26        123.   Plaintiffs and the other Nationwide Class members are "consumers"

27  within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

28

FIRST AMENDED CLASS ACTION COMPLAINT

124.   Defendant is "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4)-(5).

125.   The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

126.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their battery systems were manufactured, supplied, distributed, and/or sold by Nissan were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their battery systems would be fit for their intended use while the Class Vehicles were being operated.

127.   Contrary to the applicable implied warranties, the Class Vehicles and their battery systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Klee and the Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to the defective design of their battery systems.

128.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

129.   Defendant has been afforded a reasonable opportunity to cure its breach of implied warranty, including when Class Members brought their vehicles in for diagnoses and repair of the battery system.

**FIFTH CAUSE OF ACTION**

**(Breach of the Implied Warranty of Merchantability by Plaintiffs Klee and Wallak on Behalf of the Nationwide Class)**

130.   Plaintiffs incorporate by reference each proceeding and succeeding paragraph as applicable as though fully set forth at length herein.

131.   Defendant is a "merchant" as defined under the Uniform Commercial Code ("UCC") as adopted in California and nationally.

132.   The Class Vehicles are "goods" as defined under the UCC.

133.   Defendant impliedly warranted that the Class Vehicles were of a merchantable quality.

134.   Defendant breached the implied warranty of merchantability, as the Class Vehicles were not of a merchantable quality at the time of sale and thereafter due to the thermal management defect and the associated problems caused by this defect.  Specifically, the thermal management defect can cause severe and premature loss of driving range, battery capacity and battery life.

135.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class Members were injured and are entitled to relief.

136.   Defendant's warranty limitation, if any, is unenforceable because they knowingly sold a defective product without informing consumers about the defect and actively concealed the defect from Class Members in order to allow the applicable warranty period to run.

137.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and Class Members.  Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and Class Members, and Defendant knew or should have known that the Class

1   Vehicles were defective at the time of sale and that the batteries would fail well
2   before their useful lives.

3       138.   Plaintiffs and Class Members have complied with all obligations
4   under the warranty, or otherwise have been excused from performance of said
5   obligations as a result of Defendant's conduct described herein.

**SIXTH CAUSE OF ACTION**

**(Negligent Misrepresentation**

**By Plaintiff Wallak On Behalf of the Arizona Class)**

9       139.   Plaintiffs incorporate by reference each proceeding and succeeding
10   paragraph as applicable as though fully set forth at length herein.

11      140.   Defendant provided false and/or incorrect information to Plaintiff
12   Wallak and the members of the Arizona Class about the range and the lack of a
13   thermal management defect in the Class Vehicles at the time of sale.

14      141.   Also at the time of sale, Defendant omitted and/or failed to disclose
15   material information to Plaintiff Wallak and the members of the Arizona Class
16   about the range and the lack of a thermal management defect in the Class
17   Vehicles.

18      142.   Defendant intended that Plaintiff Wallak and the members of the
19   Arizona Class rely on these misrepresentations and/or omissions.

20          143.       Defendant failed to exercise reasonable care in
21                  obtaining and communicating these misrepresentations and/or
22                  omissions.

23      144.   Plaintiff Wallak and the members of the Arizona Class reasonable
24   relied on Defendant's material misrepresentations and/or omissions.

25      145.   As a direct and proximate result of Defendant's misrepresentations
26   and/or omissions, Plaintiff Wallak and Class Members were injured.

27      146.   Wallak and the Class were unaware of these misrepresentations and

28

1    reasonably could not have discovered them when they purchased their

2    automobiles from Nissan.

### SEVENTH CAUSE OF ACTION

### (Violation of the Arizona Consumer Fraud Act,

### Ariz. Rev. Stat. §§ 44-1521 *et seq.*

### By Plaintiff Wallak On Behalf of as to the Arizona Class Only)

7        147.   Plaintiffs hereby incorporate by reference the allegations contained

8    in the preceding paragraphs of this complaint.

9        148.   Defendant knew that the Class Vehicles and their batteries suffered

10   from an inherent defect, were defectively designed or manufactured, would fail

11   prematurely, and were not suitable for their intended use.

12       149.   In representing that its vehicles would achieve an up to 100 mile

13   driving range without disclosing that its advertised ranges were only achievable

14   by charging the battery in a damaging, capacity-reducing manner that is against

15   Nissan's own recommendations, Defendant knowingly and intentionally

16   misrepresented and omitted material facts and breached its duty not to do so.

17       150.   Plaintiff Wallak and Class Members reasonably relied on

18   Defendant's material misrepresentations and omissions in its advertisements of

19   the Class Vehicles and in the purchase of the Class Vehicles.

20       151.   Nissan's use of deception, false promises, misrepresentations and

21   material omissions in connection with the sale and advertisement of its services,

22   violates the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

23       152.   Had Plaintiff Wallak and other Class Members known that the Class

24   Vehicles would exhibit heat related battery damage and consequential loss of

25   battery capacity and driving range due to the defect herein alleged, they would

26   not have purchased the Class Vehicles or would have paid less for them.

