# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| HUMBERTO DANIEL KLEE AND DAVID WALLAK, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>NISSAN NORTH AMERICAN, INC.,<br><br>Defendant. | No. CV12-08238 DDP (PJWx)<br><br>Hon. Dean D. Pregerson<br><br>**OBJECTION TO CLASS ACTION SETTLEMENT** |

## I.   INFORMATION REQUIRED BY CLASS ACTION NOTICE

(1)   The name of the lawsuit is in the caption.

(2)   Objectors are:

Alex Kozinski and Marcy Tiffany
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
310-541-5885 (home)
424-247-8250 X304 (MT Office)
310-748-1332 (MT cell)

(3)   We currently own a Nissan LEAF SL Vehicle, known as "Pearl," which we

purchased new from Nissan of Fontana on or about May 29, 2011.

(4)     VIN # JN1AZ0CP8BT003364

(5)     The odometer changes daily, of course, but it's somewhere around 37,484 miles as of the date of this filing.

(6)     The objections are detailed at length below.

(7)     We have not objected to any class action settlement during the last 5 years.

(8)     The evidence we want the court to consider will be detailed below, during the course of stating our objections.

(9)     Objectors intend to appear at the Fairness Hearing, on November 18, 2013.

(10)    Objectors do not intend to call any witnesses but may call counsel for the parties to testify as to details concerning the settlement negotiations, discovery and other matters pertaining to the conduct of the lawsuit.

(11)    Our signatures are on the last page of this document.

## II.    SUMMARY OF OBJECTIONS

The proposed settlement is a sham, benefitting only class counsel, Named Plaintiffs and Nissan.  Class members are getting absolutely nothing of value, while having their rights abrogated.  The class lawyers will benefit to the tune of $1.9 million; the Named Plaintiffs will get $5,000 each; and Nissan will reap

2

waivers from 18,000+ class members whose product-defect and related claims will be barred by the proposed settlement. This is doubtless a great deal for Nissan, which manages to buy itself peace, just as certain of the defects with the Nissan LEAF battery are becoming apparent to consumers. And it's easy money for Plaintiffs' Counsel, who have clearly placed their interests above those of the class to whom they owe fiduciary duties. With respect, this court should not allow it.

As more fully detailed below, we urge the court to reject this bogus "settlement;" reject Capstone as class counsel and commence a process for selecting new class counsel; and appoint a Special Master to determine whether counsel should be sanctioned for their lack of candor to the court and betrayal of the class.

## III.   DETAILED OBJECTIONS

### 1.   The Settlement is not Fair Because Class Members (Other than the Named Plaintiffs) Get Nothing of Value

The class action notice is deceptively worded to suggest that class members will receive a benefit if the proposed settlement is approved, and that this benefit will be lost if the settlement is not approved or forsaken by those class members who opt out. And this supposed benefit is as follows:

If you are a Settlement Class Member, your 2011 and/or 2012

3

Nissan New Electric Vehicle Limited Warranty will be modified to include coverage against capacity loss below nine bars of capacity, as shown on the vehicle's capacity gauge, for a period of 60 months or 60,000 miles, whichever occurs first, under the terms, limitations and exclusions provided by the Nissan New Electric Vehicle Limited Warranty.  In other words, if your Nissan LEAF™ experiences capacity loss below nine bars of capacity for a period of 60 months or 60,000 miles, whichever occurs first, and you bring your car to an authorized Nissan dealership, the dealer will restore your battery's capacity to nine bars. This warranty is limited by the existing terms in the Nissan New Electric Vehicle Limited Warranty. Nothing else in the Nissan New Electric Vehicle Limited Warranty is changed and all other terms, limitations and exclusions remain in effect.

Class Notice at 4 (emphasis added).  A different part of the notice states that "Excluding yourself means . . . <u>you would not be entitled to receive any benefits</u> pursuant to the settlement . . ." Class Notice at 6 (emphasis added).

The notice also warns that "If the Court does not approve the settlement, <u>Settlement Class Members will not be entitled to receive the settlement benefits</u> described in this Notice." Class Notice at 8 (emphasis added).

Hokum.

As counsel for both parties know perfectly well, Nissan has already modified the warranty for 2011 and 2012 LEAF vehicles, precisely as described above.  The class members were notified of this on various occasions (described below) and it was confirmed in June when Nissan wrote to all LEAF owners

4

notifying them of the amendment to the warranty and including a sticker, to be

attached to the warranty booklet.  A copy of the letter is attached as Exhibit A.  The

sticker looks like this:

**NOTICE:**
In addition to the Lithium-Ion Battery Coverage for defects in materials or workmanship, the Lithium-Ion battery for your 2011 or 2012 Nissan LEAF is now also warranted against capacity loss below nine (9) bars of capacity as shown on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first. All other warranty terms, limitations, and conditions remain unchanged.

Nissan North America WBI/13-015

Neither the letter from Nissan nor the sticker make any reference to the class

action lawsuit.  Neither indicates that the new coverage is conditioned on court

approval of the settlement or on the recipient's continued participation as a class

member.  Instead, the warranty extension was bundled with a routine service

bulletin announcing an update to the LEAF's software.  The warranty extension

was offered unconditionally—apparently as a consumer goodwill gesture and to

meet growing competition by other electric vehicle manufacturers—and has been

fully implemented by Nissan Dealers across the country.  Attached as Exhibit B is

5

a printout of the warranty coverage for Pearl during her recent visit to Glendale Nissan. The printout states as follows:

| WARRANTY | EXPIRATION DATE | MILES |
|---|---|---|
| ELECTRIC VEH SYSTEMS | 05/30/16 | 60,000 |
| EV LI-ION BATTERY CAPACITY WARRANTY | 05/30/16 | 60,000 |

There is no doubt that if class members had a claim under this warranty at any time during June, July, August, September or October—or at any time in the future (within the warranty period)—it would be honored, regardless of whether the Class Action is approved or whether they opted out of the class. The coverage is fully implemented, unconditional and indefeasible.

What, then, is the class getting as a result of the settlement? What are the benefits class members would lose if they opt out? The answer, of course, is nothing. The only thing that will happen to class members if the settlement is approved is that they will lose rights—the rights they have to sue Nissan under the various theories outlined in the complaint. And, of course, class counsel will receive their fat fees for providing zero benefits to the class.

Class counsel make it sound like the additional warranty coverage was implemented as a result of their efforts. The proposed settlement notice mentions the letter from Nissan announcing the new coverage and then inserts this

6

obfuscating sentence: "The letter was sent after the parties negotiated the settlement in this action and contains the same terms as set forth in this Notice." This seems to imply (but carefully avoids saying) that the notice was sent out as a result of the settlement. There are two answers to this: It doesn't matter and it isn't true.

The reason it doesn't matter is obvious to any first-year law student: A settlement is a contract and you can't have a contract based on past consideration. Once Nissan chose, for reasons of its own, to implement the extended warranty coverage prior to approval of the class settlement, that coverage can no longer be a term of the settlement. Disapproval of the settlement will not (contrary to the misleading Settlement Notice) remove the coverage, nor (ditto) will opting out of the class deprive class members of the benefits. So, whatever the provenance of the extended coverage, it's clear that it's been fully implemented and so can't be a benefit of the proposed settlement. The settlement provides class members no other benefit and is thus inherently unfair.

In any event, it's very likely that Nissan implemented the additional coverage independent of the class action settlement, in an effort to meet competition from other electric vehicle auto makers, and to satisfy widespread consumer complaints about the deterioration of the battery. The class action

7

lawsuit seems to have come along just in the nick of time, so Nissan could kill two

birds with one stone: make itself look generous and consumer friendly by

unilaterally providing additional coverage (largely useless coverage, but more on

that below), and wipe out future lawsuits by pesky consumers who find the

additional coverage inadequate. A match made in heaven.

Objectors have no direct proof of this, not having participated in the private

negotiations between class counsel and Nissan, and seek leave to take discovery on

this point, should the court be in doubt and deem it relevant. But the tracks on this

are perfectly clear: We start by noting that neither the settlement nor the settlement

notice nor the motion seeking approval even claim that Nissan's letter augmenting

the LEAF warranty was caused, procured or secured by the class action lawsuit or

the settlement negotiations.

Then there are multiple public statements by Nissan concerning

augmentation of the warranty, none of which attribute it to the settlement or in any

way connect it to the lawsuit. Nissan first announced the warranty augmentation

on its website dedicated to LEAF owners. See http://goo.gl/ozjhwS. On

December 27, 2012, it posted a letter from Andy Palmer, Executive Vice President

of the Nissan Motor Company, addressed to "all our Nissan LEAF owners in the

U.S. and abroad." The letter begins by stating that the "comments today will be

8

specific to Nissan LEAFs in the U.S., but the actions I will explain will apply and be specifically communicated to each owner <u>worldwide</u> in the coming months in accordance with applicable law." (Emphasis added.)  The letter then proceeds to explain the reasons for the change to be announced:

> Throughout the latter half of this year, our technical teams have worked diligently to ensure that the batteries installed in Nissan LEAFs were operating to specification.  As we've gone through this process, <u>we have listened to your concerns</u>, and have communicated with you in various ways, including through the MyNissanLEAF owners' forum and other third parties.

> <u>Nissan has been taking your concerns very seriously</u>, yet we know that some of you have not been satisfied with the pace of our support activities.  Since launch, the Nissan LEAF has garnered some of the highest customer advocacy of any vehicle in the Nissan lineup, so we understand the importance of maintaining and growing that advocacy.  And the only way to do that is by earning a high level of customer trust in our product and our support of it.

> Simply put, <u>we want to take actions which will further improve our customers' satisfaction with their Nissan LEAFs while demonstrating industry-leading confidence in the integrity of our battery system</u>.  Nissan is fully committed to the long-term viability of electric vehicles and we will continue to demonstrate that with action.

