1
2
3
4
5

Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Capstone Law APC
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396

6

Attorneys for Plaintiffs and Class Members

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

10

11
12
13

HUMBERTO DANIEL KLEE and
DAVID WALLAK, individually, and
on behalf of a class of similarly
situated individuals,

14

Plaintiffs,

15

v.

16

NISSAN NORTH AMERICA, INC.,

17

Defendant.

Case No. CV12-08238 BRO (PJWx)

Hon. Beverly Reid O'Connell

**CLASS ACTION**

**PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE SETTLEMENT**

Date:      November 18, 2013
Time:      10:00 a.m.
Place:     Courtroom 14

18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................. 1

II.  OVERVIEW OF THE OBJECTIONS ............................................. 2

III. RESPONSES TO OBJECTIONS .................................................... 3

    A.   The Contention that the New Warranty Coverage Was Not
        the Result of Plaintiffs' Efforts ................................................. 3

    B.   Contentions Regarding the June 2013 Announcement .......................... 6

    C.   The Contention that Plaintiffs Are Not Pursuing All Claims .............. 10

        1.   Thermal Management Defect and Excessive Loss of
            Battery Capacity .......................................................... 10

        2.   Driving Range .................................................................. 13

        3.   Battery Charge ................................................................. 14

        4.   Damages .......................................................................... 16

        5.   Plaintiffs' Discovery ...................................................... 17

    D.   The Contention that Only the Named Plaintiffs Are Being
        Made Whole .......................................................................... 19

IV.  RESPONSE TO THE OPPOSITION TO PLAINTIFFS'
    MOTION FOR FINAL APPROVAL OF CLASS ACTION
    SETTLEMENT ........................................................................ 20

V.   CONCLUSION ................................................................................ 21

PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE SETTLEMENT

## I.   INTRODUCTION

The Settlement in this action provides outstanding relief to the Class in the form of a new Nissan New Electric Vehicle Limited Warranty that protects against excessive battery capacity loss for all 2011-2012 Nissan LEAFs nationwide.  Pursuant to the Settlement, Defendant Nissan North America, Inc. ("Nissan") has agreed to provide new "Lithium-ion Battery Capacity Coverage," which is coverage added to, and made a part of, the 2011 and 2012 Nissan New Electric Vehicle Limited Warranty.

Nissan had represented that the LEAF battery would lose on average 20% of battery capacity over 5 years, when, in fact, the battery was losing that same percentage over only one to two years, especially in hotter climates, resulting in a reduction in the vehicles' driving range.  LEAF owners were concerned that the excessive rate of capacity loss that they experienced in the first two years would continue, putting them well below Nissan's projected loss of battery capacity. The new warranty protects against this result.

Under the new coverage, Nissan will cover any repairs needed to return battery capacity to a level of at least nine bars (approximately 70% capacity) on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever occurs first.  If necessary, the Lithium-ion battery components will be repaired or replaced in eligible vehicles and the original Lithium-ion battery will be returned to the vehicle.  If repair is not possible, the Lithium-ion battery will be replaced in eligible vehicles with either a new or remanufactured Lithium-ion battery.  There is no cap on the number of repairs that can be made, and Class Members will be assured of a plan that covers the loss of battery capacity for the warranty period, even if the problem recurs.  This is the same coverage that Nissan also has agreed to implement on a going forward basis for all 2013 LEAF vehicles.  All Class Members are entitled to the new battery capacity warranty terms, unless they opt-out of the Settlement.

Pursuant to the Preliminary Approval Order (Dkt. No. 36), the Claims Administrator mailed 19,398 Notices to Class members. In response, a total of only 13 objections have been received. Three (3) of these objections have been withdrawn, leaving a total of 10 objections (0.051% of the Class) to the Settlement.[1] This is a miniscule number of objections and supports the Parties' assertion that the Settlement, which has been overwhelmingly endorsed by nearly all 2011-2012 Nissan LEAF owners and lessees, is fair, adequate and reasonable and should be approved. *See, e.g., Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of a class action settlement where 90,000 class members received notice, and 45 objections were received).

## II.    OVERVIEW OF THE OBJECTIONS

Interestingly, the objections cover both ends of the spectrum. Certain objectors claim that the Settlement and the new battery warranty do not go far enough. However, the Ninth Circuit has rejected the contention that a settlement is not fair if it "could have been better." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). "Settlement is the offspring of compromise; the question [the Court] address[es] is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from

_____

[1] The ten objections are by Patricia and Mervyn Devine ("Devine Objection") (Dkt. No. 48), Alex Kozinski and Marcy Tiffany ("Tiffany Objection") (Dkt. No. 50), Chinh Vo (Dkt. No. 53), John Chun (Dkt. No, 54), Cody Pelech (Dkt. No. 58), Mark Larsen (Dkt. No. 59), Charles Gregory Smith, Jr (Dkt. No. 61), Clotide Artur-Tamers, Raymond Carignan and Richard Willoughby. The Chun, Pelech, and Smith objections were filed late, and the Artur-Tamers, Carignan and Willoghby objections were rejected by the Court for failure to comply with the Court's filing procedures. Dkt. No. 44. However, all of the objections are addressed herein. Objectors Roberta Friedman and Leslie Kornblum (Dkt. No. 52), Robin Jans (Dkt. No. 49) and Eric Fisher (objection mailed but not filed) have withdrawn their objections. Declaration of Jordan L. Lurie in Support of Plaintiffs' Response to Objections ("Lurie Response Decl.").