27       153.   Had Plaintiff Wallak and Class Members known that Nissan's

28

FIRST AMENDED CLASS ACTION COMPLAINT

advertised driving ranges were based on a 100% charge, but that to mitigate capacity loss, they would need to limit charges to 80%, they would not have purchased the Class Vehicles or would have paid less for them.

154.   Plaintiff Wallak and the Class suffered injury in fact to a legally protected interest.  As a result of Defendant's conduct, Plaintiff Wallak and Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience heat related battery damage and consequential loss of battery capacity and driving range due to the thermal management defect.  Had Plaintiff Wallak and other Class Members known of the thermal management defect, they would not have purchased or leased the Class Vehicles or would have paid less for them.

155.   As a result of Defendant's conduct, Plaintiff Wallak and Class Members were harmed and suffered actual damages as a result of Defendant's misrepresentations and omissions with regard to vehicle range because they purchased vehicles which do not perform as advertised.

156.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff Wallak and Class Members suffered and will continue to suffer actual damages.

## RELIEF REQUESTED

Plaintiffs, on behalf of themselves and Class Members request the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Classes and Sub-Classes, designating Plaintiffs as named representative of the Class, and designating the undersigned as Class Counsel;

(b)   On behalf of the Nationwide Class and California Sub-Class, an order enjoining Nissan from selling the Leaf with the misleading information;  enjoining Nissan from

misrepresenting the mileage range of the Nissan Leaf and compelling Nissan to issue corrective disclosures; compelling Nissan to remove and replace Plaintiffs and Class Members' battery systems with a suitable alternative product; compelling Nissan to provide class members with a new battery for the Leaf that does not contain the defects alleged herein; and/or compelling Nissan to reform its Leaf battery warranty, in a manner deemed to be appropriate by the Court, to cover the loss of battery capacity under warranty as alleged herein and to notify all class members that such warranty has been reformed.

(c)   On behalf of the Arizona Class, damages, including all monies paid by Plaintiff and Class Members for any repairs that had to be made and all monies attributable to diminution in value of the Class Vehicles;

(d)   An award of pre-judgment and post-judgment interest, as provided by law;

(e)   Leave to amend the Complaint to conform to the evidence produced at trial;

(f)   An award of attorneys' fees and costs, as allowed by law, including an award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5, the Consumer Legal Remedies Act, and the Song Beverly Consumer Warranty Act, and Arizona statutes; and

(g)   Such other relief as may be appropriate under the circumstances.

FIRST AMENDED CLASS ACTION COMPLAINT

1

## DEMAND FOR JURY TRIAL

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a

3     trial by jury of any and all issues in this action so triable of right.

4

5     Dated:  December 14, 2012                    Respectfully submitted,

6                                                  Capstone Law APC

7

8                                          By: /s/ Jordan L. Lurie
                                               Jordan L. Lurie
9                                              Tarek H. Zohdy

10                                             Attorneys for Plaintiffs
                                               Humberto Daniel Klee and David Wallak

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

**CERTIFICATE OF SERVICE**

UNITED STATES DISTRICT COURT    )

                        )        SS

CENTRAL DISTRICT OF CALIFORNIA  )

        I am employed in the State of California, County of Los Angeles.  I am over the age of 18 and not a party to the within suit; my business address is 1840 Century Park East, Suite 450, Los Angeles, California 90067.

On **December 14, 2012**, I served the documents described as: 1) **FIRST AMENDED CLASS ACTION COMPLAINT** on the interested parties in this action by sending on the interested parties in this action by sending [ ] the original [or] [✓] a true copy thereof [✓] to interested parties as follows [or] [✓]] as stated on the attached service list:

[✓]    **BY MAIL (ENCLOSED IN A SEALED ENVELOPE):** I deposited the envelope(s) for mailing in the ordinary course of business at Los Angeles, California.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  Under that practice, sealed envelopes are deposited with the U.S. Postal Service that same day in the ordinary course of business with postage thereon fully prepaid at Los Angeles, California.

[ ]    **BY E-MAIL:** I hereby certify that this document was served from Los Angeles, California, by e-mail delivery on the parties listed herein at their most recent known e-mail address or e-mail of record in this action.

[ ]    **BY FAX:** I hereby certify that this document was served from Los Angeles, California, by facsimile delivery on the parties listed herein at their most recent fax number of record in this action.

[ ]    **BY PERSONAL SERVICE:** I caused to be delivered by messenger such envelope(s) by hand to the office of the addressee(s).

[ ]    **BY OVERNIGHT DELIVERY:** I am "readily familiar" with this firm's practice of collection and processing correspondence for overnight delivery.  Under that practice, overnight packages are enclosed in a sealed envelope with a packing slip attached thereto fully prepaid.  The packages are picked up by the carrier at our offices or delivered by our office to a designated collection site.

[✓ ]    **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

        Executed this **December 14, 2012**, at Los Angeles, California.

Arvin Ratanavongse
_____              _____
Type or Print Name                               Signature

SERVICE LIST

**Gene Arthur Meneses**
Initiative Legal Group APC
1800 Century Park East Mezzanine
Los Angeles, CA 90067
310-556-5637
Fax: 310-861-9051
Email: AMeneses@initiativelegal.com

**Paul J Riehle**
Sedgwick LLP
333 Bush Street 30th Floor
San Francisco, CA 94104