> So today, we are announcing that we are enhancing the warranty coverage of the battery system that powers the Nissan LEAF electric vehicle.  With this action, <u>Nissan becomes the first and only manufacturer in the automotive industry to provide limited warranty coverage for battery capacity loss for electric vehicles</u>. (Emphasis added.)

9

The Palmer letter then goes on to explain the enhanced warranty, in much the same terms as the Settlement Notice, and then reiterates that the change was intended to improve consumer satisfaction:

> Our actions today are intended to put customer minds at ease regarding the topic of battery capacity loss. Even though it is expected the great majority of owners will never have to use this enhanced warranty, we want each Nissan LEAF owner to have the security that should capacity loss exceed this defined threshold, Nissan will cover the repair or replacement of their battery under warranty. (Emphasis added.)

The Palmer letter does not mention the class action lawsuit, nor does it say that the warranty enhancement was adopted as the result of settlement negotiations. Quite the contrary, by explaining that the warranty extension will be applicable to "each Nissan LEAF owner" world-wide, the Palmer letter makes it clear that the change in the warranty terms is part of a world-wide effort at maintaining customer satisfaction, not the result of a settlement of a lawsuit in the United States.

Lest one suspect that Palmer was confused—or not fully advised of the circumstances of the warranty enhancement—the letter is flanked by two other documents that remove any doubt. Palmer's epistle is preceded by a breezy missive from someone calling himself "Jeff" who declares his purpose as providing "a more friendly and engaging introduction" to Palmer's

10

"understandably formal" letter. And why is Palmer's letter so formal? Jeff tells us:
"It has to be. We live in a world where every word is parsed and dissected by
lawyers and regulators. Andy is addressing issues in this note that relate to
regulated and contractual matters, issues that are regulated by hundreds of different
organizations in the various countries where we sell the Nissan LEAF. That said,
understand that Andy has signed this note." In other words, Andy signed a formal
letter that was carefully vetted for accuracy and compliance with contractual and
regulatory requirements by people presumably familiar with this class action
lawsuit. So, if Andy had something to say about the connection between the
warranty extension and the lawsuit, it would have been included. Jeff himself says
nothing about the class action lawsuit or any settlement thereof, but does confirm
that the warranty change will be applicable to all LEAF owners worldwide.

Following Palmer's formal letter is a Q&A which addresses some specific
issues. The most pertinent of these is the following:

> Q. What is the status of the class-action lawsuit against Nissan
> related to battery capacity issues?
>
> A. The lawsuit has been settled as part of our effort to address
> customer concerns, including those expressed by the two
> customers who filed the class-action lawsuit.

Thus, the lawsuit was very much on Palmer's mind when he issued his formal

11

statement, but he doesn't say: "This warranty enhancement is the direct result of settlement negotiations with the plaintiffs in the class action lawsuit." Nor does he say that the extension of the warranty terms is conditioned on approval of the settlement. Quite the contrary:

> Q.  Why did you decide to enhance the warranty policy and implement the program now?
>
> A. The expanded warranty is intended to put customers' minds at ease concerning battery capacity loss, although it is expected that the great majority of LEAF owners will not have to use this enhanced warranty.  Nissan's decision is to demonstrate its confidence in the integrity and performance of its battery system.
>
> . . . .
>
> Q. What are the other countries where the warranty policy will apply?
>
> A. Further details will be announced in spring of 2013, but in addition to the United States we do plan to include other global markets such as Japan and Europe.

The Palmer letter and its accompanying materials are attached as Exhibit C.

Nissan's internal communications confirm that the warranty extension had nothing to do with the class action settlement.  On May 29, 2013, Nissan issued a Parts and Service Bulletin Amendment addressed to All Nissan Dealer Principals, All Nissan Dealer Service Managers and All Nissan Dealer Parts Managers.  The Bulletin, which is attached as Exhibit D, informs dealers of the new warranty and

explains their responsibility in implementing it.  It includes a Q&A which

Objectors quote in relevant part:

> **Q:**  **What is the reason for this new coverage?**
> **A:**  To ensure customer satisfaction.  All lithium ion batteries experience gradual capacity loss with time and use.  This is normal.  If capacity falls below nine bars (approximately 70%) within 60 months/60,000 miles, whichever comes first, the battery will be repaired or replaced in order to restore capacity above nine bars.
>
> **Q:**  **How do I confirm coverage for an affected vehicle in SERVICE COMM?**
> **A:**  Dealers can confirm coverage by checking the SERVICE COMM applicable warranty screen.
>
> **EV LI-ION BATTERY CAPACITY WARRANTY   xx/xx/xx   60,000mi**

Is the coverage contingent on acceptance of the settlement or continued

participation in the class?  The Q&A helpfully addresses this issue as well:

> **Q:**  **Are there any conditions for application of this warranty?**
> **A:**  Yes.  <u>All terms, conditions and exclusions relating to the warranty</u> can be found in the Warranty Information Booklet, which should be reviewed for details.  (Emphasis added.)

The Warranty Information Booklet came with the LEAF when it was delivered so,

of course, it contains no reference to the settlement.

The very next day, Nissan issued a Claims Information Bulletin, attached as

Exhibit E, which stated that "All MY 2011 and MY 2012 Nissan LEAF vehicles

are eligible for this expanded warranty and can be confirmed via SERVICE

13

COMM." There's no condition requiring acceptance of the proposed class settlement. There's no exclusion for people who opt out. And as shown above, the warranty coverage does, in fact, show up on Pearl's warranty coverage report.

These official Nissan communications leave no doubt that the enhancement to the Nissan warranty was implemented by the car manufacturer independent of the class action lawsuit, that it applies far beyond the lawsuit class to LEAF owners world-wide and that it was in the planning long before the so-called settlement terms were negotiated. The only thing the lawsuit did was give Nissan a bonus: a chance to use the warranty enhancement it was going to roll out in any event, to also wipe out any claims by disgruntled LEAF owners in the United States. And it could achieve this end by gifting the class action lawyers $1.9 million and $5,000 each to the Named Plaintiffs. Someone on Nissan's legal staff must have thought this is very clever, but it could not have been achieved without the duplicity of Plaintiffs' Counsel.

## 2. The Proposed Settlement is not Fair Because the Notice of Proposed Settlement is Materially Deficient

Every notice to class members must meet the requirements of due process of law. A notice must be fair and clear and provide enough information about "the action and the plaintiffs' rights in it" that potential class members are afforded an

14

opportunity to be heard or to opt out of the proposed settlement. See, e.g., Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811–12 (1985). This notice fails to meet the test.

The notice does not tell class members that they gain nothing by remaining in the lawsuit and lose nothing by opting out. To the contrary, it strongly suggests that opting out of the class will result in loss of the enhanced warranty and that the only way to preserve it is by staying in. See pp. 4–5 supra.

Just the opposite is true, of course. A consumer loses whatever rights he may have against Nissan by staying in the lawsuit and allowing the settlement to go forward. As lawyers to the class, Plaintiffs' Counsel had a professional responsibility to explain this clearly so their clients could make an informed choice. And the lawyers for both parties had a professional obligation to disclose this to the court in seeking its preliminary approval for the proposed settlement and the misleading notice.

The notice should have said: "You have nothing to gain by staying in the lawsuit and much to gain by opting out. As your lawyers, we therefore advise you to opt out." But any such statement would doubtless have caused the court to deny preliminary approval. It would also have caused a great many class members to opt out, depriving Nissan of the peace it bargained for by agreeing to hand a $1.9

15

million bonus to Plaintiffs' Counsel. Yet without such a statement, the class action notice is materially misleading and may have caused many class members to stay in when they would have opted out if fully and accurately informed.

If the court is not inclined to reject the settlement outright for the reasons explained in the other objections, it should at least require Plaintiffs' Counsel (at their own expense) to send out a proper notice to the class, one that fully and accurately explains the consequences of staying in versus opting out of the class.

### 3.   The Settlement is Unfair Because, Even on its own Terms, the Relief Provided is Inadequate

As argued above (see Objection 1), the settlement is not fair because the class plaintiffs get nothing of value. But, even assuming that the warranty extension counts as part of the settlement, it is wholly inadequate and fails to address most of the claims in the class action complaint.

The Memorandum of Points and Authorities in support of the motion for preliminary approval of the settlement says: "The Settlement negotiated by Plaintiffs' Counsel provides just what Plaintiffs asked for; a new battery capacity warranty for all 2011-2012 Nissan LEAFs nationwide." Memorandum of Points & Authorities at 1. It then goes on to explain the scope of the new warranty in the same terms as explained by Nissan in its notice to consumers and elsewhere: The

16

battery will be repaired so it will show at least 9 bars of battery capacity within the first 5 years or 60,000 miles.  A new LEAF has 12 bars of battery capacity, so that 9 bars is about 75 percent of battery capacity.  (In fact, because the bars do not each represent the same battery capacity, with the first bar representing more than the succeeding bars, the loss of 3 bars actually results in a 30 percent loss of battery capacity.  See "Nissan to Replace Leaf Batteries, Extend Warranty," Chicago Tribune, Dec. 28, 2012, at: goo.gl/ScPtfi; "Battery Capacity Loss," at: goo.gl/QZKEx4).  So Plaintiffs' Counsel represented to the court that retaining 70 percent of battery capacity is "just what plaintiffs asked for."

One scours the complaint in vain for any such request.  Here, from page 1 of the complaint, is a summary of what plaintiffs were seeking:

> Plaintiff Klee seeks an order, inter alia, (1) enjoining Nissan from using misleading information in connection with selling the Leaf; (2) compelling Nissan to issue corrective disclosures to Leaf owners and lessees; (3) compelling Nissan to remove and replace Plaintiffs and Class Members' battery systems with a suitable alternative product; (4) compelling Nissan to provide class members with a new battery for the Leaf that does not contain the defects alleged herein; and/or (5) compelling Nissan to reform its Leaf battery warrant, in a manner deemed to be appropriate by the Court, to cover the loss of battery capacity under warranty as alleged herein and to notify all class members that such warranty has been reformed. . . .