1   collusion."  *Id.  See also Lane v. Facebook*, 696 F.3d. 811, 818 (9th Cir. 2012)

2   (the court "must evaluate the fairness of a settlement as a whole, rather than

3   assessing its individual components").

4        On the other hand, certain objectors (Larsen, Smith) "object" that this case

5   never should been brought at all because the LEAF battery functions exactly as

6   advertised and Nissan already made all the necessary disclosures regarding the

7   LEAF battery.  Based on these objections, the Settlement and the achievement of

8   a new warranty are all the more outstanding.

9        Plaintiffs' Counsel has attempted to resolve certain of the objections,

10  especially the objections that were based on assumptions and unsupported

11  speculation.  Plaintiffs' Counsel met in person with Objector Tiffany on

12  November 1, 2013.   Plaintiffs' Counsel also spoke with Ms. Tiffany by phone

13  on November 4, 2013.   The Tiffany Objectors clearly are extremely dissatisfied

14  with their Nissan LEAF.  They drove it home from the dealer on a full charge,

15  and the car (which they call "Pearl") could not make the 78 mile trip without

16  recharging the battery.  They claim that the salesperson at the Nissan dealership

17  who sold Pearl warned them of this possibility, but only after they signed the

18  paperwork.  After meeting with Plaintiffs' Counsel, the Tiffany Objectors filed

19  an Amendment to Objection wherein they "withdraw any suggestion that

20  Plaintiffs' Counsel acted unethically in the conduct of this litigation."  Dkt. No.

21  67.

22  **III.   RESPONSES TO OBJECTIONS**

23       None of the issues raised by the objectors justify not approving the

24  Settlement which has been overwhelmingly endorsed by the Class.  Plaintiffs

25  directly respond to the objectors' issues below.

26       **A.    The Contention that the New Warranty Coverage Was Not the**

27       **Result of Plaintiffs' Efforts**

28  The Tiffany Objectors contend that the new warranty coverage provided

by the Settlement was not the result of Plaintiffs' efforts and that Nissan "was planning to augment its warranty as to all 2011-2012 LEAF owners and did so long before the Settlement could be proposed or finalized" (Tiffany Objection at 34). Based on Plaintiffs' Counsel's conversations with Ms. Tiffany, Plaintiffs believe that this concern has been assuaged as to Plaintiffs' conduct and that these objectors now believe that Plaintiffs and their counsel acted in good faith and did not know whether or not Nissan already was planning to offer a new warranty independent of the Settlement. *See also* Tiffany Objectors' Amendment to Objection. Dkt. No. 67 (withdrawing any suggestion that Plaintiffs' Counsel acted unethically in the conduct of this litigation).

In fact, the chronology of this case compels that conclusion. As set forth in detail in Plaintiffs' Motion for Final Approval (Dkt. No. 66) and in the supporting declaration (Dkt. No. 66-1), prior to the time that Plaintiffs filed their original complaint in this matter, Nissan repeatedly maintained that there was nothing wrong with the LEAF battery capacity and that the battery was performing as expected.

For example, on July 24, 2012, Carla Bailo, Senior Vice President of Nissan, issued an open letter to Nissan LEAF owners on behalf of Nissan. The letter stated, in relevant part, "less than 0.3 percent of Nissan LEAFs in the U.S. (including vehicles dating back to December, 2010) have experienced a loss of any battery capacity bars." Further, the letter stated that "all lithium-ion batteries lose capacity with use and age. This is normal and expected. In general, lithium-ion batteries exhibit a higher loss of capacity early in life, with the rate of loss decreasing over time." *See* Ex. A to Lurie Approval Decl.

On September 4, 2012, Andy Palmer, Executive Vice President of Nissan Motor Company, dismissed recent reports of LEAF battery problems in hot weather. Palmer said that the problem was a faulty battery level display. "We don't have a battery problem," he said. *See* Ex. B. to Lurie Approval Decl.

1   Similarly, on September 17, 2012 Nissan announced a new and improved
2   battery for the 2013 model Nissan LEAF but did not announce any
3   improvements or new warranties for the 2011-2012 model years.  *See* Ex. C to
4   Lurie Approval Decl.

5   On or around September 22, 2012, two days before Plaintiffs filed their
6   complaint, Mark Perry, Executive Vice President of Nissan, stated, "the cars and
7   battery packs are behaving as we expected."  *See* Ex. D to Lurie Approval Decl.