> Plaintiff David Wallak brings this action for damages, pursuant to Arizona law, on behalf of himself and all current and former

17

owners or lessees in Arizona of 2011–2012 Nissan Leaf vehicles.
First Amended Class Action Complaint at 1. Only a single item on this list—#5 on
the Klee list of sought-after injunctive relief—concerns reformation of the battery
warranty, and it seeks a warranty that will "cover the loss of battery
capacity"—which sounds like the battery is to be returned to full capacity, not just
70 percent.

The motion seeking preliminary approval of the settlement says not a word
about the crucial loss of 30 percent capacity, or about why any of the other sought-
after forms of relief have been abandoned. It does not explain why class members,
other than the Named Plaintiffs, get no damages. Instead, it makes it sound like the
class got everything it asked for. This is untrue and deceptive.

An analysis of the complaint discloses just how far from the mark the
proposed settlement is. The complaint contains the following claims:

### a. Misleading Advertising re Driving Range

Objectors can do no better than quote the complaint on this point:

> Before purchase or lease, Nissan failed to disclose its own
> recommendation that owners avoid charging the battery beyond
> 80% in order to mitigate battery damage and failed to disclose
> that Nissan's estimated 100 mile range was based on a full
> charge battery, which is contrary to Nissan's own
> recommendation for battery charging. Consumers were thus

18

> misled by Nissan's representations regarding driving range
> without being aware that these ranges were only achievable by
> charging the battery in a manner contrary to Nissan's own
> guidance.

First Amended Class Action Complaint at ¶ 8.

To this litany, Objectors would add that the 100 mile range advertised by Nissan is a pipe dream. Perhaps that distance can be achieved driving 20 mph without traffic, stops or turns on perfectly level ground, but never by a consumer under normal driving conditions carrying a normal load. No way, no how.

On the first day they owned Pearl, Objectors drove her home from Nissan of Fontana to their home in Rancho Palos Verdes, a distance of 78.4 miles, after the car had been fully charged by the dealer—and didn't make it. About 15 miles from home, they had to stop at a Nissan dealer for the better part of an hour to charge the battery. Even then, they made it home with the low-battery (turtle) warning light lit. The sales-person at Nissan of Fontana who sold Pearl warned Objectors of this possibility—only AFTER they signed the paperwork—and called ahead to the other dealer to make sure the charger would be available when Objectors drove in. And that was with a <u>fully</u> <u>charged</u> brand new battery.

After Objectors got home and started reading the manual, they had another disappointing revelation: Charging the battery to its full capacity is poison, to be

avoided at all costs. Filling the battery to full charge causes it to deteriorate and lose capacity. The battery must be charged to no more than 80 percent of capacity so that the theoretical 100 mile range is immediately reduced to 80 miles. This brings the LEAF's effective range down to a theoretical 80 miles and a realistic range of 55-60 miles. And this is with a new battery that has a full 12 bars of capacity. As the battery deteriorates, it must be charged to no more than 80 percent of what's left of its capacity, to keep it from deteriorating further. Nissan and its sales-force were well aware of this, but took pains to conceal it from consumers.

The proposed settlement gives up this claim in its entirety and forever bars class members from raising it, individually or as a class. This is a major, serious claim based entirely on the scope of advertising and other disclosures to consumers, not technical engineering issues. Yet the settlement provides no remedy and the settlement notice offers no explanation for why this claim is being summarily abandoned. The settlement provides no compensation for the resulting damages.

Nissan promised class members an effective range of 100 miles based on a full, 12-bar battery. They never disclosed that the 100 miles can never be achieved in normal driving. Nor did they disclose that proper battery maintenance meant the

battery could be charged to no more than 80 percent of capacity.  Yet the proposed

settlement doesn't secure for class members even a battery operating at 80 percent:

Instead, it serves up a meager warranty that supposedly guarantees 70 percent of

capacity (9 bars), which can only be charged 80 percent—little more than half the

original capacity and range.  This is in no way "just what Plaintiffs asked for."

Counsel misled the court in claiming that it was in order to obtain preliminary

approval of the settlement.

### b. Defective Thermal Management System Claim

The complaint also claims that LEAF used defective thermal management

technology—inferior to the industry standard—and failed to disclose this to

consumers.  The short of this is that Lithium Ion batteries deteriorate more quickly

when they overheat, so other manufacturers use a liquid coolant to keep the battery

from overhearing, but Nissan does not.  Here, once again, Objectors can do no

better than quote the complaint:

> Nissan Failed to disclose and/or intentionally omitted to reveal a design
> defect in the Leaf's battery system (the "thermal management defect")
> which is causing all Class Vehicles to suffer widespread, severe and
> premature loss of driving range, battery capacity and battery life.

> Other electric vehicles equipped with lithium ion batteries in North
> America, including the Chevrolet Volt, the Toyota RAV4 EV, and the
> Ford Focus Electric, are equipped with active thermal management

systems. These systems circulate cooling fluid throughout the battery array, actively cooling the batteries.

Nissan, however, opted not to include an active thermal management system in the Leaf. The lack of an adequate active cooling system is a design defect that fails to adequately cool the batteries, causing the batteries to suffer heat-related damage and causing premature battery capacity loss, well in excess of Nissan's own guidelines.

While Nissan's owner's manual provides that the Leaf may lose *20%* of battery capacity over *five (5) years* of operation, in fact, class members' vehicles, especially those vehicles exposed to warm climates, are losing over *27.5%* battery capacity within the first *one (1) to two (2) years of operation*. This battery capacity loss results in a reduction in the vehicle's driving range.

As described below, Nissan was well aware of the active thermal management defect and failed to disclose it. Moreover, Nissan exacerbated its wrongful conduct, by expressly *excluding* loss of battery capacity under its 8 year/100,000 mile warranty, even though it knew of the thermal management defect and propensity of the battery to lose capacity in excess of the amounts disclosed.

. . .

Other electric vehicles equipped with lithium ion batteries in North America, including the Chevrolet Volt, the Toyota RAV4 EV, and the Ford Focus Electric, are equipped with active thermal management systems. These systems circulate cooling fluid throughout the battery array, actively cooling the batteries. Nissan, however, opted not to include an active thermal management system in the Leaf. The lack of an adequate active cooling system is a design defect that fails to adequately cool the batteries, causing the batteries to suffer heat-related damage and causing premature battery capacity loss in excess of Nissan's representations.

. . .

22

Plaintiffs are informed and believe and based on thereon allege that Defendant knew or should have known that the Class Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Defendant has actively concealed and failed to disclose this defect from Plaintiffs and the Class Members at the time of purchase or lease and thereafter.

Since 2010, if not before, Nissan knew that the Class Vehicles and their battery systems were defectively designed. Rather than alerting Class Members and offering to repair the Class Vehicles, Nissan has concealed this problem from its customers at the time of purchase or lease and thereafter.

Defendant knew of and concealed the thermal management defect that is present in every Class Vehicle, along with the attendant lack of warranty coverage and associated repair costs, from Plaintiffs and Class Members, at the time of sale, lease, and repair and thereafter. The existence of the thermal management defect is a fact that a reasonable consumer would consider material when deciding whether to purchase or lease an electric vehicle with an advertised range of 100 miles per charge or less.

. . .

Dating back to 2010, if not before, Nissan was aware of the thermal management defect. Nissan, however, failed and refused to disclose this known defect to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

For example, in 2009, before the Leaf was released, Elon Musk, CEO of Tesla Motors, described the Leaf's thermal management system as "primitive," due to its failure to actively cool the batteries. Musk predicted that due to Nissan's failure to include an active thermal management system in the Leaf, its battery would experience temperatures "all over the place," causing it to suffer "huge degradation" in cold environments and to basically "shut off" in hot environments.

23

. . .

Nissan was contacted by Automotive Engineering online in 2010 to respond to the expert's concerns, and was thus aware of the thermal management defect:

"Contacted by AEI for comment, Nissan North American Manager of Technology Communications Colin Price stated: "We are confident [the cells] will dissipate heat well and anticipate the battery pack will have 70 to 80% of capacity left after 10 years of automotive use."

First Amended Class Action Complaint at ¶¶ 9–13; 45, 51–53, 57–58, 61.  The complaint also lists a variety of sources, including complaints to NHTSA, indicating that the premature loss of battery capacity due to overheating is widespread.  Id. at ¶ 62-63.

The proposed class action settlement abandons this claim altogether without so much as a mention.  There are no expert reports, no engineering studies, not even an explanation as to why these claims have been abandoned.  In essence, the proposed settlement validates Nissan's view that a 30 percent battery loss in 1 or 2 years of driving—or however long it takes to put 60,000 miles on the odometer—is normal and acceptable.

### c. The Premature Battery Deterioration Claim

Closely related to—but distinct from—the defective thermal management claim, is the claim that the Nissan LEAF battery deteriorates far faster than Nissan

24

represented in its Owner's Manual and elsewhere, particularly in warmer climates

such as California and Arizona.  Again, quoting from the complaint:

> Lithium ion batteries experience a reduction in the amount of electricity or charge they can hold over time.  This battery capacity loss results in a reduction in the vehicle's driving range. In the Nissan Leaf owner's manual, Nissan explicitly estimates that the Leaf may lose 20% of battery capacity over five (5) years of operation.  Nissan recently informed consumers on Facebook, "If a LEAF is treated as outlined in the Owner's Manual, you can expect 80 percent of the battery capacity after 5 years."[1]
>
> Similarly, Mark Perry, Nissan's Director of Product Planning, stated in a 2010 interview, "We don't need thermal management for the U.S., but we are looking at the technology for Dubai and other locations like that.... **We've gone on the record saying that the pack has a 70 to 80 percent capacity after 10 years."**[2]
>
> However, in practice, class members especially those whose vehicles are exposed to warm climates, are finding their battery capacity reduced by 27.5% or more within the first *one (1) to two (2) years of operation.*
>
> . . .