8   Also on September 22, 2012, Ms. Bailo published a second open letter to
9   LEAF owners concerning the battery capacity loss issue and the results of tests
10  conducted on seven individual vehicles in the Phoenix area.  Nissan's letter
11  stated, in relevant part, that "the Nissan LEAFs inspected in Arizona are
12  operating to specification and their battery capacity loss over time is consistent
13  with their usage and operating environment.  No battery defects were found."
14  Further, Bailo stated that "information on gradual battery capacity loss is
15  available in the paperwork that was delivered with your vehicle, in the owners'
16  manual, and on the many vehicle resources available at
17  http://www.nissanusa.com/leaf-electric-car/." *See* Ex. E to Lurie Approval Decl.

18  In all of the Nissan communications prior to the filing of Plaintiffs'
19  complaint, there was no mention of any fix for the loss of excessive battery
20  capacity and no mention of any new or extended warranty to address the
21  excessive capacity loss issue.

22  Nissan also responded to Plaintiff Klee's CLRA letter by stating, in part,
23  that Plaintiffs' allegations are unfounded and that Nissan denies that there is any
24  defect in the vehicles or their batteries.

25  Moreover, even after the complaint was filed, Nissan continued to
26  maintain that the action had no merit and that there were no problems with
27  excessive battery capacity loss.

28  Nissan only agreed to offer the new warranty after Plaintiffs' Counsel

1  initiated settlement discussions with the intention of obtaining warranty coverage

2  for the LEAF's excessive loss of battery capacity. On October 10, 2012,

3  Plaintiffs' Counsel called counsel for Nissan and suggested that Nissan extend

4  the warranty to cover excessive battery capacity loss.  On November 13, 2012,

5  counsel for Plaintiffs and representatives of Nissan conducted a telephonic

6  conference to address issues raised by and in the complaint, including the

7  possibility of an extended warranty. On November 14, 2012, Plaintiffs' Counsel

8  sent Nissan a formal demand letter detailing Plaintiffs' requested settlement

9  relief, which included a warranty coverage extension to cover capacity loss in

10 Class vehicles. On December 4-5, 2012, counsel for the parties met in person in

11 Los Angeles for two days of face-to-face negotiations to discuss proposed

12 settlement terms.  On December 5, 2012, the parties signed a Settlement Term

13 Sheet outlining and confirming the settlement terms, which included a modified,

14 new Electric Vehicle Limited Warranty for the Nissan LEAF that provided new

15 battery capacity loss protection.   Plaintiffs' Motion for Final Approval at 8:18-

16 20, Dkt. No. 66.

17       Accordingly, based on the foregoing and as discussed with Ms. Tiffany,

18 Plaintiffs believe that the Tiffany Objectors' contention that the new warranty

19 coverage was not the result of Plaintiffs' efforts is a non-issue.

20       **B.       Contentions Regarding the June 2013 Announcement**

21       Certain objectors (Vo, Carignan) contend that the new warranty already

22 was implemented in June 2013 (after the parties' Settlement Term Sheet in

23 December 2012 but before the final approval process) and that the Settlement

24 conveys no benefit to the Class as Nissan already has agreed to extend the

25 warranty.  The Tiffany Objectors further contend that "once Nissan chose, for

26 reasons of its own, to implement the extended warranty prior to approval of the

27 class settlement, that coverage can no longer be a term of the settlement"

28 (Tiffany Objection at 7) and the Class Notice "does not tell class members that

1  they gain nothing by remaining in the lawsuit and lose nothing by opting out"

2  (*Id*. at 15).

3    This entire argument arises out of a misunderstanding of the June 2013

4  announcement, how it came about, what it was intended to accomplish, and the

5  effect of this Court's final approval order on the June 2013 announcement.

6  Again, the chronology is instructive.

7    As described in Plaintiffs' Motion for Final Approval (Dkt. No. 66) and

8  the exhibits attached to the Lurie Approval Declaration filed therewith (Dkt. No.

9  66-1), the parties executed a Settlement Term Sheet on December 5, 2012.  The

10  Settlement Term Sheet allowed for Nissan to determine how the new warranty

11  terms could be communicated to the public prior to Settlement approval.  The

12  Settlement Term Sheet permitted Nissan to announce its plan to modify the New

13  Electric Vehicle Limited Warranty for the Nissan LEAF and to advise its

14  customers and the public that the coverage will be made retroactive to the 2011-

15  2012 model years.  The Settlement Term Sheet further provided that at least one

16  announcement would indicate that the coverage was being provided as a

17  customer satisfaction effort to address customer concerns, including those

18  expressed by the named Plaintiffs in this lawsuit.

19    Plaintiffs agreed to these terms because, frankly, it was more important to

20  Plaintiffs that the new warranty come to fruition than to insist on taking public

21  credit for the new warranty in Nissan's press releases.  Moreover, anyone who

22  has negotiated and settled a class action with a large company is aware that, as a

23  general business practice, corporate defendants are loath to agree in public

24  announcements that any corrective action that they might take is the "direct

25  result of settlement negotiations with plaintiffs in the class action lawsuit."