---

[1]   Nissan Facebook page (August 29, 2012), http://www.facebook.com/nissanleaf/posts/142423552561869?comment_id=282400&offset=0&total_comments=29

[2]   Domenik Yoney, *Is the Nissan Leaf battery pack Underengineered?* (August 31, 2012) http://green.autoblog.com/2010/01/25/is-the-nissan-leaf-batter-pack-uner-engineered/

First Amended Class Action Complaint at ¶¶ 41–43 & nn. 1–2 (emphasis in

original).  The proposed settlement abandons these claims without explanation. Nor is there an explanation as to why Nissan is allowed to offer a warranty that amounts to 70 percent after 5 years or 60,000 miles, when its Director of Product Planning has "gone on the record saying that the [battery] pack has a 70 to 80 percent capacity after 10 years."

### 4.   The Proposed Settlement is Unfair Because it Fully Compensates the Named Plaintiffs and No Other Class Members

The proposed settlement would give Named Plaintiffs Klee and Wallak $5,000 each as compensation for minimal services to the class.  Memorandum of Points & Authorities at 25.  Here's what they claim they did: "Plaintiffs each provided documents to, and consulted with, counsel about the claims . . . reviewed the allegations of the Complaint and the Settlement Agreement, kept in constant contact with counsel regarding the status of the case, and responded to inquiries regarding the warranty benefit and Class' reaction to the Settlement . . . and made their vehicles available for inspection."  Id.  So, Klee and Wallak turned over a few papers, chatted with class counsel and let someone look at their cars.  The Named Plaintiffs did so little, they had to repeat the list twice just to fill out a paragraph. Compare id. at lines 20–22 ("Plaintiffs reviewed the allegations of the Complaint and the Settlement Agreement, kept in constant contact with counsel regarding the

status of the case . . . .") with id. at lines 23–25 ("Plaintiffs reviewed the allegations of the Complaint and the Settlement Agreement, kept in constant contact with counsel regarding the status of the action . . . .).

There is no indication that Klee and Wallak were the subject of depositions or other discovery; made any court appearances; reviewed any documents or consulted in any way in the prosecution of this lawsuit. If the court is to approve any such substantial payment to a class member, it must at least be provided a record of what specific tasks Named Plaintiffs performed to earn this amount. The motion seeking approval of the settlement provides no such information and so there is no record basis for approval of the payment. See Matter of Cont'l Ill. Sec. Litig., 962 F.2d 566, 571–72 (7th Cir. 1992) (upholding district court's refusal to award fees to named plaintiff who "was deposed, which took a few hours, and bore a slight risk of being made liable for sanctions, costs, or other fees should the case go dangerously awry.")

Nor is this merely a matter of a measly $10,000 which, compared to what the lawyers are getting and the enormous benefit to Nissan, is chicken-feed. The un-earned $5,000 payment to each of the Named Plaintiffs buys off their consent to the settlement by making them whole, while leaving the rest of the class without a remedy. Objectors, too, would gladly settle their claims against Nissan for $5,000

27

in cash; we suspect there are few LEAF owners who wouldn't.  By making this payment to the two Named Plaintiffs, Nissan (in cahoots with Plaintiff's Counsel) is buying their consent to a settlement that causes nothing but harm to the other class members.  Or, to put it differently, by paying Klee and Wallak $5,000 in hush-money, Nissan and the lawyers are removing the only individuals now in the litigation who know enough to out the settlement as unfair.

5.    **The Proposed Settlement is Unfair Because the Notice of Proposed Settlement Provides no Information Supporting the Adequacy of the Relief Obtained**

Objectors realize that a settlement is a compromise and that not all of plaintiffs' claims will be satisfied in full.  Nevertheless, there are better and worse compromises.  Class members must be able to decide for themselves whether the compromise reached is fair and reasonable, in light of the known facts and the vagaries of litigation.  In deciding whether to remain in the class, retain their own counsel, opt out or object, members of the class must be given enough information to make an informed decision.  Such information must be in the settlement notice, mailed to members of the class, or found in the documents made available for inspection on the claims administrator's website.  See http://goo.gl/BYZeyI.

One searches these documents in vain for an explanation as to why the

claims of the complaint were compromised so drastically. Except for the false statement that the 70 percent capacity warranty is "just what Plaintiffs asked for," Memorandum of Points & Authorities at 1, there is very little that would help satisfy an inquiring mind.

Thus, none of the documents explains why the claim concerning Nissan's failure to disclose that the battery can only be charged 80 percent in order to avoid damaging it is not being pursued. Not a word. Does the claim lack merit? Did Nissan show that it did disclose this fact to consumers? About this, the documents are entirely silent.

Nor do the documents explain why the claim based on a defective thermal management system was thrown overboard. Did Nissan provide proof that the passive thermal management system is effective? Did Plaintiffs' Counsel employ engineers to study the system and, based on their advice, conclude that the claim has little merit? We don't know because the documents don't tell us.

The same is true as to each of the other claims in the complaint. We are given no explanation, much less any evidence, supporting abandonment of those claims.

What we are given instead is a bunch of lame excuses by Plaintiffs' Counsel for turning tail and running: "The reality is that any case against a major

29

automotive manufacturer alleging a defect in thousands of vehicles has the potential to take up significant amounts of attorneys' time and the court's resources." Id. at 12. What kind of talk is that from a supposed advocate? If Plaintiffs' Counsel expects to walk away with $1.9 million, they'd better spend significant time on this case.

The same is true for counsel's complaint that "class certification undeniably represents a serious risk for plaintiffs in any class action lawsuit" and even if the class were certified, there would remain a "genuine risk that the Court would revisit its ruling and decertify." Id. (citations and internal quotation marks omitted). Such general concerns, unrelated to the facts of the case, the applicable law or matters disclosed in discovery can't be sufficient reason for compromising the class claims down to nothing. Class members and the court can't make an informed decision about the risks of litigation based on such boilerplate.

The papers do claim that "[p]rior to filing this action, Plaintiffs' Counsel thoroughly researched and investigated the operation of Nissan LEAF and the electric battery system," id. at 3, so we can presume that these claims were not frivolous on their face. What then is the justification for throwing in the towel after gaining little or no benefit for the class?

The Memorandum discloses that plaintiffs took no discovery before

30

negotiating a settlement, but afterwards "conducted over five (5) months of confirmatory discovery" during the course of which "Nissan provided, and Plaintiffs' Counsel analyzed, over 4000 pages of documents and data covering Plaintiffs contentions in the FAC and a broad range of issues concerning the LEAF battery that could impact the Settlement terms." Id. at 6. That's pretty much it. There is no disclosure as to what any of these documents said and how they supported or undermined plaintiffs' claims in the FAC. Nor is there any evidence that Plaintiffs' Counsel had the expertise to understand technical data provided by Nissan or hired experts capable of helping them understand.

The Memorandum represents that "[p]laintiffs' Counsel also undertook to complete a rigorous analysis of the Settlement's responsiveness to Class Members' concerns about the LEAF battery life as expressed on blogs and message boards." Id. Objectors are not impressed by counsel's claim they deserve to be paid huge sums for surfing the Internet. To satisfy themselves as to some of these concerns, "Plaintiffs' Counsel sought and obtained a detailed declaration under oath from a senior manager responsible for the Nissan LEAF who concluded that it would be nearly 'impossible for a dealer technician to manipulate the vehicle's battery capacity gauge or to install a new program that would show a different battery capacity than that of the vehicle's actual battery.'"

31

In other words, in evaluating the settlement, Plaintiffs' Counsel engaged in some mighty aggressive Googling and then assuaged their concerns by relying on self-serving documents and declarations spoon-fed to them by Nissan. There is no indication that counsel took any depositions, propounded any interrogatories, sought to obtain any documents beyond those volunteered by Nissan, retained any experts or obtained the advice of any engineers or mechanics in evaluating the data provided by their adversaries. The papers on the Settlement Administrator's website certainly contain no evaluations or reports that one might examine to determine whether the decision to accept the settlement was fair and reasonable. How then can class members make an informed decision about how to proceed? How can the court evaluate the fairness of the settlement without such information?

Plaintiffs' Counsel followed the same lackadaisical course in determining the value of the settlement: "Plaintiffs' Counsel also sought to determine the aggregate value of the new warranty coverage to the Settlement Class Members. To that end, Plaintiffs' Counsel sought and received a declaration from Nissan confirming that the valuation of the Settlement terms to Class members exceeds $10 million." Id. at 7. Right. The settlement is worth $10+ million because Nissan says that's what it's worth. Objectors are somehow not reassured by this.

32

Plaintiffs' Counsel also claim that they "retained an accountant and valuation expert to conduct an independent analysis of the Settlement valuation." <u>Id.</u> The Memorandum does not say that the account and valuation experts actually conducted a valuation or, if they did, what they concluded. There is no valuation report or statement from the accountant in support of the settlement, only in support of the motion for attorneys' fees. To Objectors, this looks like a transparent effort by Plaintiffs' Counsel to puff up the value of a worthless settlement so as to justify their $1.9 million fee.

**6.    The Proposed Settlement is Unfair Because the Attorney's Fees are Vastly out of Proportion to Counsel's Work on the Case and, Most Critically, to the Results "Achieved"**

It is perfectly obvious that Plaintiff's Counsel did very little useful work on this case. Here is what they did:

1. They drafted a complaint.

2. They held two days of negotiations.

3. They claim to have reviewed documents selected for them by Nissan.

4. They did a little Internet research.

5. They obtained a couple of self-serving declarations from Nissan.

6. They hired an accountant and valuation expert.

7. They prepared a few unopposed documents seeking approval of the class, the settlement and the fees.

8. They filed an unopposed motion for attorneys' fees.

Here is what they don't claim they did:

1. Engaged in active discovery: depositions, interrogatories, requests for admission, investigations—all that stuff real lawyers do.