26    Consistent with the parties' Settlement Term Sheet, on or about

27  December 27, 2012 Nissan announced that a new warranty for the 2011-2012

28  Nissan LEAF would be provided.  Ex. F to Lurie Approval Decl.  In the Q&A

1  accompanying the announcement, Nissan specifically referred to the pending

2  class action lawsuit, stating that the "class action lawsuit was settled as part of

3  our efforts to address customer concerns," as required by the Settlement Term

4  Sheet.  Ex. G to Lurie Approval Decl.  The December 2012 announcement also

5  stated that the specifics of the new warranty would be communicated to each

6  owner early in 2013.

7          On June 7, 2013, as indicated in the December 2012 announcement,

8  Nissan mailed letters to all Class members advising them of the new battery

9  warranty terms.  The letter enclosed labels describing the new warranty coverage

10 to all Class Members to affix to Class Members' Warranty Information Booklets.

11 Ex. H to Lurie Approval Decl.

12         Nissan's decision to announce the new warranty in June 2013 and before

13 the formal approval process was contemplated by, and pursuant to, both the

14 Settlement Term Sheet and Nissan's December 2012 announcement.  In fact, the

15 June 7, 2103 letter specifically states that "Nissan is offering the new warranty

16 "as previously announced by Nissan in December 2012."

17         The June 2013 letter does not render the Settlement a nullity, and any

18 contention that Class Members received nothing in exchange for their release

19 because the new warranty already was fully implemented is simply wrong.  As is

20 apparent from the foregoing chronology, while the June 2013 letter did not

21 clarify that the warranty was being offered as part of the Settlement, the June

22 2013 announcement resulted from this lawsuit and was based on the expectation

23 that the Settlement would be finally approved.  By sending the warranty letter in

24 June 2013 -- after the parties executed the Settlement Term Sheet in December

25 2012 and following an announcement regarding the new warranty by Nissan on

26 December 27, 2012 -- Nissan agreed to provide the warranty benefits in

27 anticipation that the Court would ultimately approve the Settlement.  This is a

28 laudable act that benefits consumers, and the Settlement should not be

jeopardized because of it.

That the class action lawsuit was not specifically referenced in the June 2013 communication was a business decision by Nissan. As already described, the Settlement Term Sheet allowed Nissan to determine how it would disseminate information regarding the new warranty, and the June 2013 letter is consistent with that agreement.

More importantly, Class Members are receiving something extremely valuable in exchange for their release in this case: simply put, any Class member who stays in the Class is entitled to the benefits of the new warranty; any Class member who opts out is not -- just as the Class Notice describes. Over 100 Class members, having reviewed the Notice, determined that they would prefer to opt out of the Settlement and preserve their individual remedies with respect to Nissan. Nissan has been keeping track of the Class members who opt out, and the opt-outs will not be entitled to the new warranty. This means that, with respect to Class members who opt out, Nissan would have no obligation to repair or replace the battery or to take any other action set forth in the new warranty.

That warranty changes are put in place before final approval of a settlement does not invalidate the settlement. To the contrary, final approval ensures that defendants' prior changes are enforceable and subject to court oversight and sanctions. *See, e.g., Lane*, 696 F.3d. at  824 ("Even assuming Objectors' premise that Beacon was already effectively terminated, absent a judicially enforceable agreement, Facebook would be free to revive the program whenever it wanted. It is thus false to say that Facebook's promise never to do so was illusory"). *See also In re Budeprion XL Marketing & Sales Litigation*, 2012 U.S. Dist. LEXIS 91176 (E.D. Pa. 2012) (holding that changes put in place before a settlement is finalized does not make the settlement illusory since defendants' failure to comply with the terms of the settlement agreement can lead to sanctions, including a finding that they are in contempt of court, and that

the settlement makes the change permanent).  Final approval makes the new warranty legally enforceable and ensures that it cannot be modified or rescinded. Similarly, in *Sadowska v. Volkswagen Group of America, Inc.*, CV-00665-BRO (AGRx), Civil Minutes, Order on Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees, Expenses, Costs and Class Representative Incentive Awards, this Court granted final approval of the Settlement, noting that "the Settlement Agreement provides numerous benefits to Class Members, many of which already have been claimed." *Id*. at p. 13.

In sum, contrary to the objectors' contentions, the new warranty was not "fully implemented, unconditional and indefeasible" as of June 2013 (Tiffany Objection at 6); the Notice adequately informed Class Members that they would not be entitled to the warranty benefits if they opted out; and final approval of this Settlement provides the Court's imprimatur and ensures that the new warranty terms cannot be rescinded or withdrawn.

**C.   The Contention that Plaintiffs Are Not Pursuing All Claims**

Certain objectors contend that the Settlement "fails to address most of the claims in the class action complaint."  Tiffany Objection at 16.  However, at the same time, even these objectors admit that "a settlement is a compromise and that not all of plaintiffs' claims will be satisfied in full."  *Id*. at 28.  In resolving this matter, Plaintiffs determined, based on their investigation, that the new warranty in fact fairly, adequately and reasonably resolved the claims in this lawsuit.