2. Hired experts and technical advisors or obtained expert reports.

3. Filed substantive motions, or responded to substantive motions from the other side.

4. Conducted a trial.

5. Took or defended an appeal.

We must therefore ask:  What valuable service did Plaintiffs' Counsel provide to earn almost $2 million in fees?  It was not that they got Nissan to do anything it wasn't going to do anyway, as it's plain as day that Nissan was planning to augment its warranty as to all 2011 and 2012 LEAFs world-wide, and did so long before the settlement could be proposed and finalized.

So what did Plaintiffs' Counsel do to induce Nissan to agree to a cool $2M in fees?  The obvious answer is that they delivered the class to Nissan on a silver platter so Nissan could use the lawsuit to quash any future claims of

34

misrepresentation as to battery range and capacity, and/or defective battery design. In other words, Plaintiffs' Counsel used the threat of future class suits to extract for themselves a nice bounty, while obtaining several thousand dollars for the Named Plaintiffs.

If Nissan wants to pay the Plaintiffs' Counsel $1.9 million, regardless of this court's approval, it's free to do so, although Objectors would be very surprised to see the payment made if Nissan does not get the class action waiver. But under no circumstances should this court make itself a party to this deceit by authorizing the payment.

The court, rather, should refer the lawyers for both sides to the California State Bar for investigation of misconduct in the negotiation of this phony settlement. The court should also refer the matter to a Special Master (perhaps a Magistrate Judge) for a Report and Recommendation as to whether counsel have complied with their duty of candor to the court and their ethical responsibility to their clients.

## IV.   CONCLUSION

Objectors therefore request that this honorable court:

1. Reject the Proposed Settlement.

2. Deny without prejudice certification of the class and any sub-classes.

3. Deny plaintiffs Humberto Daniel Klee and David Wallak the status of class representatives, without prejudice to later renewal if no better class representative comes forward.

4. Deny any cash payment to the Named Plaintiffs unless they each come up with evidence that they provided services to the class worth $5,000.

5. Deny Capstone LAW APC and all of its lawyers appointment as class counsel, and disqualify them from any further participation as counsel in this case.

6. Disqualify Sedgwick LLP and all of its lawyers from representing Nissan in this matter.

7. Order counsel for both sides to pay any expenses heretofore incurred on behalf of the class.

8. Appoint a Special Master to determine whether counsel for both parties complied with their duty of candor to the court, and whether Plaintiffs' Counsel complied with their ethical responsibilities to the class in seeking approval of the proposed settlement.

9. Order the issuance of a notice to the class advising class members of the court's action and encouraging other LEAF owners to come forward if they wish to be considered as class representatives. This notice should also make clear that the

36

court will consider other counsel for appointment to the status of Class Counsel. This notice should be paid for entirely by the lawyers of the Capstone and Sedgwick firms who have participated in the litigation or negotiation of this bogus settlement.

We declare under penalty of perjury that the facts set forth above as personally known to us are true.


Alex Kozinski                              Marcy Tiffany


October 15, 2013

37

# EXHIBIT A

**Dear Nissan LEAF Owner:**

Nissan values the feedback that we receive from our owners, and we try to use your comments to improve our products. With the goal to provide the highest level of customer satisfaction, Nissan is now offering two ongoing improvements for your Nissan LEAF.

First, Nissan is providing a new software enhancement for model year 2011-2012 LEAF vehicles, updating them with the software currently used in production for 2013 model year LEAF vehicles. The software enhancement is aimed at improving the accuracy of the battery capacity level gauge and providing greater compatibility with an expanded range of EV charging equipment.

Second, Nissan is now implementing expanded coverage under its New Electric Vehicle Limited Warranty, to protect against capacity loss in your LEAF's lithium-ion battery, as previously announced by Nissan in December 2012.

## SOFTWARE ENHANCEMENT

The 2013 LEAF features many improvements, including updated software that improves the performance of the battery capacity level gauge (outlined below) to more accurately reflect actual battery capacity. This update does not change the amount of capacity represented by any of the bars in the meter.

In addition, the vehicle's on-board charger software has been enhanced to improve compatibility with a broader range of EV charging equipment. By updating the software for 2011 and 2012 vehicles, Nissan is providing customers with the benefits of these ongoing improvements enjoyed by owners of the 2013 LEAF.

**WHAT NISSAN WILL DO**

To ensure your continued satisfaction and confidence in your car, your EV Certified Nissan dealer will update the software as described above at no cost to you for parts and labor.

40/41 NTB13-061

**WHAT YOU SHOULD DO**

Contact your EV Certified Nissan dealer at your earliest convenience in order to arrange your appointment. This service is free of charge and the work should take less than 2 hours to complete. **To ensure the greatest convenience to you, it is important that you have an appointment before bringing your vehicle to the dealer for this service.** Please bring this notice with you to your service appointment. Detailed instructions have been sent to your EV Certified Nissan dealer.

**EXPANDED WARRANTY COVERAGE**

In addition to the existing lithium-ion battery coverage provided under the Nissan Electric Vehicle Limited Warranty for defects in materials or workmanship, the lithium-ion battery for your 2011 or 2012 Nissan LEAF is now also warranted against capacity loss below nine (9) bars (or approximately below 70 percent) as shown on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first. This warranty covers any repairs needed to return battery capacity to a level of nine remaining bars on the vehicle's battery capacity level gauge. If possible, the lithium-ion battery components will be repaired or replaced, and the original battery pack will be returned to the vehicle. If necessary, the lithium-ion battery will be replaced with either a new or remanufactured battery. Any repair or replacement made under this Lithium-Ion Battery Capacity Coverage may not return the battery to an "as new" condition with all 12 battery capacity bars, but it will provide the vehicle with a capacity level of nine bars or more on the battery capacity level gauge.

If your vehicle's battery capacity level gauge is already displaying eight (8) or fewer bars of capacity prior to the above referenced software update (and within the first 5 years or 60,000 miles, whichever comes first), your Nissan dealer will verify this condition and arrange for the repair or replacement of the lithium-ion battery in accordance with the terms of the warranty.

Please note that replacement lithium-ion batteries may require special ordering which may delay the actual repair by several weeks. Your patience in these circumstances is appreciated.  If you have any questions about this announcement, you may contact the Nissan LEAF Call Center at 877-N0-GAS-EV (877-664-2738), or by writing us at Nissan North America, Inc., P.O. Box 685003, Franklin, TN 37068-5003.

Thank you for providing us an opportunity to ensure your satisfaction. We hope you continue to enjoy smooth, zero emissions driving in your Nissan LEAF!

NOTICE: In addition to the Lithium-Ion Battery Coverage for defects in materials or workmanship, the Lithium-Ion battery for your 2011 or 2012 Nissan LEAF is now also warranted against capacity loss below nine (9) bars of capacity as shown on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first. All other warranty terms, limitations, and conditions remain unchanged. Nissan North America WBI/13-xxx Peel and stick label into warranty book

41/

# EXHIBIT B

15:02:51 Tuesday, September 24, 2013

                        S E R V I C E - C O M M
09/24/13 15:02:50                                        CICSWB07
                        APPLICABLE WARRANTIES

 IN-SERVICE DATE: 05/30/11                VIN: JN1AZ0CP8BT003364

                              ***** EXPIRATION *****
        WARRANTY               DATE          MILES
 ELECTRIC VEH SYSTEMS          05/30/16      60,000
 EV LI-ION BATTERY CAPACITY WARRANTY  05/30/16   60,000


ENTER = CONTINUE   N = NEXT VEHICLE   M = SERVICE-COMM MENU>



**Joshua Fuentes**
Service Consultant

_____

**Glendale NISSAN**
727 South Brand Blvd.
Glendale, CA 91204-2108
Tel: 818.240.6000
Cell: 818.476.2640 • Fax: 818.291.4188
Email: josh.fuentes@glendale-nissan.com
www.nissan1.com

# EXHIBIT C

EV News  |  Win an EVSE!  |  Nissan Leaf > Choose Another EV Forum          Facebook

Twitter



Advertise on the forum | Upgrade your account

Like    1,048 people like this. Sign Up to see what
        your friends like.

⊡ Login  ✓ Register          ⊠ Nissan Leaf Wiki  ⊠ Nissan Leaf Blogs  ⊡ FAQ  ⊠ Rss Feed

It is currently Thu Oct 03, 2013 5:45 pm

SIEMENS          Don't wait around with a Level 1 charger
                 Cut your EV charge time in half with VersiCharge™

Board Index » General Nissan Leaf » News & Main Leaf Discussion          All times are UTC - 8 hours [ DST ]

# Nissan LEAF Update from Andy Palmer

Facebook    Tweet    LinkedIn    Tumblr    Stumble    Digg    Delicious

Like  38

  Page 1 of 42  [ 419 posts ]          Go to page 1, 2, 3, 4, 5 ... 42  Next

Print view          Previous topic | Next topic

| Author | Message |
|--------|---------|

**Hawk0630**          Post subject: Nissan LEAF Update from Andy Palmer      ⊡ Posted: Thu Dec 27, 2012 10:42 am

          This is Jeff from Nissan.

Joined: Sat Sep 22, 2012 9:23    Today I'm bringing you a note from Andy Palmer, Executive Vice President, Nissan Motor Company.
am                               In this letter, Andy addresses issues that you - LEAF owners and members of the
Posts: 20                        mynissanleaf.com community - have brought to us through the forum, discussions and our dealers.
Delivery Date: 22 Sep 2012
                                 The first thing about this note is that it is formal, to say the least. I understand this, as does
                                 Andy. In his note to me earlier this morning, he said that it was "understandably formal", but he
                                 asked if we could provide a more friendly and engaging introduction (that's what I'm attempting to
                                 do here). I hope that you can appreciate why the letter is in the more "formal" style. It has to be.
                                 We live in a world where every word is parsed and dissected by lawyers and regulators. Andy is
                                 addressing issues in this note that relate to regulated and contractual matters, issues that are
                                 regulated by hundreds of different organizations in the various countries where we sell the Nissan
                                 LEAF. That said, understand that Andy has signed this note.