**1.   Thermal Management Defect and Excessive Loss of Battery Capacity**

Plaintiffs alleged that the Nissan LEAF battery in the 2011-2012 models experienced excessive battery capacity loss due to a Thermal Management Defect.  Specifically, Nissan had represented that the LEAF battery is expected to maintain approximately 80% of its initial capacity after 5 years of normal

1   operation.  However, LEAF owners were concerned that the excessive rate of

2   capacity loss that they experienced in the first two years would continue, putting

3   them well below Nissan's projected loss of approximately 20% battery capacity

4   over 5 years.  The new warranty protects against this result.

5          The new warranty addresses the alleged Thermal Management Defect by

6   providing warranty coverage that expressly protects against excessive capacity

7   loss due to the Defect.  The new warranty restores the battery's capacity to

8   approximately the same level of capacity that Nissan represented would occur

9   over 5 years of normal operation.  The new warranty provides that Nissan will

10  cover any repairs needed to bring the battery capacity level up to at least nine

11  bars (approximately 70% capacity) on the vehicle's battery capacity level gauge

12  for a period of 60 months or 60,000 miles, whichever occurs first. [2]  If necessary,

13  the Lithium-ion battery components will be repaired or replaced in eligible

14  vehicles and the original Lithium-ion battery will be returned to the vehicle.  If

15  repair is not possible, the Lithium-ion battery will be replaced in eligible

16  vehicles with either a new or remanufactured Lithium-ion battery. There is no

17  cap on the number of repairs that can be made, and Class Members will be

18  assured of a plan that covers the loss of battery capacity for the warranty period,

19  even if the problem recurs.

20         The new warranty directly addresses Plaintiffs' claim that, due to the

21  Thermal Management Defect, the Nissan LEAF does not achieve the range

22  advertised *i.e.*, that excessive capacity loss results in a lower driving range.  As a

23  result of the new warranty, the LEAF's battery capacity will be brought back up

24  to at least nine bars, which will restore the range that Nissan represented would

---

25  [2] The Settlement Agreement at paragraph 8 clearly states that "Any repair
26  or replacement made under this new Lithium-ion Battery Capacity Coverage will
    not return the Lithium-ion Battery to an 'as new' condition" with all 12 battery
27  capacity bars, but will provide the vehicle with a capacity level of nine *bars or
    more* on the battery capacity level gauge."  Emphasis added.
28

PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE SETTLEMENT

1    be maintained by the vehicles at that level of battery capacity.

2          Objectors contend that "in essence, the proposed settlement validates

3    Nissan's view that a 30 percent battery loss in 1 or 2 years of driving –or

4    however long it takes to put 60,000 miles on the odometer – is normal and

5    acceptable." Tiffany Objection at 24.  Not correct.  The nine bars was based on a

6    determination that even customers who fall below the 80% average or are in

7    hotter climates and who might therefore suffer significantly more battery

8    capacity loss still would have a guaranteed amount of capacity.  As Nissan

9    explained in a Q&A on December 27, 2013 issued after the parties' agreement:

10              Q.     Why doesn't the warranty restore the battery to
                the same level as a brand new one?
11
                A.     Gradual capacity loss is normal and expected in
12              all lithium-ion batteries with time and use.  The intent
                of this warranty is to provide consumers with
13              confidence that despite this normal battery capacity
                loss, they will be assured of a minimum level of
14              capacity throughout the warranty period.

15         Moreover, Nissan never represented that the LEAF would lose only 20%

16   capacity over 5 years.  There was no guarantee about a specific percentage of

17   capacity loss.  Some drivers may have more; some drivers may have less.  All

18   LEAF purchasers were required at the time of purchase to read, acknowledge

19   and sign a "LEAF Customer Information and Disclosure Form" for use with the

20   2011-2102 LEAFs.  Objector Kozinski signed that Form.  Ex. D to Lurie

21   Response Decl.  The LEAF Customer Information and Disclosure Form

22   confirms, as Nissan consistently has represented, that the LEAF battery is

23   expected to maintain "*approximately* 80% of its initial capacity after 5 years of

24   normal operation and recommended care, but this is not guaranteed.  This

25   number may be higher or lower depending upon usage and care." (Emphasis

26   added).  Similarly, the LEAF owners' manual states that "Nissan estimates that

27   battery capacity will be *approximately* 80% of original capacity after five years,

28   although this is only an estimate, and this percentage may vary (and could be

1    significantly lower) depending on individual vehicle and Li-ion battery usage."

2    Emphasis added.  Ex. K to Lurie Approval Decl.

3        Thus, the new warranty fairly, adequately and reasonably resolves the

4    issue of excessive battery capacity loss.

5                 **2.**      **Driving Range**

6        As alleged by Plaintiffs, the driving range issue was a function of the

7    excessive battery capacity loss *i.e.,* Plaintiff alleged that that excessive capacity

8    loss results in a lower driving range. "To this litany, [the Tiffany] Objectors

9    would add that the 100 mile range advertised by Nissan is a pipe dream," that

10   "Nissan promised class members an effective range of 100 miles based on a full,

11   12-bar battery, and that Nissan "never disclosed that the 100 miles can never be

12   achieved in normal driving."  Tiffany Objection at 19-20.  Other objectors

13   (Artur-Tamers, Devine, Pelech, Vo) also claimed that the vehicles do not have

14   the driving range represented by Nissan.  Objector Chun complains about "range

15   anxiety."