                                 The second thing about this note is what it is not. It is not a notice for any owner to take action
                                 at this time. In this letter, Andy announces changes to Nissan's LEAF warranty coverage that will

| EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | Facebook |
|---------|--------------|----------------------------------------|----------|
|         |              |                                        | Twitter  |

will take time to formally notify each customer, as is necessary by regulation in most, if the countries where we sell the LEAF. Also, we need to insure that every dealer is prepa welcome and assist a customer when they arrive at the dealership.

Finally, in this note Andy does not attempt to address every question that you have raised. Foremost, he wants to announce the warranty changes that will be coming in the next few months. He realizes that there are other issues to address.

I want to take this opportunity to announce that we will host an open house in the Phoenix area on Tuesday, January 8th. I am working with Tim Gallagher, who I think most of the west coast MNL people know well, to arrange this event. I will come back to you shortly with the details, but you can count on Andy Palmer attending, as will Billy Hayes, the newly appointed Vice President of Global Sales for the Nissan LEAF. Tim, Dave Reuter and I also will be there. Just as a heads up, this may be a breakfast event due to the various schedules that we're attempting to juggle. If so, we would start at around 8 or 8:30 a.m. Let me know your thoughts on that. Tentative location is the Valley Ho in Scottsdale. Tim will have a quick charger on hand for those who require it.

In line with the Phoenix event, Chelsea - as a part of her advisory board efforts - has asked a few member to help ensure that the right questions are asked. I believe that Tony Williams and Phil Sadow are among those she is working with on that topic.

I didn't intend for this "introduction" to be so long, but I think that we had a number of issues to cover. Below is Andy's note. I look forward to your comments on it, on the event and on other issues that you would like to bring to me.

Let me close with my best wishes to every one for a happy and health New Year.

Cheers!

Jeff

---

Special announcement regarding the Nissan LEAF
from Andy Palmer, executive vice president, Nissan Motor Co., Ltd.

Good morning and Happy Holidays to all our Nissan LEAF owners in the U.S. and abroad.

As we approach the close of 2012, I wanted to provide an update on a subject that has interested a number of Nissan LEAF drivers in the U.S. desert southwest and select other markets. I'm speaking, of course, about concerns regarding the rate of battery capacity loss in the Nissan LEAF's Lithium-Ion battery.

My comments today will be specific to Nissan LEAFs in the U.S., but the actions I will explain will apply and be specifically communicated to each owner worldwide in the coming months in accordance with applicable law.

Throughout the latter half of this year, our technical teams have worked diligently to ensure that the batteries installed in Nissan LEAFs were operating to specification. As we've gone through this process, we have listened to your concerns, and have communicated with you in various ways, including through the MyNissanLEAF owners' forum and other third parties.

Nissan has been taking your concerns very seriously, yet we know that some of you have not been satisfied with the pace of our support activities. Since launch, the Nissan LEAF has garnered some of the highest customer advocacy of any vehicle in the Nissan lineup, so we understand the importance of maintaining and growing that advocacy. And the only way to do that is by earning a high level of customer trust in our product and our support of it.

Simply put, we want to take actions which will further improve our customers' satisfaction with

EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | Facebook

Twitter

system. Nissan is fully committed to the long-term viability of electric vehicles and we will
continue to demonstrate that with action.

So today, we are announcing that we are enhancing the warranty coverage of the battery system
that powers the Nissan LEAF electric vehicle. With this action, Nissan becomes the first and only
manufacturer in the automotive industry to provide limited warranty coverage for battery
capacity loss for electric vehicles.

Under an expanded New Electric Vehicle Limited Warranty, Nissan will protect against capacity
loss in LEAF batteries that fall below nine bars, of the available 12 bars displayed on the vehicle's
battery capacity gauge, for the first five years or 60,000 miles in the United States, whichever
comes first. For LEAF vehicles whose batteries have fallen below nine bars during this period,
Nissan will repair or replace the battery under warranty with a new or remanufactured battery to
restore capacity at or above a minimum of nine bars.

A vehicle whose battery has nine remaining bars indicated on the gauge is retaining
approximately 70 percent of its original battery capacity. This new limited warranty coverage
remains subject to the other terms, conditions and exclusions of the Nissan New Electric Vehicle
Limited Warranty, which otherwise remain unchanged.

As previously mentioned, we are also looking at opportunities to improve the precision of the
battery capacity gauge that displays remaining capacity in the LEAFs electric vehicle battery, and
intend to have more to report on this topic in the New Year.

The specifics of this new limited warranty coverage will be communicated to each owner in a
dedicated communication early next year. The expanded warranty coverage will apply in the
United States to the upcoming Model Year 2013 Nissan LEAF upon its release. Importantly, Nissan
will provide this expanded coverage to all model year 2011 and 2012 Nissan LEAFs sold and
distributed by Nissan in the United States to date, effective upon a date to be announced but
which is anticipated to be in the Spring of 2013.

Our actions today are intended to put customer minds at ease regarding the topic of battery
capacity loss. Even though it is expected the great majority of owners will never have to use this
enhanced warranty, we want each Nissan LEAF owner to have the security that should capacity
loss exceed this defined threshold, Nissan will cover the repair or replacement of their battery
under warranty.

I'm certain that there will be questions regarding the specifics of what we've announced here
today. The attached 'Q&A' is intended to address some of those, although our dialogue on this
subject will not end here. We intend to continue communicating with LEAF owners and we hope to
add more information early in the New Year.

Also, many of you may have heard about or already read a recent LEAF customer survey that
Plug-In America (PIA) administered. The survey, available here, is a valuable read for any LEAF
owner concerned about the performance of their electric vehicle battery. I would encourage every
LEAF owner to digest PIA's data, which came from over 240 vehicles, with contributions from over
25 states, two Canadian provinces, and the UK, representing over 3 million miles driven.

Finally, in early January, we will also announce the details of the new, model year 2013 Nissan
LEAF for the U.S. As many of you know, this vehicle - and the batteries that power it - will be built
right here in the United States at our plant in Smyrna, Tennessee. There are exciting changes
coming with the 2013 Nissan LEAF, and we can't wait to tell you about them very soon.

In the meantime, Happy New Year to each of you, and thank you again for your advocacy and
support of the electric vehicle movement.

Best Regards,

| EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | | Facebook |
|---|---|---|---|---|

Executive Vice President - Nissan Motor Co., Ltd.

Twitter

**Top**





Charge your LEAF twice as fast!
Low-cost charging solutions
evsejournal.com

**Hawk0630**

Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 10:54 am

offline

Joined: Sat Sep 22, 2012 9:23 am
Posts: 20
Delivery Date: 22 Sep 2012

This is Jeff from Nissan ... again.

I'd like to attached a Q&A to Andy's letter that I was unable to do in the above. I may have created too long of a post. Apologize for the inconvenience.

Jeff

---

Expanded New Electric Vehicle Limited Warranty
'Question & Answer'

Q. What does the LEAF's Expanded "Nissan New Electric Vehicle Limited Warranty" actually cover?
A. In addition to the coverage provided under the existing Nissan New Electric Vehicle Limited Warranty, this expanded warranty applicable to LEAF vehicles in the United States will protect against capacity loss in LEAF batteries that falls below nine bars, of the available 12 bars displayed on the vehicle's battery capacity gauge, for the first 5 years or 60,000 miles, whichever comes first. For LEAF vehicles whose batteries have fallen below nine bars during this period, Nissan will repair or replace the battery under warranty with a new or remanufactured battery to restore capacity at or above a minimum of nine bars. A vehicle whose battery has nine remaining bars indicated on the gauge is retaining approximately 70 percent of its original battery capacity, although remember that the rate of capacity loss is non-linear and decreases over time.

Q. What vehicles are covered by this new limited warranty coverage? Will this warranty be retroactive for existing owners?
A. The expanded warranty coverage will apply in the United States to the upcoming Model Year 2013 Nissan LEAF upon its release. Importantly, Nissan will provide this expanded coverage to all model year 2011 and 2012 Nissan LEAFs sold and distributed by Nissan in the United States to date, effective upon a date to be announced but which is anticipated to be in the Spring of 2013. This new limited warranty coverage remains subject to the other terms, conditions and exclusions of the Nissan New Electric Vehicle Limited Warranty, which otherwise remain unchanged.

Q. Does the warranty cover replacement or refurbishment?
A. This warranty covers any repairs needed to return battery capacity to a level of nine remaining bars on the vehicle's battery capacity level gauge. If possible, the Lithium-Ion battery components will be repaired or replaced, and the original Lithium-Ion battery will be returned to the vehicle. If necessary, the Lithium-Ion battery will be replaced with either a new or remanufactured Lithium-Ion battery. Any repair or replacement made under this Lithium-Ion Battery Capacity Coverage may not return a Lithium-Ion battery to an "as new" condition with all 12 battery capacity bars, but it will provide the vehicle with a capacity level of nine bars or more on the battery capacity level gauge.

10/3/2013 5:47 PM

| EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | | Facebook |
| | | | | Twitter |

Q. Why doesn't the warranty restore the battery to the same level as a brand new one?
A. Gradual capacity loss is normal and expected in all lithium-ion batteries with time an intent of this warranty is to provide consumers with confidence that despite this normal battery capacity loss, they will be assured of a minimum level of capacity throughout the warranty period.

Q. Is there an option for an owner to replace the battery? Is there a price for replacement?
A. Nissan is confident this new warranty will ensure customer satisfaction, but we also plan to release battery replacement pricing for those customers who wish to replace their batteries once they are no longer eligible for the warranty. Further details will be announced at a later timing in spring of 2013.

Q. What is the cost of the replacement battery?
A. We will announce further details before implementation.

Q. When does this new warranty coverage go into effect?
A. This expanded warranty will apply to Model Year 2013 LEAFs upon their release for sale by United States Nissan dealers. The date on which this new warranty coverage becomes effective for Model Year 2011 and 2012 Nissan LEAF vehicles will be announced in the future, effective upon a date to be announced but which is anticipated to be in the Spring of 2013, to allow for proper implementation by Nissan and its network of certified LEAF dealers.