16        Respectfully, and as Plaintiffs' Counsel pointed out to Ms. Tiffany, all

17   purchasers were required at the time of purchase to read, acknowledge and sign a

18   "LEAF Customer Information and Disclosure Form" for use with the 2011-2102

19   LEAF (which Objector Kozinski signed). Ex. D to the Lurie Response Decl.

20   This very detailed Form expressly notifies potential purchasers that actual

21   driving range will vary depending on driving/charging habits, speed, conditions,

22   weather, and temperature and battery age.  The LEAF Customer Information and

23   Disclosure Form also informs potential buyers of the LEAF's estimated range,

24   the conditions that affect range, and the scenarios under which various ranges are

25   attainable.  The Form expressly states that the driving ranges "are estimates" and

26   that "the distance you can drive (range) varies considerably depending on, for

27   example: state of charge, weather, temperature, usage, age, topography, and

28   manner of driving."  Nissan specifically discloses in the Form that in order to

1   attain 105 miles of "suburban driving on a nice day," the average speed must be

2   24 mph in an ambient temperature of 72 degrees with climate control off."  *Id*.

3   Moreover, the EPA information on the Monroney window sticker for the

4   LEAF states clearly that the estimated range is only 73 miles.  Ex. L to Lurie

5   Approval Decl.  The window sticker also states 99 "MPGequivalent" which

6   some have mistakenly confused as a range estimate.  MPGequivalent is an EPA

7   term first used on the LEAF and certain other electric cars, and is a measure of

8   the average distance traveled per unit of energy consumed, not the driving range

9   that may be achieved on a charge.  *See also* Larsen Objection at 2 ("Nissan did,

10   indeed, advertise 100-mile range for the LEAF but always with explicit

11   clarification.')  Dkt. No. 59.

12   Accordingly, Plaintiffs determined that the range claim addressed by the

13   Settlement is the lower driving range *attributable specifically to the excessive*

14   *battery capacity loss*, not the 100 mile range claim as identified by objectors.

15   The new warranty directly addresses Plaintiffs' claim that, due to the Thermal

16   Management Defect, the Nissan LEAF does not achieve the range advertised *i.e.*,

17   that excessive capacity loss results in a lower driving range.  As a result of the

18   new warranty, the LEAF's battery capacity will be brought back up to at least

19   nine bars, which will restore the range that Nissan represented would be

20   maintained by the vehicles at that level of battery capacity.

21   Again, any Class Members who feel that they were misled by a LEAF

22   sales person or dealership or that the LEAF Customer Information and

23   Disclosure Form is misleading had the option to opt out and sue Nissan directly.

**3.    Battery Charge**

25   The Tiffany Objectors maintain that "charging the battery to its full

26   capacity is poison, to be avoided at all costs," that "filling the battery to full

27   charge causes it to deteriorate and lose capacity,"  and that "the battery must be

28   charged to no more than 80% of capacity."  Objection at 19-20.  Objectors are

incorrect.

First, the LEAF battery may be charged to 100%; in fact, 100% is the default setting. What is to be avoided, in order to maximize the battery's useful life, is constantly recharging the battery to 100% when it already is at a high rate of charge (for example, if the driver charges the battery to 100% after it depletes to 80% and then constantly repeats that process by charging the battery to 100% without allowing the battery to more fully deplete). As the owner's manual clearly recommends: "Avoid sustained high battery state of charge (caused, for example, by frequently charging to 100% state of charge and/or leaving the battery above 80% state of charge for long periods of time)."

The 80% charge is only a *recommendation* to ensure that the Class Vehicles are not maintained at a continuous high state of charge (more than 80%), which may result in excessive battery capacity loss over time. The charging timer recommendation in the LEAF user manual plainly "recommends charging the Li-ion battery using the long life mode to help maximize the Li-ion battery useful life . . . The long life mode is set by changing the [% Charge] to [80% Charge (Improves Battery Longevity)]." Ex. M to Lurie Approval Decl. The charging timer option expressly states that "100% Charge (Maximizes Driving Range) 80% Charge (Improves Battery Longevity)." Ex. N to Lurie Approval Decl.

More importantly, even the 80% battery charge issue is covered by the new warranty terms. Even if a Class member does not follow the recommendation and charges the battery to 100% or if the battery drops below nine bars of capacity within 5 years, the Class Member is still covered under the new warranty and can have the capacity restored to nine bars or more.

It is worth reiterating that certain objectors support the foregoing conclusion regarding the battery charge and are adamant that the contention that "Nissan failed to disclose its own recommendation that owner avoid charging the

1    batter beyond 80%" is "inaccurate."  *See* Larsen Objection at 2 ("Plaintiffs

2    cannot claim that Nissan 'misled' them if they themselves **neglected to read** the

3    numerous disclaimers, disclosures, clarifications, range predictions, and

4    recommendations in the ads, web pages, purchase agreements, window stickers,

5    onboard displays, and manuals that were openly available to them.") Emphasis in

6    original.  Similarly, Objector Smith notes that "the warranty information booklet

7    clearly states that the EV battery will experience capacity loss with time and use.