Q. Why did you decide to enhance the warranty policy and implement this program now?
A. The expanded warranty is intended to put customers' minds at ease concerning battery capacity loss, although it is expected that the great majority of LEAF owners will not have to use this enhanced warranty. Nissan's decision is to demonstrate its confidence in the integrity and performance of its battery system.

Q. What is the status of the class-action lawsuit against Nissan related to battery capacity issues?
A. The lawsuit has been settled as part of our effort to address customer concerns including those expressed by the two customers who filed the class-action lawsuit.

Q. What are the other countries where this warranty policy will apply?
A. Further details will be announced in spring of 2013, but in addition to the United States we do plan to include other global markets such as Japan and Europe.

Q. Why are you waiting until spring of 2013 for implementation of this warranty as it applies to Model Year 2011 and 2012 vehicles?
A. Providing prompt and effective warranty service requires proper planning and preparation by our parts and service division working closely with our network of certified LEAF dealers.

Q. What should customers do if the gauge falls below 9 bars?
A. Customers who believe that their vehicle battery may need repair or replacement should visit their nearest certified Nissan LEAF dealer. Additional details on the warranty and repair process will be provided in spring 2013.

Q. How does the frequency of fast charging affect the rate of capacity loss? Are there other factors that influence the rate of capacity loss?
A. Quick charging the vehicle more than one time a day will affect and may hasten the rate of battery capacity loss. Other factors that will affect and may hasten the rate of capacity loss include, but are not limited to: (1) Sustained high battery temperatures (caused, for example, by

| EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | Facebook |
| | | | Twitter |

charges); (2) Sustained high battery state of charge (caused, for example, by frequently to 100% state of charge and/or leaving the battery above 80% state of charge for long pe time); and (3) Higher than estimated annual mileage accumulation (such as more than 12,500 miles per year).

Top                    profile

**RegGuheert**          Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 11:00 am

offline                 Wow! Bravo to Nissan for providing LEAF owners with a battery capacity warranty! It is much
Gold Member             appreciated!

                        RegGuheert
                        2011 Leaf SL Demo vehicle
Joined: Mon Mar 19, 2012 4:12   2011 miles at purchase. 10,000 miles on April 14, 2013
am                      Charged by our 9.87 kW solar array
Posts: 2498
Location: Northern VA
Delivery Date: 16 Mar 2012
Leaf Number: 5926

Top                    profile

**eclecticflower**      Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 11:03 am

offline                 This is very good news!

Joined: Tue Apr 24, 2012 10:35
am                      2012 Cayenne Red LEAF SL: Vanity Plate - G'BYGAS
Posts: 438              Reserved 08/10, Ordered 3/12/2012, $99 Refunded 5/16/12, Delivered 6/4/12.
Location: Kansas City, Missouri   Wild LEAFs: 4 red, 4 silver; Wild Volts: 4; Wild Teslas: 1 (1RAD-EV); Wild iMiEVs: 1.
Delivery Date: 04 Jun 2012
Leaf Number: 021559

Top                    profile

**adric22**             Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 11:06 am

offline                 An interesting read. Its definitely a start. Personally, I think they should break it down more..
                        Such guarantee 10 bars for the first 20,000 miles, then 9 bars after that. I know if I had a Leaf for
Joined: Fri Apr 23, 2010 2:40 pm   just one year and it dropped to 9 bars I'd be pretty irritated that I'd have to wait for it to fall
Posts: 1953            below that before anything could be done.
Location: Fort Worth, TX
Delivery Date: 05 Apr 2011
Leaf Number: 000768      2011 Blue Nissan Leaf SL (No QC port) "11-bars" and 24,000 miles
                        2012 Summit White Chevy Volt (wife's car)

Top                    profile

**z0ner**              Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 11:16 am

EV News    |    Win an EVSE!    |    Nissan Leaf > Choose Another EV Forum    |    Facebook

Twitter

**Forum Supporter**



> **adric22 wrote:**
> An interesting read. Its definitely a start. Personally, I think they should break it down more.. Such guarantee 10 bars for the first 20,000 miles, then 9 bars after that. I know if I had a Leaf for just one year and it dropped to 9 bars I'd be pretty irritated that I'd have to wait for it to fall below that before anything could be done.

And don't forget, once it falls under 9 bars under this new warranty they would only have to bring it "up to" 9 bars.

I agree it's better than nothing, but a 9 bar warranty is particularly feeble here IMO.

Joined: Wed Jul 07, 2010 10:16 am
Posts: 428
Location: Orange County, CA
Delivery Date: 18 Apr 2011
Leaf Number: 0909

Top



---

**Nubo**



**Gold Member**

Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 11:29 am

I applaud Nissan for stepping up with a real warranty on the most expensive component in their electric car! Thank you!

I do have a concern though, with "bars" being the unit of measurement. Obviously the bars representation are controlled by the onboard computer and can be changed arbitrarily -- as was already done once with an early firmware update.

What assurance will the customer have that re-calibration of the display is not a loophole? Will the warranty also be expressed in some standard units, for example Kilowatt-hours?

Once again, thanks. This is a great step towards wider adoption of electric vehicles.

Joined: Fri May 28, 2010 11:01 am
Posts: 2371
Location: Vallejo, CA
Delivery Date: 0-12-2011
Leaf Number: 16000

Top



---

**Tony Williams**



**Forum Supporter**

Post subject: Re: Nissan LEAF Update from Andy Palmer          Posted: Thu Dec 27, 2012 11:30 am

> **z0ner wrote:**
>
> > **adric22 wrote:**
> > An interesting read. Its definitely a start. Personally, I think they should break it down more.. Such guarantee 10 bars for the first 20,000 miles, then 9 bars after that. I know if I had a Leaf for just one year and it dropped to 9 bars I'd be pretty irritated that I'd have to wait for it to fall below that before anything could be done.
>
> And don't forget, once it falls under 9 bars under this new warranty they would only have to bring it "up to" 9 bars.
>
> I agree it's better than nothing, but a 9 bar warranty is particularly feeble here IMO.

Joined: Sat Feb 19, 2011 1:48 am
Posts: 8041
Location: 100 Mile Club San Diego
Leaf Number: 00000

Certainly it's a wise move, because the actual exposure to Nissan is extremely small and it makes them look like they are proactive.

| EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | Facebook |
|---------|--------------|---------------------------------------|----------|

Twitter

Granted, they appear to have settled at least one class action (that in my opinion was pc executed by the plaintiff's counsel), there will obviously be some unsatisfied consumers never told that 70.1% capacity is ok, regardless of when it happens after the sale. While those folks may file complaints (and sue), Nissan has given themselves very low cost defense in such cases.

Bottom line; 99.9% of current LEAF owners have no claim under this warranty, Nissan won't buy back any more cars (since you're covered), and consumers will largely be in "status quo ante".

Great maneuvering Nissan !!!! Now, they can keep pumping out exactly the same car in Phoenix, get exactly the same results, and pay virtually nothing. Bravo.

I don't want anybody to think I'm Debbie Downer on this; I actually applaud the move that let's prospective owners know the limits.

EVRAV4, was PLGS IN (#2244), & PLGIN2 (#20782)
Next San Diego EVent Aug 24, 5pm-8pm, BBQ @ my house
Battery Degradation Summary
Range Chart
All EV Rally "BC 2 BC" Canada 2 Mexico
100 mile / 200 km Club + Longest Drive

**Top**    

| | | |
|--|--|--|
| **edatoakrun** | **Post subject:** Re: Nissan LEAF Update from Andy Palmer | **Posted:** Thu Dec 27, 2012 11:33 am |

offline

Joined: Thu Nov 11, 2010 9:33 am
**Posts:** 2602
**Location:** Shasta County, North California
**Delivery Date:** 15 May 2011
**Leaf Number:** 2184

Very reasonable response by Nissan, IMO.

But I also believe it would be very wise for Nissan to announce the replacement price in April, rather than June...

> **Quote:**
> Q. Is there an option for an owner to replace the battery? Is there a price for replacement?
> A. Nissan is confident this new warranty will ensure customer satisfaction, but we also plan to release battery replacement pricing for those customers who wish to replace their batteries once they are no longer eligible for the warranty. Further details will be announced at a later timing in spring of 2013.
>
> Q. What is the cost of the replacement battery?
> A. We will announce further details before implementation.

*no condition is permanent*

**Top**    

| | | |
|--|--|--|
| **thankyouOB** | **Post subject:** Re: Nissan LEAF Update from Andy Palmer | **Posted:** Thu Dec 27, 2012 11:38 am |

offline

Gold Member

Joined: Mon Feb 21, 2011 11:14 am

Q. What is the status of the class-action lawsuit against Nissan related to battery capacity issues?
A. The lawsuit has been settled as part of our effort to address customer concerns including those expressed by the two customers who filed the class-action lawsuit.

| EV News | Win an EVSE! | Nissan Leaf > Choose Another EV Forum | Facebook |
|---|---|---|---|

**Delivery Date: 30 Apr 2011**

where can we learn about that.

also, does the warranty ensure that the restoration of 9 bars is not done by changing software or resetting the coding; rather that the software on the car will be left intact so that it is true restoration.

i applaud that we are getting some corporate response to value us as consumers and, as well, to place a floor on the value of our vehicles. this will stabilize used car prices to some extent.
i am an owner who intends to keep his vehicle for at least 100k miles and eight years. folks such as myself will all know allot more this spring about how to assess and value this step when replacement battery pricing is announced.

that said, i think a 10 bar reset would be a much better set point, as that correlates to the standard of charging that is recommended for long life of a new vehicle.
i would be far far more comfortable with that and recommend it either as a basic warranty or one that you can buy as an add on.

---

may reserve/delivery 4/30/11
**
ECOtality/LADWP/ Blink 4/4/11
**
Gardena Nissan, msrp -1k
red SL with etec L3
SOLAR POWERED since 2008

Last edited by thankyouOB on Thu Dec 27, 2012 11:54 am, edited 3 times in total.