8    I have leased my Nissan Leaf for more than 12 months, have followed the tips in

9    the Owner's Manual, and still have 12 bars of battery capacity.  Nissan has no

10   control over the operational conditions of the car by owners or lessees, and as

11   such, should not be held liable for damages or failures that may result from

12   improper operational procedures."  Smith Objection at 1.

**4.    Damages**

14         The Settlement does not include damages for repairs due to excessive

15   capacity loss because Class Members did not actually suffer out of pocket

16   damages by having to pay for a repair due to loss of battery capacity. Class

17   Members were not out of pocket because Nissan denied that there was a problem

18   and therefore did not even offer repairs for excessive battery capacity loss for

19   which Class Members were required to pay out of pocket.  Nissan also never

20   even offered to sell replacement lithium-ion batteries for the LEAF.

21         To the extent that there might be a potential damages claim for diminution

22   in value resulting from loss of capacity, that claim is addressed by the addition of

23   the new warranty which now covers the excessive battery capacity loss.

24   Similarly, concern that Class vehicles might not operate as promised during the

25   warranty period also is obviated by the new warranty.  Moreover, while a

26   damages remedy is not being offered by this Settlement, under the Settlement

27   each Class Member actually is receiving a Settlement *benefit* worth over $11,000

28   per Class Vehicle (which is the value of the new warranty, as determined by

1  Plaintiffs' expert). Finally, to the extent that any Class Member might claim
2  damages attributable to excessive capacity loss, that Class Member still had the
3  option to opt out of the Settlement and pursue an individual claim.

### 5.    Plaintiffs' Discovery

5      Notwithstanding their Amendment to Objection wherein they "withdraw
6  any suggestion that Plaintiffs' Counsel acted unethically in the conduct of this
7  litigation" (Dkt. No. 67), the Tiffany Objectors still take issue with the fact that
8  this case was settled subject to confirmatory discovery.  They contend that
9  Plaintiffs first should have insisted on bringing to light all documents showing
10  that the LEAF battery suffers from a variety of defects and that no settlement can
11  be negotiated without Plaintiffs' Counsel first finding out everything that Nissan
12  knew.   Objectors contend that Plaintiffs and their counsel failed to act in the best
13  interest of the Class.

14      To set the record straight, the agreement to settle in December 2012
15  expressly was conditioned on discovery to confirm whether or not the
16  representations made by Nissan during settlement negotiations were true and that
17  the new warranty, in fact, was not only fair, adequate and reasonable but the best
18  possible relief for the Class. The settlement was not locked.  If the discovery had
19  not confirmed that the facts were as represented during the mediation or that the
20  Settlement in fact was not a good deal for the Class, Plaintiffs would not have
21  finalized the settlement, no matter the fee amount.  Objectors can debate whether
22  the relief is sufficient and the Court will decide.  But it is inaccurate and without
23  any basis whatsoever to accuse Plaintiffs and their counsel of simply taking
24  whatever settlement they were handed by Nissan.

25      Second, objectors' claims about discovery are largely beside the point
26  because the new warranty provides excess battery capacity coverage *regardless*
27  *of the cause of the defect*.  In objectors' view, apparently Plaintiffs should have
28  spent months or years litigating this issue while Class Members' vehicles

1   continued to suffer from excess battery capacity loss.  Or Plaintiffs should not

2   have agreed to even discuss settlement until after they had conducted discovery.

3   In some cases, it may be inappropriate to enter into settlement talks if discovery

4   has not been undertaken.  That was not Plaintiffs' approach in this case.  Here,

5   Plaintiffs had sufficiently identified the issue and the solution and even had

6   sought an extended warranty as relief in their complaint.  Plaintiffs and their

7   counsel were focused on getting the best result for the Class while Class

8   Members still owned their vehicles and could actually benefit from a settlement.

9   In Plaintiffs' estimation, that goal was achieved through a new extended

10  warranty for excessive battery capacity loss, and that fact was confirmed during

11  discovery.  The discovery proved, to Plaintiffs' satisfaction, that the excess

12  battery capacity coverage loss was the key issue in the case and that Plaintiffs'

13  other claims as alleged should not be pursued.

14       The discovery also investigated the terms of the new warranty to

15  determine whether, in fact, they were fair, adequate and reasonable.  As set forth

16  in prior pleadings, Plaintiffs' Counsel undertook a rigorous analysis of the

17  settlement's responsiveness to Class Members' concerns about the LEAF battery

18  life as expressed on blogs and Internet message boards, which is where most

19  LEAF owners communicate with each other.  For example, Class Members were

20  concerned about manipulation of the battery capacity gauge by dealers or third

21  parties to avoid the capacity warranty.  To address this concern, Plaintiffs'

22  Counsel sought and obtained a detailed declaration under oath from a senior

23  manager responsible for the Nissan LEAF who concluded that it would be nearly

24  "impossible for a dealer technician to manipulate the vehicle's battery capacity

25  gauge or to install a new program that would show a different battery capacity

26  than that of the vehicle's actual battery."  Lurie Fee Decl. ¶ 20.