**Top**          

Display posts from previous: [ All posts ]   Sort by [ Post time ]   [ Ascending ]   [Go]

     Page 1 of 42  [ 419 posts ]          Go to page 1, 2, 3, 4, 5 ... 42  Next

**Board index » General Nissan Leaf » News & Main Leaf Discussion**          All times are UTC - 8 hours [ DST ]

You **cannot** post new topics in this forum
You **cannot** reply to topics in this forum
You **cannot** edit your posts in this forum
You **cannot** delete your posts in this forum
You **cannot** post attachments in this forum

 

Advertise on the forum | Upgrade your account

© My Nissan Leaf Forum – part of the MyElectricCarForums.com Group

# EXHIBIT D



**PARTS & SERVICE BULLETIN AMENDMENT**

NISSAN NORTH AMERICA, INC.
National Headquarters
One Nissan Way
Franklin, TN 37067

Reference: NPSB/13-006a

Date: **May 29, 2013**

TO:   All NISSAN DEALER PRINCIPALS
       All NISSAN DEALER SERVICE MANAGERS
       All NISSAN DEALER PARTS MANAGERS

SUBJECT: **2011-2013** LEAF LITHIUM-ION BATT. CAPACITY COVERAGE / BATTERY REPAIR

**NEW WARRANTY STATEMENT**

In addition to the Lithium-Ion Battery Coverage for defects in materials or workmanship under the Nissan New Electric Vehicle Limited Warranty, the Lithium-Ion battery for model years **2011-2013** Nissan LEAF is now also warranted against capacity loss below nine (9) bars of capacity as shown on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first.

This warranty covers any repairs needed to return battery capacity to a level of nine remaining bars on the vehicle's battery capacity level gauge. If possible, the Lithium-Ion battery components will be repaired or replaced, and the original Lithium-Ion battery will be returned to the vehicle. If necessary, the Lithium-Ion battery will be replaced with either a new or remanufactured Lithium-Ion battery. Any repair or replacement made under this Lithium-Ion Battery Capacity Coverage may not return the Lithium-Ion battery to an "as new" condition with all 12 battery capacity bars, but it will provide the vehicle with a capacity level of nine bars or more on the battery capacity level gauge. All other terms, conditions and exclusions of the Nissan New Electric Vehicle Limited Warranty remain unchanged.

**DEALER RESPONSIBILITY**

If a **2011-2013** LEAF vehicle is presented for service which shows less than nine (9) bars of capacity as shown on the vehicle's battery capacity level gauge, dealers must check SERVICE COMM to confirm coverage and look for any open service campaigns. Once all open service campaigns have been completed, please review the history of annual Lithium-Ion battery inspections.

Dealers will use CONSULT-III+ to generate an "EV Battery Usage Report" which will confirm the current capacity. NNA may request the printed report to initiate the parts order for battery repair or replacement.

Following any battery repair, a second "EV Battery Usage Report" must be provided to the customer to confirm capacity exceeds nine (9) bars.

The diagnosis and repair process will be as follows:

1. Check SERVICE COMM to confirm coverage and look for any open service campaigns. Complete all open campaigns.
2. Review vehicle history of annual Lithium-Ion battery inspection.
3. Use CONSULT-III+ "EV Battery Usage Report" to printout the "Battery Information Sheet".
4. EV certified technician contact TECH LINE to open report and confirm diagnosis.
5. NNA will arrange parts shipment as needed for battery repair or replacement.
6. Customer is free to drive vehicle until repair parts arrive.

NNA004164

7. After repairs are complete, use CONSULT-III+ "EV Battery Usage Report" to printout "Battery Information Sheet"; retain one copy for warranty and provide one copy to customer.
8. Warranty return of incident parts as directed.  Core charges will apply if removed battery is not returned.

## FAQ

**Q.   What model year LEAF vehicles are involved?**

A.   Previously, Nissan announced 2013 LEAF vehicles distributed by NNA in the United States will have this coverage, which will be outlined in the 2013 Nissan New Electric Vehicle Limited Warranty Information Booklet.  Now, Nissan has expanded this coverage to include model year 2011 and 2012 LEAF vehicles distributed by NNA in the United States.

**Q.   What is the reason for this new coverage?**

A.   To ensure customer satisfaction.  All lithium ion batteries experience gradual capacity loss with time and use.  This is normal.  If capacity falls below nine bars (approximately 70%) within 60 months/60,000 miles, whichever comes first, the battery will be repaired or replaced in order to restore capacity above nine bars.

**Q.   How do I confirm coverage for an affected vehicle in SERVICE COMM?**

A.   Dealers can confirm coverage by checking the SERVICE COMM applicable warranty screen.

**EV LI-ION BATTERY CAPACITY WARRANTY**          **XX/XX/XX**      **60,000 MI**

**Q.   Does this coverage apply to any other Nissan (or Infiniti) models?**

A.   No, this coverage is unique to **2011-2013** LEAF and does not apply to any other Nissan (or Infiniti) models.

**Q.   Are there any conditions for application of this warranty?**

A.   Yes.  All terms, conditions and exclusions relating to the warranty can be found in the Warranty Information Booklet, which should be reviewed for details.

NNA004165

# EXHIBIT E



| **CLAIMS INFORMATION** **BULLETIN** CORRECTION | **NISSAN NORTH AMERICA, INC.** National Headquarters 333 Commerce Street Nashville, TN 37201-1800 |
|---|---|

Reference: WBI/13-015                                                    Date: May 30, 2013

**TO:**        Service Manager, Service Advisors, and Claims Administrator

**SUBJECT:**   Expanded Limited Warranty Coverage for MY 2011 and MY 2012 LEAF
               Lithium-Ion Batteries & Battery Repair

> **This bulletin replaces WBI/13-015 sent on May 29, 2013. Please discard all prior copies.**

In addition to the existing Lithium-Ion Battery Coverage for defects in materials or workmanship under the Nissan New Electric Vehicle Limited Warranty, the Lithium-Ion battery for MY 2011 and MY 2012 Nissan LEAF is now warranted against capacity loss below nine (9) bars of capacity as indicated on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first.

This newly expanded limited warranty covers any repairs needed to return battery capacity to a level of nine remaining bars on the vehicle's battery capacity level gauge. If possible, the Lithium-Ion battery components will be repaired or replaced, and the original Lithium-Ion battery will be returned to the vehicle.  If necessary, the Lithium-Ion battery will be replaced with either a new or remanufactured Lithium-Ion battery. Any repair or replacement made under this Lithium-Ion Battery Capacity Coverage may not return the Lithium-Ion battery to an "as new" condition with all 12 battery capacity bars, but it will provide the vehicle with a capacity level of nine bars or more.

All MY 2011 and MY 2012 Nissan LEAF vehicles are eligible for this expanded warranty and can be confirmed via SERVICE COMM. When an eligible vehicle is presented for service please check the Warranty Information Booklet (WIB) to verify that a warranty expansion label has already been applied to the front cover.  If not, ask the customer if they have the label and if so, apply it to the front cover of the WIB on their behalf.

Dealers can order additional labels from IMS by logging on to NNAnet.com and clicking on "Dealer Materials Ordering", or by calling 1 800 247-5321 and specifying the Claims Bulletin Reference number WBI/13-015.

LABEL SAMPLE:

> **NOTICE:**
> In addition to the Lithium-Ion Battery Coverage for defects in materials or workmanship, the Lithium-Ion battery for your 2011 or 2012 Nissan LEAF is now also warranted against capacity loss below nine (9) bars of capacity as shown on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first. All other warranty terms, limitations, and conditions remain unchanged.
>
> Nissan North America WBI/13-015

NNA004167

## APPROVAL PROCESS

The "EV Battery Usage Report" showing the bar status of the battery will be a required document for approval to replace the battery. All battery replacements must be performed by a Nissan LEAF certified dealer. In addition, TECH LINE must confirm the battery repair or replacement diagnosis prior to completing the work.

## CLAIMS CODING INFORMATION

Submit a Primary Failed Part (PP) line claim using the following claims coding:

**PARTS INFORMATION**

| Description | PART # | Quantity |
|---|---|---|
| EV Battery Pack Assembly | Given by TECH LINE | 1 |

**LABOR INFORMATION**

| Description | FRT | OP CODE | SYM | DIA | FRT |
|---|---|---|---|---|---|
| CHECK LI-ION BATTERY CAPACITY | (1) | JQ98AA | HG | 32 | (2) |
| RPL LI-ION BATTERY PACK ASSY | | JQ01AA | | | |

(1) Applicable part given by TECH LINE
(2) Reference the current Nissan Warranty Flat Rate Manual and use the indicated FRT.

**EXPENSE INFORMATION**

| Expense Code | Description | Max Amount |
|---|---|---|
| 188 | EV Battery | $1,500.00 |

Questions concerning this bulletin may be directed to the Nissan Claims Call Center at 1-800-258-7008, option 7.

## WARRANTY DEPARTMENT

NNA004168

## PROOF OF SERVICE
### Klee v. Nissan North America, Inc.
No. CV12-08238 DDP(PJWx)

I am over the age of 18 and not a party to the within action. My address is: 789 E. Villa St. #12, Pasadena, CA 91101. On October 15, 2013, I served this proof of service, together with the Objection to Class Action Settlement on all interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| Jordan L. Lurie<br>Capstone Law APC<br>1840 Century Park East, Suite 450<br>Los Angeles, CA 90067 | E. Paul Cauley, Jr.<br>Sedgwick LLP<br>1717 Main St., Suite 5400<br>Dallas, TX 75201 |
| Nissan Leaf Settlement Administrator<br>P.O. Box 43191<br>Providence, RI 02940-3191 | |

**BY MAIL.** I mailed such envelopes by first-class, United States mail by depositing them, with postage thereupon fully prepaid, in a United States mailbox at Pasadena, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Deanna Manning

October 15, 2013