27       To further confirm the reasonableness of the Settlement and that it

28  responded to Class Members' concerns, Plaintiffs' Counsel also insisted on and

PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE SETTLEMENT

1  received detailed responses from Nissan representatives regarding other issues

2  that had been raised by Nissan LEAF owners, such as:  (1) why Nissan

3  determined that the battery capacity can be restored to only 9 bars (or approx.

4  70% capacity); (2) why there was not more robust coverage for cars sold in hot

5  climates; (3) how the 9 bars under the new warranty would be verified; and (4)

6  whether the new warranty precludes buy-backs by NNA for unsatisfied

7  customers.  *Id.*  By the time Plaintiffs executed the Settlement Agreement, they

8  had more than adequate information to assess the strengths and weaknesses of

9  their case.[3]

10      If, for whatever their individual motivations, objectors are preoccupied

11  with finding out Nissan's inner thoughts or exposing Nissan or if objectors

12  choose not to believe Nissan's representations that were the basis for this

13  settlement, they can opt out and sue Nissan to continue their campaign.  They

14  should not be permitted to hold the settlement hostage.

15  **D.      The Contention that Only the Named Plaintiffs Are Being Made**

16  **Whole**

17      Certain objectors object to the $5,000 incentive amount (Vo) or

18  misunderstand the incentive payment and believe that Plaintiffs' Counsel will be

19

20  _____

[3] Objectors make similar unsubstantiated claims regarding the settlement valuation and the fee award.  Plaintiffs did obtain the cost of repair, which is the amount that Nissan was willing to pay its own dealers.  Johns Decl., ¶ 14. Nissan considered the actual cost of the battery itself to be a highly confidential trade secret, so for that fact Plaintiff's expert relied on market valuations. Objectors' other contentions regarding valuation are disproved simply by carefully reading the Johns Decl. and the declaration submitted by Warren DeBardelaben on behalf of Nissan (Dkt. 47-2).  The value conferred by the Settlement more than justifies the fee award under the Ninth Circuit's percentage-of-the-recovery method, which is the prevailing approach for cases where the value to the class is ascertainable.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (surveying common fund cases in the Ninth Circuit).  *See also* Plaintiff's Notice of Motion and Motion for Attorney's Fees, Expenses and Class Representative Incentive Awards (Dkt. No. 46).

1   receiving $5,000 per Class Member (Devine).  The Tiffany Objectors further
2   contend, without any evidence whatsoever, that the proposed payment to the two
3   named Plaintiffs "is buying their consent to a settlement that causes nothing but
4   harm to the other class members.  Or to put it differently, by paying Klee and
5   Wallak $5,000 in hush-money, Nissan and the lawyers are removing the only
6   individuals who know enough to out the settlement as unfair."  Tiffany Objection
7   at 28.  Based on Plaintiffs' Counsel's discussion with Ms. Tiffany and based on
8   the Amendment to Objection, Plaintiffs are under the impression that this
9   contention is withdrawn.

10          In any event, as set forth in Plaintiff's Motion for Fees and as this Court is
11   well aware, a modest incentive award is justified and common in class actions to
12   compensate named plaintiffs for undertaking the risk and expending time in
13   working with Plaintiffs' Counsel to advance Class Members' interests.  *See e.g.*,
14   *Hopson v. Hanesbarnds, Inc.*, No. CV-08-08434 EDL, 2009 LEXIS 33900, at
15   *27-28 (N.D. Cal. Apr. 3, 2009) ("In general, courts have found that $5,000
16   incentive payments are reasonable.").  For the same reasons, this Court approved
17   a $5,000 incentive award to Plaintiffs in *Sadowska*,  *infra*.

18   **IV.   RESPONSE TO THE OPPOSITION TO PLAINTIFFS' MOTION**
19   **        FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

20          On November 10, 2013, the Tiffany Objectors filed an Opposition to
21   Plaintiffs' Motion for Final Approval of Class Action Settlement.  Neither the
22   Preliminary Approval Order nor the Class Notice provides for this supplemental
23   pleading.  Accordingly, the Opposition should be stricken.

24          Plaintiffs' Counsel reserve the right to respond to the Opposition in a
25   subsequent brief.

26   ///
27   ///
28   ///

1    **V.    CONCLUSION**

2           For all of the foregoing reasons, the objections should be overruled and the

3    Settlement should be approved.

4

5    Dated:  November 11, 2013              Respectfully submitted,

6                                           Capstone Law APC

7

8                                      By: /S/ Jordan L. Lurie

9                                           Jordan L. Lurie
                                            Tarek H. Zohdy

10                                          Attorneys for Plaintiffs and
                                            Class Members
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO OBJECTIONS TO THE SETTLEMENT