1           **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3     **HONORABLE BEVERLY REID O'CONNELL, U.S. DISTRICT JUDGE**

4

5  HUMBERTO DANIEL KLEE and DAVID WALLAK, )
    individually, and on behalf of a class )
6  of similarly situated individuals,    )
                                  )
7                Plaintiffs,    )
                                  )
8     vs.                  )        Case No.
                                 )  CV 12-8238 BRO (PJWx)
9  NISSAN NORTH AMERICA, INC.,       )
                                  )
10               Defendant.    )

11

12               **REPORTER'S TRANSCRIPT OF**
      **MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
13             **MONDAY, NOVEMBER 18, 2013**
                   **10:12 A.M.**
14           **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22       ————————————————————————————————————

23         **MYRA L. PONCE, CSR 11544, RMR, CRR**
            FEDERAL OFFICIAL COURT REPORTER
24       312 NORTH SPRING STREET, ROOM 430
         LOS ANGELES, CALIFORNIA 90012
25             (213) 894-2305

1                 **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFFS:**

4      CAPSTONE LAW, APC
     BY:  JORDAN L. LURIE

5      BY:  MARK GREENSTONE
     BY:  REBECCA LABAT

6      BY:  TAREK H. ZOHDY
     BY:  CODY P. PADGETT

7          Attorneys at Law
     1840 Century Park East, Suite 450

8      Los Angeles, California 90067
     (310) 556-4811

9

10

11   **FOR THE DEFENDANT:**

12      SEDGWICK LLP
     BY:  E. PAUL CAULEY

13          Attorney at Law
     1717 Main Street, Suite 5400

14      Dallas, Texas  75201
     (469) 227-8200

15

16      SEDGWICK LLP
     BY:  PAUL J. RIEHLE

17      BY:  GREGORY C. READ
         Attorneys at Law

18      333 Bush Street, 30th Floor
     San Francisco, California  94104

19      (415) 781-7900

20      SEDGWICK LLP
     BY:  ANTHONY ANSCOMBE

21          Attorney at Law
     One North Wacker Drive, Suite 4200

22      Chicago, Illinois 60606
     (312) 641-9530

23

24   **OBJECTOR:**  ALEX KOZINSKI

25

**UNITED STATES DISTRICT COURT**

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, NOVEMBER 18, 2013

 2                           10:12 A.M.

 3                             -oOo-

 4            THE COURTROOM DEPUTY:  Case No. CV 12-8238 BRO,

 5   Humberto Daniel Klee, et al., versus Nissan North America,

 6   Incorporated, et al.

 7        Counsel, state your appearances, please.

 8            MR. LURIE:  Good morning, Your Honor.  Jordan Lurie,

 9   Capstone Law, representing plaintiffs in the class.  With me

10   today is Mark Greenstone, Rebecca Labat, Tarek Zohdy, and

11   Cody Padgett, plaintiffs' counsel.

12            THE COURT:  Good morning.

13            MR. CAULEY:  Good morning, Your Honor.  Paul Cauley

14   with Sedgwick on behalf of Nissan.  With me today is

15   Paul Riehle, Greg Read, and Anthony Anscombe.

16            THE COURT:  All right.  Good morning.

17        All right.  We're here for apparently -- recently

18   transferred to me, for the fairness hearing and final approval.

19        Are there objectors present in the courtroom?

20            MR. KOZINSKI:  Good morning, Your Honor.

21   Alex Kozinski, objector.

22            THE COURT:  Good morning, Your Honor.

23        All right.  I've read and considered what can only be

24   characterized as lengthy papers and the declarations.  It was

25   preliminarily approved by Judge Pregerson, is my understanding,
```

1    and then he recused himself.

2        But -- and my job under Rule 23 is to independently

3    evaluate the settlement against the claims, listen to the

4    objectors, and determine whether or not this is a fair

5    settlement, given the claims.

6        So I would like to hear from the objector.

7        Judge?

8            MR. KOZINSKI:  Good morning.  This is made for tall

9    people.

10            THE COURT:  Don't I know it.

11            MR. LURIE:  Your Honor, can I just raise a

12    preliminary issue with the Court's respect?  There -- on behalf

13    of both parties, there are some confidential information that

14    was filed under seal.  Also, the extent of the arguments may

15    include confidential settlement discussions.  The parties would

16    request that all -- that the hearing be closed and that anyone

17    who's not essential to the proceedings, court personnel, not be

18    included in the courtroom?

19            THE COURT:  Well, I don't see anybody -- I see my

20    staff here.  I see --

21            MR. KOZINSKI:  Two law clerks of mine who are here

22    to watch.  I plan to make no reference to any -- Your Honor, I

23    was --

24            THE COURT:  I -- I'm going to -- hold on.

25        Sir, you are present in the courtroom.  Are you a reporter

1    or something?

2              UNIDENTIFIED MAN:  No, ma'am, just an observer.

3              THE COURT:  Okay.  Well, I am going to ask you to

4    confine yourself to the public record when you're making your

5    statements, and we will take it up after I hear from the

6    objector.  Certainly the objector is not then privy to anything

7    filed under seal.

8              MR. LURIE:  He is, actually, Your Honor.  He signed

9    a protective order allowing him to review the pleadings filed

10   on Saturday by Nissan.

11             THE COURT:  Well, I'm sure the judge will know that

12   he is bound by the protective order.

13             MR. KOZINSKI:  Your Honor, I'm not a judge this

14   morning.  Mr. Kozinski.

15             THE COURT:  Okay.  Mr. Kozinski, I'm sure you know

16   you're bound by the protective order?

17             MR. KOZINSKI:  Yes, I did acknowledge it.  I did not

18   tell my law clerks the contents of the protective order.

19   They're here to watch the hearing.  I plan to say nothing

20   that --

21             THE COURT:  Well, I want to --

22             MR. KOZINSKI:  -- refers to anything protected.  And

23   I guess counsel can -- can signal if they plan to go into those

24   territories.

25             THE COURT:  Here's what's going to happen.  If you

1    plan to go into anything under seal, please let me know ahead

2    of time.  Okay?  I just want to hear from Mr. Kozinski.

3            MR. KOZINSKI:  Thank you.

4        Your Honor, I filed -- my wife and I -- incidentally, my

5    wife apologizes, she couldn't be here.  She has a brief due

6    before one of your colleagues, and she is busy doing that.  So

7    I've been delegated the responsibility of appearing this

8    morning.

9        I just have some points to reiterate that were in my

10   papers and also to respond a little bit to -- to some points

11   raised by Nissan.  The basic point is that there can't be a

12   fair settlement here because Nissan has already given away and

13   implemented the warranty.

14       All of us, long before we heard about the settlement or

15   before we got the settlement notice, got a letter in the mail

16   saying you've got an extended warranty.  They included a

17   sticker, and here it is (indicating).  And they said put it on

18   your warranty book, it extends your warranty.

19       There was no talk of any settlement.  There was no talk of

20   any class action.  There was no talk of any defeasance or

21   somehow this would be inapplicable if a settlement isn't

22   approved.  It's quite unconditional.  I checked with my Nissan

23   dealer; it's right there in my record.

24       Now, surprisingly, surprisingly Nissan has not come back

25   and said, oh, it's all provisional, contingent.  And people who

1  opt out are going to be denied the coverage, the new coverage.

2  Well, I don't think they can do that, Your Honor.  They claim

3  this was valuable consideration.  But, of course, they're

4  familiar with the Uniform Commercial Code.  And Uniform

5  Commercial Code Section 2-209(1) states quite clearly that the

6  modification of a contract does not need consideration.

7       The Uniform -- that portion of the Uniform Commercial Code

8  has been adopted in California and, so far as I know, in every

9  other state.

10       The Tennessee Supreme Court, which, of course, there are

11  class members in Tennessee, in *Paskell v. Nobility Homes* held

12  it applicable to the purchase of a mobile home, quite analogous

13  to our situation here.

14       So I think they're out of luck.  I think they tried to

15  pull a fast one.  They tried to persuade the public and the

16  clients and their customers that they were giving away

17  something for nothing.  And they went ahead and implemented the

18  warranty.

19       Now, I should make it perfectly clear, I do not think that

20  a class action settlement can't be provisionally implemented

21  before Court approval.  And if they said --

22            THE COURT:  I agree with you.

23            MR. KOZINSKI:  Excuse me?

24            THE COURT:  I agree with you.

25            MR. KOZINSKI:  Well --

1          THE COURT:  It can be provisionally implemented

2     before --

3          MR. KOZINSKI:  It can be provisionally implemented.

4          THE COURT:  Under Rule 23.

5          MR. KOZINSKI:  Exactly.  And if that's what they

6     have said, if they had sent letters to the customer saying we

7     are -- we have a settlement in the works, we hope the Court

8     will approve it, we are so acting in good faith that we will

9     start implementing the settlement now and wait for -- not wait

10    for Court approval because we want to be extra fair to our

11    customers, that's fine.  They could have done that, but they

12    didn't do that.

13         What they did is they sent out an indefeasible letter.

14    And for them to now stand here and say, oh, we could all pull

15    it back, aside from the fact this would be a public relations

16    disaster, they'd never do it.  They cannot do it as a matter of

17    law.  The FTC and the State Attorney General would have serious

18    objections to this, I'm quite confident.

19         I also think, Your Honor, that the statement that Nissan

20    makes that objectors are -- I'm sorry, opt -- those who have

21    opted out would be denied benefits if they go to try to get the

22    warranty implemented at the dealers I think is illegal.  And

23    this Court should enjoin it.

24         Look at the class action notice and the discussion of the

25    settlement and the discussion of the -- of the -- you know,

1    they make reference to the parallel -- to the parallel letter

2    that people got.  And what it says, if you opt out, you don't

3    get the benefits of the settlement.  It does not say you will

4    also lose the benefits you got when we sent you a letter and we

5    sent you a sticker to put on your warranty card.

6         And I think it would be unconscionable for this Court to

7    approve a settlement that takes people who read, which is at

8    best an ambiguous notice and I believe one would say a -- far

9    more than ambiguous, it's actually a misleading notice -- and

10   give Nissan the right to pull back because they exercise the

11   right under the class action lawsuit to opt out.

12        Now, of course, Your Honor, I don't represent those

13   people.

14             THE COURT:  No.

15             MR. KOZINSKI:  Mr. Lurie does, and I would expect

16   for him to stand up and agree with me on this point because

17   these are his clients.  But I just point this out, that this is

18   entirely inappropriate for Nissan to even raise in its papers

19   as an argument.

20        So that's my basic argument.  My basic argument, there's

21   no settlement possible because there's nothing Nissan has got

22   left to give.  If they want a settlement, they've got to go

23   back to the negotiating table and provide more.

24        Now, having said that, let me give full credit to

25   Mr. Lurie and his team.  I think they've done a good job.  I

**UNITED STATES DISTRICT COURT**

1   expressed some skepticism in my papers, particularly in my

2   original papers.  I didn't know.  I got this notice from Nissan

3   and then I get this class action settlement.  To me, it looks

4   like a -- fishy.

5        Well, my wife absolved Mr. Lurie, whom I've talked to this

6   morning.  My wife talked to him.  And my wife's a good judge of

7   character.  She -- she said --

8             THE COURT:  I suppose you would say that because she

9   married you, Mr. Kozinski.

10            MR. KOZINSKI:  I think I would say despite the fact

11  that she married me --

12            THE COURT:  Okay, then.

13            MR. KOZINSKI:  -- and has stayed married -- in fact,

14  we -- we were married here -- not here.  We were married when

15  my -- before my wife clerked for Judge Pfaelzer here when it

16  was her first year on the bench.

17            THE COURT:  Okay.

18            MR. KOZINSKI:  So we've been going -- we've been

19  here a long time.  We've been together a long time.

20        So that's my basic argument.

21            THE COURT:  Okay.

22            MR. KOZINSKI:  Getting past that -- and I don't want

23  to burden the Court with too much -- I won't take up too much

24  more time.  But I just think the settlement is not fair on its

25  face, even if we get past the question of consideration,

1    whether settlement is possible.  We don't know.  The only

2    people that have the technical data are Nissan -- is Nissan.

3    They have the data, and they won't share it.

4         Mr. Lurie tried to file a valuation from an expert who had

5    zero information.  He had to scour the Internet for what he

6    thinks is the price of a battery.  But all the other data, the

7    technical data about how often the battery was replaced, what

8    the cost of replacement, what the cost of repair, all that

9    stuff he has to guess at.

10        Now, that's not -- he's not an engineer expert.  He's a

11   valuation expert.  Nissan, who has the information, won't even

12   provide enough information to plaintiffs' counsel to be able to

13   make a decent valuation.  I think this Court should reject the

14   valuation.  It's totally useless.  And, frankly, it's like an

15   insult.  I think for -- for a valuation expert to come up with

16   something like 38 million or $200 million and for Mr. Lurie to

17   then say, oh, it's up to $200 million, I just don't think

18   that's right.

19        Finally, look -- you know, Nissan -- and this will be my

20   last point.  Nissan has raised an argument that all this is so

21   difficult and if this case had been tried or had been gone

22   to -- had not settled, this would be so hard to win.  And

23   they -- in support of this, I don't know about the Court, but I

24   got two boxes of documents, a foot square weighing about 15

25   pounds this weekend in addition to their submission.  And they

1    sort of piled on the papers.  But you know what?  It gets down
2    to one single document.
3         And I am -- I'm grateful to Mr. Lurie for having reminded
4    me of it because I had read it and I had remembered much of it
5    but I had forgotten that I had one in my file, and that is the
6    disclosure that every single LEAF owner is required to sign --
7    correction, Your Honor -- that I was required to sign and I
8    believe every LEAF owner was required to sign before buying it.
9         So it's quite an unusual document.  It's quite unlike
10   anything I've ever done when buying a car.  And I actually sat
11   down and read it and memorized parts of it and, in fact, had a
12   copy in my file.  I'm glad Mr. Lurie reminded me of its
13   existence.
14        But if you look at this document, it says all sorts of
15   interesting things in it.  It does not say -- it talks about
16   having, after five years, 80 percent of initial capacity.  It
17   says it's not certain.  But it never says mileage counts.  It
18   never says the more you drive the car, the more you drive down
19   the battery.
20        Now, Nissan comes back -- and this is in the document they
21   filed yesterday, but I believe this is not confidential because
22   it's a legal argument.  They say, oh, it says usage.  But usage
23   is not mileage.  Usage can encompass any number of things.  And
24   we're talking about the Magnuson-Moss Act.  We're asking the
25   question:  Would this be clear to a reasonable consumer?  And I

1   submit to the Court that it would not be very difficult -- it's

2   highly likely that a juror sitting in that box would look at

3   this and say -- when they say usage, a reasonable consumer

4   would not understand mileage, would not understand that the

5   battery would deteriorate with miles.

6       It's an easy case.  I think they could win it on summary

7   judgment.  But if not for summary judgment, it's a very short

8   and easy trial.

9       I'm putting aside the other claims, the technical claims.

10  They -- they've made claims in the Complaint about -- about the

11  passive cooling system and so on.  I don't know anything about

12  those.  I don't know anything about this because Nissan

13  provides no information and plaintiffs have not done any

14  discovery.  They sat down to negotiate without knowing anything

15  about what's hidden in Nissan's records.  But I'm putting all

16  those claims aside.  I'm just talking about this document, the

17  one that everybody signed.  There is no multiplicity.

18          THE COURT:  Well, the one you think everyone signed,

19  the one you know you signed.

20          MR. KOZINSKI:  The one I know I signed and the one I

21  believe I've read in the papers.

22          THE COURT:  Sure.  Okay.

23          MR. KOZINSKI:  I believe in the papers they said

24  everybody signed but --

25          THE COURT:  Okay.

 1          MR. KOZINSKI:  I'm assuming everybody.  Perhaps they

 2     can correct me.

 3          But if that is the case, then all the questions about

 4     whether the class is a unified class, whether there are

 5     circumstances unique to every individual goes away.  If this

 6     is, in fact, the document that binds the entire class together,

 7     this would be a one-day trial.  And you know what?  I've

 8     offered to Mr. Lurie, I can get on that stand.  I can be quite

 9     persuasive.

10          THE COURT:  Okay.

11          MR. KOZINSKI:  Unless the Court has further

12     questions --

13          THE COURT:  I don't have any further questions of

14     you, Mr. Kozinski.  I have some further questions of Mr. Lurie

15     and of Nissan.

16          MR. KOZINSKI:  I will take my seat in the audience.

17          THE COURT:  Okay.  Thank you.

18          First, Mr. Lurie, I want to talk to you because I've read

19     your papers where you tell me this is such a great result.

20     This is a wonderful, exceeds your expectations, blah, blah,

21     blah.  And Mr. Kozinski, you know, he raises some points.

22          First of all, you -- you do in your motion for attorneys'

23     fees say you have done some limited discovery.  But tell me why

24     this benefits everybody.  Tell me why I should -- one judge --

25     and I'm fully aware that one judge has already preliminarily

1  approved this.  And this has only come to me quite recently.

2  But my obligation, I believe, is to independently review it.

3      So you can convince me.

4          MR. LURIE:  Thank you, Your Honor.

5      I have to say that I'm certainly glad that Mr. Kozinski

6  likes me because I would hate to see what he would say if he

7  didn't like me, given the tenor of the papers and some of our

8  discussions.  But I appreciate the time he spent this morning

9  clarifying his position, and I appreciate the opportunity of

10  the Court to clarify our position.

11     Let me step back for a moment, give the Court some

12  context, and then I will respond directly to the points that

13  were raised by -- not only Kozinski objections but all the

14  objectors.

15     This is an outstanding settlement for the class and here's

16  why.  We have successfully achieved settlement from Nissan

17  which is a new, unprecedented battery warranty, covers all

18  Nissan LEAFs 2011-2012.

19          THE COURT:  No, I understand all of that.  I

20  understand that the battery, the nine bars, the inability to

21  drive it, are significantly reduced.  But Mr. Kozinski brings

22  up a good point.  Nissan immediately sent out a warranty.  How

23  is that a settlement at all?

24          MR. LURIE:  Nissan sent out that warranty,

25  Your Honor, because we negotiated a settlement that allowed

1    them to do that.  I think that this is -- we have to understand

2    and step back a little -- and it's all set forth in the papers,

3    but there's a voluminous amount of material.  Let me just step

4    back and give the Court some context on this.

5         When we met with Nissan -- let me step back, actually, to

6    the time we filed the case because it's important.  We were

7    cognizant when we filed this case that there was a problem with

8    these cars.  We alleged that there was a problem with these

9    cars.

10            THE COURT:  No, I mean, you did a lot of pre-filing

11   discovery.  I understand you scoured the Internet.

12            MR. LURIE:  Well, we did more than scour the

13   Internet, Your Honor, in fairness.  We consulted -- we had

14   consultants, we talked to lots of potential plaintiffs, class

15   members, we did a lot of research.  But we filed the case.

16        And our understanding of what the issue is here is, as put

17   in the papers and as the parties essentially agree, this

18   battery was losing capacity in an excessive rate.  It should

19   have lost 20 percent over five years.  It was losing 20 percent

20   over one or two years.

21        Our solution to that problem was to get Nissan to honor

22   the terms, essentially -- more or less to honor the terms of

23   the original warranty, meaning -- not the original warranty --

24   of the original battery capacity, meaning to say if they said

25   it was going to lose 20 percent over five years and it was

1    losing more than that, get it back to that point.

2        We understood at the very beginning of this case that the

3    way to do that was to either extend the warranty or create a

4    new warranty that would protect consumers who were concerned

5    that if they were losing one or two bars within two years,

6    they'd lose a heck of a lot more after five or six years or

7    after three or four years.

8        We came into this case, it was our intention to get the

9    best possible result that we could for the class members.  And

10   we understood that the way to do that was to get a new or

11   extended warranty.  And it essentially accomplishes exactly

12   that purpose.  We pled it in the Complaint, we asked for

13   injunctive relief, and we accomplished it.

14       And the result is excellent because that is essentially

15   what it does.  It addresses the excessive capacity loss issue.

16   And that issue is related to driving range, to a certain

17   extent.  If you lose less capacity in your battery, you're

18   going to be able to drive less far.

19       We spent two full days negotiating with the defendants to

20   get to that result.  We then did additional discovery to

21   confirm that the terms that we had agreed to were the correct

22   terms, that there weren't any other issues in the case that we

23   were giving away.

24       So this is -- and I think the Court has to understand

25   that.  What would have happened if we had not settled this case

1    when we did?  Let's say that we -- that you overruled the

2    objection --

3              THE COURT:  Mr. Kozinski would have testified, as he

4    has volunteered.

5              MR. LURIE:  And I look forward to it if we get that

6    far.  But we don't need to get that far, Your Honor, because we

7    have conferred an excellent result in this case, and it's a

8    result that should be supported and endorsed.  The -- the class

9    members get an outstanding result in this case.

10        Judge Kozinski raises an issue about the June 30 notice.

11   It's very important for the Court to understand that that

12   notice, that June 30 -- the sticker and the part that was

13   attached to the book was sent pursuant to this party

14   settlement.  That was a term that Nissan was allowed to do.  It

15   was all sent conditioned on the Term Sheet and pursuant to the

16   settlement.

17        When that was sent out, it was entirely consistent with

18   our settlement.  It's not as if they willy-nilly turned around

19   and implemented a new warranty.  They did it pursuant to our

20   settlement.

21        They can explain best why they didn't say on the bottom

22   this is pursuant to a class action settlement, but they didn't.

23   And that was a business decision that they made.  It does not

24   at all take away from the fact that that new warranty was

25   issued pursuant to the settlement.

1          I would also add that -- I know that Judge Kozinski does

2     not agree with this principal, but we have -- we have briefed

3     it in the papers.  And if you want, we could -- if the Court

4     would want, we could submit additional material on this issue.

5     That even conceding all the points that Judge Kozinski made

6     about the June 30 warranty, even conceding that and even

7     conceding, which I do not, that the warranty was unconditional,

8     indefeasible, and that it couldn't be rescinded, the reality is

9     that Court approval of this settlement guarantees that that

10    can't happen.

11         And Courts have recognized that that is an additional

12    benefit conferred by final approval of a class action

13    settlement, meaning to say tomorrow Judge Kozinski disagrees

14    with this as a matter of law, okay, but let's assume he is not

15    correct.  I know that may be a difficult assumption, but let's

16    assume that he's not correct on this point.

17         Nissan today could withdraw that warranty for whatever

18    reason it wanted.  It could withdraw it.  It could rescind it.

19    It could decide that it's not going to make it for five years.

20              THE COURT:  Well, under your argument, they cannot.

21              MR. LURIE:  Until -- no.  Under my argument, they

22    could.  Until --

23              THE COURT:  They breach the settlement, yes or no,

24    because that -- you're telling me the reason that motivated

25    Nissan to send that warranty was you.

```
 1              MR. LURIE:  Correct.

 2              THE COURT:  And so if they rescind it tomorrow,

 3    they're in breach of the settlement.

 4              MR. LURIE:  They are in breach of the settlement

 5    that was subject to final approval.

 6          I'm not sure why this is a difficult concept for

 7    Judge Kozinski, and I know that he handles difficult concepts

 8    routinely.  We have a settlement that's conditioned upon final

 9    approval.  The steps that were taken between the Term Sheet

10    being signed in December and today's hearing date to finally

11    approve the settlement were all pursuant to that original Term

12    Sheet.

13              THE COURT:  Here's the deal.  Judge Kozinski is one

14    objector.

15              MR. LURIE:  Correct.

16              THE COURT:  He is one person.

17              MR. LURIE:  Correct.

18              THE COURT:  Today he's Mr. Kozinski.

19              MR. LURIE:  Right.

20              THE COURT:  He could be John Roberts.

21              MR. LURIE:  Right.

22              THE COURT:  Doesn't matter.

23              MR. LURIE:  Right.

24              THE COURT:  Today it doesn't matter.

25              MR. LURIE:  Right.
```

1          THE COURT:  And most certainly he's not going to

2   hear the appeal.  So you need to convince this judge --

3          MR. LURIE:  Correct.

4          THE COURT:  -- that it's fair.

5     So I don't care whether he knows -- he has difficulty with

6   the concept, in your opinion, or not because I'm the person,

7   that I'm having difficulty with it.

8          MR. LURIE:  And I apologize, Your Honor.  You're

9   absolutely right, and I appreciate your saying that.

10     So what issues specifically would you like me to address?

11  Because I think I can tell you how great the warranty is.  I

12  can tell you what will happen if the warranty -- if the

13  settlement is not approved.  Is there a specific -- I can run

14  through the points that Judge Kozinski --

15         THE COURT:  I think you should run through the

16  points that the objector made to -- for me to determine whether

17  or not this settlement is fair.  And then we're going to get to

18  Nissan, and they're going to have some explaining to do.

19         MR. LURIE:  Okay.  We've briefed all these issues in

20  the papers, Your Honor, but let me summarize them.

21     With respect to the issue of Nissan already implemented

22  the warranty, that it was indefeasible, unconditional, and

23  fully implemented, that is incorrect.  It's simply incorrect.

24  It's incorrect as a matter of law for all the reasons that

25  Nissan has briefed in their papers.  It's incorrect as a matter

1   of practical -- as a practical matter, it's incorrect.

2        The case law supports the part -- the argument that I was

3   making earlier that the settlement is conditioned.  The

4   warranty that was issued in June and pursuant to the original

5   Term Sheet is conditioned upon final approval of this

6   settlement.

7        If the Court doesn't settle it -- if the Court doesn't

8   approve it, Nissan has every right to withdraw it, rescind it,

9   cancel it, or modify it.  And that is something that only can

10  happen with final approval.

11       Now, did they send out a letter in June that muddied the

12  waters?  Yes, they did.  All right.  Would they have done it

13  again?  I don't think so, because it created a lot of extra

14  problems.  But the fact is it was a good thing.  It was a good

15  thing because people got the warranty relief offered to them

16  earlier than having to wait for now.  And maybe they would have

17  done it earlier.  Maybe they would have done it again.

18       The fact is, and the Court has acknowledged, they can

19  issue interim improvements before there's final approval.  Why

20  is that any different than what's going on here?  That's

21  exactly what's going on here.  They issued the warranty, it was

22  subject to final approval of the settlement.  It's really no

23  different, when you think about it, than any other case -- and

24  the defendants have cited quite a few of them, and this Court

25  actually approved it in the *Sadowska* case -- where improvements

 1   were already ongoing, and the Court granted final approval.

 2        If you don't do that, then what you've done effectively is

 3   tied the hands of every defendant to say, You know what?  If

 4   we're going to issue a new warranty, we can't issue it until

 5   final approval, which is going to come six months, eight

 6   months, ten months, a year from now.  There's no value in that.

 7        And, frankly, as a plaintiffs' counsel, Your Honor, our

 8   goal was to get the best possible relief to the class members

 9   as quickly as possible.  And we accomplished that.

10        Should the notice have said something else?  Should the

11   June letter or the sticker, should it have said something else?

12   Maybe.  But that was a decision by Nissan not to include that

13   information.  But it doesn't change the fact.  The fact is that

14   that warranty was subject to final approval today.  And Nissan

15   still has the absolute right to change it, modify it, or

16   rescind it.  And it was entirely consistent with our settlement

17   terms.

18        So, frankly, whoever made -- whoever makes the objection,

19   it's an invalid objection.

20        And, frankly, Your Honor, I'm -- I'm curious to know how

21   this would actually play out.  Because let's assume -- let's

22   assume that this settlement is not approved and Nissan decides

23   that they are going to withdraw the warranty.  Now what

24   happens?  Now all the class members who up until this point

25   actually had the benefit of an outstanding warranty now will

1    not have it.

2        That's an unjust result, and it's unfair.  And, frankly,

3    it goes against everything that class action settlements stand

4    for.  And that is a very real possibility.  Will they do it?

5    Who knows.  Could they do it?  Absolutely.  And that's why it's

6    important to have court imprimatur on the settlement.  It

7    grants an incredible amount of value to the case and it's

8    undeniable.

9            THE COURT:  Let's talk about the litigative risk.

10   It's one of the things I look at.

11           MR. LURIE:  Uh-huh.

12           THE COURT:  How do you have any litigative risk

13   here?

14           MR. LURIE:  How did we have before we settled?

15           THE COURT:  Yes.

16           MR. LURIE:  When we pled the case, Your Honor, we

17   pled the -- the fact, essentially, that the battery had a -- it

18   was defective in a sense that it was losing capacity in an

19   excessive rate.  To bolster those allegations, we also alleged

20   other things; had to do with driving range, other -- other

21   complaints about battery charging incapacity.

22       Those were all in the context -- and if you read the

23   Complaint carefully -- they were all in the context of our

24   allegation that the battery was losing excessive capacity.  All

25   right?  Really wasn't a stand-alone claim.

1    Nissan said you could drive 100 miles on a fully charged

2    battery and, therefore, Nissan lied.  If you read the Complaint

3    carefully, that's not what it said.  Right?  It was in the

4    context of the excessive battery capacity.  But even if you did

5    read the Complaint that way -- and I'll grant, certain

6    objectors did read it that way and one could read it that way.

7        Even if that were the case, what happened was after we had

8    our settlement discussion with Nissan, they pointed out to us

9    that those claims, in fact, were meritless -- or were of very

10   little merit.  And we did the discovery necessary to figure out

11   if that was true, independently and in using the documents that

12   were produced by Nissan.

13       We evaluated each complaint that was made in the

14   Complaint -- each allegation that was in the Complaint.  And we

15   came to the conclusion that, on balance, those claims did not

16   have merit or enough merit not to accept a warranty that they

17   were offering today, which was outstanding and which would take

18   care of plaintiffs today.

19       And as I stand here today, Your Honor, telling you, those

20   claims, in our mind, are not worth sacrificing the warranty

21   that the class got as a result of this settlement.  And I can

22   tell you specifically what the problems were.

23       The defendants, unfortunately, did a very generous job of

24   kind of raining on our -- on our allegations, which is, I

25   guess, their job.  But the truth is, Your Honor, that the only

**UNITED STATES DISTRICT COURT**

1    allegation or the allegation that had the most strength in this

2    case was the battery -- excessive capacity battery claim.

3    Okay.  The rest of the claims simply did not have sufficient

4    merit to prosecute them.

5        For example -- and I -- I'm actually glad that

6    Judge Kozinski referenced the -- the disclosure form.  Okay.

7    There are a lot of very educated consumers who buy Nissan LEAF.

8    Almost all of them realized, however, that this is technology

9    that's on the cutting edge.  That's probably why Nissan has a

10   five-page disclosure, because this is not exactly like driving

11   a regular car or even like charging your phone.  It's

12   completely different.

13       They disclose -- they go to great lengths to disclose

14   exactly what the risks are when you buy this car, how do you

15   use it and how not to use it.

16       We evaluated that pretty carefully.  And, frankly,

17   Your Honor, I would encourage you to do it if you're so

18   inclined.  If you read that disclosure form and the other

19   documents that were submitted as exhibits to my declaration and

20   as exhibits to Nissan's papers, it is very hard to argue that

21   we should have taken this case to trial on those disclosure

22   issues and expected to win and sacrificed a warranty that we

23   had in place immediately benefiting class members, an

24   unprecedented warranty that would last for five years, replace

25   or repair the battery.

1        And here, Your Honor, there is information with respect to

2    the confidential information that was submitted, which I would

3    refer to if there weren't other people in the room because it

4    is trade secret information.

5            THE COURT:  No, I will -- I will reread your

6    confidential submissions.  So --

7            MR. LURIE:  Okay.  So it was an outstanding

8    warranty, and there was simply no reason to pursue those other

9    claims.

10       Now, objectors may contend, sure, the Magnuson-Moss claim,

11   that was obvious.  But it's not an obvious claim, Your Honor.

12   It's simply not.  You haven't satisfied the other requirements

13   of consent, assent, mutual agreement.  We don't believe those

14   were there.

15       But even if they were there, even if they were there,

16   should we have prosecuted that claim, which had its risk -- we

17   certainly could lose.  And if Judge Kozinski is right and this

18   is a Ninth Circuit issue, we certainly -- it's certainly not a

19   well settled issue of law.  We should have traded that claim

20   and the risk of losing that claim, the risk of not certifying a

21   class, which is not small, the risk that we would never get a

22   nationwide class, which we got in this settlement because we

23   had only pled a California case and -- class and Arizona class.

24   So we achieved a nationwide settlement.  But we should have

25   sacrificed all that in the interest of pursuing a claim that

1  was questionable.

2      As a plaintiffs' counsel standing here, I would not -- I

3  did not make that decision.  In fact, I would not make it -- I

4  would make the same decision again.  Because when you settle a

5  case, you have to evaluate what are the relative merits and

6  negative characteristics of the case.

7      When we pled it, we pled it one way.  Discovery confirmed

8  for us that the only legitimate claim worth settling in this

9  case was the excessive capacity claim.

10     The other claims that Judge -- that objectors in general

11 make is this claim about charging the battery to 100 percent;

12 that if you charge it to full capacity, it's poison.  Frankly,

13 Your Honor, we looked at the disclosures, it's simply not true.

14 Nissan didn't say it.  It was misconstrued.

15     Now, very intelligent people can read those disclosures

16 and reach different conclusions; there's no doubt about that.

17 But there are a lot of class members who read those disclosures

18 who thought our lawsuit was bogus.  There were class members

19 who thought we never should have filed this because it was

20 obvious what Nissan had said and our claims had no merit

21 whatsoever.  They couldn't even understand why we had filed a

22 lawsuit.

23     So for as many people as the objectors here in the

24 courtroom who might think that these disclosures were

25 misleading, there are an equal, if not more, number, a larger

```
 1   number who think that those disclosures were perfectly clear.

 2   And usage means driving and not charging means not charging,

 3   and there weren't any ambiguities in this issue.

 4        So when we had to balance the relative merits of the

 5   claims and decide which claims we should prosecute, we made the

 6   decision that it was worth settling.  It was not even worth

 7   settling, it was an outstanding -- outstanding settlement

 8   because we got the plaintiffs, the class members what they

 9   needed right away on a nationwide basis.

10        Let me just touch on two other issues quickly, if you'd

11   like.

12             THE COURT:  Go ahead.

13             MR. LURIE:  With respect to the opt-out issue,

14   Judge Kozinski, the objectors, other objectors made an issue

15   about, you know, how legitimate are these opt-outs.

16        Your Honor, the class notice that went out is perfectly

17   clear.  If you participate in the settlement, you get the

18   warranty.  If you don't, you don't.

19        The objectors wanted to know is there proof of that.  How

20   do we know that?  Nissan submitted a declaration, and they said

21   that.  If you opt out, you do not get the warranty.  You're on

22   the list.  You're on their hit list.  They will check it out

23   when you come in.  And if you're not on there, they have the

24   option not to give you that warranty.  You are not covered.

25             THE COURT:  So even if they have a sticker --
```

```
 1    because presumably they've already sent out this sua sponte,
 2    according to you, subject to your settlement agreement,
 3    sticker, which was shown to me today.  Then if the person with
 4    the sticker opts out, they get on the naughty list as opposed
 5    to the nice list, and they go to Nissan to get their battery
 6    because it's less than nine bars and they want to be able to
 7    drive more than 75 miles, Nissan says, Nope, you're out.
 8              MR. LURIE:  Nissan can say, Nope, you're out, yes.
 9    Will they say it?  I don't know.  I don't work for Nissan.
10    Does anybody sitting at that table know if they're going to say
11    it?  I don't know.  They're not the dealer.  The reality is
12    they absolutely have that option.  And if they want to, they
13    absolutely can.
14         But when you approve the settlement today, they absolutely
15    can't.  Because when you approve the settlement, everybody
16    who -- the settlement will actually -- the settlement will
17    endorse all the settlement claims.  I misspoke.  I was
18    confusing the issues.
19              THE COURT:  Okay.
20              MR. LURIE:  Sorry about that, Your Honor.
21              THE COURT:  I'm ready to --
22              MR. LURIE:  I got a little excited, Your Honor.  I
23    withdraw that.  I withdraw that.  I withdraw that.
24              THE COURT:  Okay.
25              MR. LURIE:  Strike that.  Okay.
```

1        The reality is that is what Nissan has confirmed in

2   writing.   Judge Kozinski wanted to see it, we gave it to him.

3        I'm not sure what more we can do to convince the Court

4   that exactly what we said happens and that we got the result

5   that is outstanding in the class.

6        With respect to the discovery issue, you know, frankly,

7   Your Honor, we put it in the papers.   There was plenty of

8   discovery in this case.   And I think the really important

9   issue -- I'm trying not to take it personally, but it is a

10  personal thing.   It's a little -- frankly, it's a little --

11  more than a little bit insulting.

12       I mean, we did a tremendous amount of work in this case

13  before, during, and after.   Frankly, we still are.   We're still

14  dealing with plaintiffs in the case, class members.   We did an

15  outstanding -- an incredible amount of discovery to confirm

16  that our allegations were correct before we filed them.   We did

17  a tremendous amount of discovery afterwards to confirm that the

18  settlement was fair, adequate, and reasonable.   And again, I

19  would just add parenthetically, something this Court already

20  knows, it doesn't have to be a perfect settlement.   It has to

21  be fair, adequate, and reasonable.

22       Could it be better?   Any settlement could be better.

23  Could we have gotten 100,000 miles?   No, we couldn't, because

24  we negotiated for that and we didn't get it.   Did we get the

25  best settlement we could get under the circumstances?   I have

```
 1   no doubt about that, and there's no doubt for that reason that
 2   the settlement should be approved.  We did the best -- we got
 3   the best possible result in this case.
 4        And with respect to the discovery, I think it's
 5   important -- you know, certain objectors think that it's the
 6   goal of a litigation to shake up the company, to shine light
 7   into all the hidden recesses of the company, dig out all the
 8   bad stuff and, you know, shining the light of day.  Sometimes
 9   you need to do that in a case; sometimes you don't.  And in
10   this particular case, we did not.
11        Defendants agreed with us at the beginning, we are -- the
12   goal at the beginning was to get the benefit to the class as
13   soon as possible.
14        Frankly, Your Honor, it doesn't matter to us what the
15   cause is of the battery -- the excessive battery capacity
16   defect.  It doesn't matter.  You know why?  Because the
17   warranty covers it.  The warranty covers it 100 percent.
18   Regardless of the cause, regardless of the reason, they're
19   guaranteeing this battery.  It's not important to us.  And,
20   frankly, it wasn't worth two more years of litigation to find
21   that out so that the class wouldn't have a benefit right away.
22   Simply wasn't.
23        And I'd stand by that decision again and I stand by it now
24   and I would stand by it in the future.
25             THE COURT:  Let me say, Mr. Lurie, my -- my intent
```

UNITED STATES DISTRICT COURT

```
 1   is not to insult you in any way.  My intent is to -- with very

 2   short notice, not having presided over any of the preliminary

 3   matters in this case, to figure out whether or not the

 4   settlement is fair and reasonable independently.

 5          MR. LURIE:  No.  I appreciate that.  The insulting

 6   comment was really to the papers that had been filed, not --

 7   certainly not to this Court.

 8          THE COURT:  All right.

 9          MR. LURIE:  Certainly not.

10          THE COURT:  Anything else you feel like you want to

11   explain to me before I hear from Nissan?

12          MR. LURIE:  I'm sure I have a lot to explain,

13   Your Honor, because I think -- I feel strongly that this is a

14   settlement that should be approved despite some of the

15   objections that have been raised.  I would appreciate the

16   opportunity after Nissan speaks to cover any additional points

17   that the Court has with respect to this settlement or with

18   respect to the fee.

19       I very much respect the objectors, and we did -- we took

20   our responsibility seriously as class counsel.  We met with

21   them in person, and they're not the only ones.

22          THE COURT:  No, no.  I've read the -- the list of

23   objectors, and some were -- some opted out for certain reasons

24   and some did not.

25          MR. LURIE:  Right.  So we take it seriously, and we
```

```
 1   respect everyone who brings an objection.  You don't have to be
 2   a jurist, a lawyer.  We spoke to everybody.
 3        But the bottom line here, Your Honor, is we have one
 4   objector -- we have one significant -- we have ten objectors.
 5   We have one vocal, serious objector.  He's not happy with his
 6   car.  I appreciate that.  I really do.  But it's not a reason
 7   not to confirm the settlement.
 8        Thank you.
 9             THE COURT:  All right.  Thank you.  I'll give you
10   time to respond.
11             MR. LURIE:  Thank you.
12             THE COURT:  Nissan.
13             MR. CAULEY:  Good morning, Your Honor.
14             THE COURT:  Good morning.
15             MR. CAULEY:  I -- I certainly would first like to
16   talk about the value of the settlement and why we certainly
17   consider it valuable, important consideration for the class.
18             THE COURT:  Let's talk about the value of the
19   settlement for a second because the valuation expert from the
20   plaintiff has a wide breadth of value, 38 million to
21   200 million, $11,000 per person.
22        So how can that value possibly be estimated with no
23   information?
24             MR. CAULEY:  Your Honor, I --
25             THE COURT:  And then we're going to get into whether
```

1    or not there was any consideration for this.

2            MR. CAULEY:  We certainly would agree with you that

3    plaintiffs asked us for a valuation.  I will tell you that the

4    cost of these batteries and the value of these batteries is

5    highly proprietary information.  They are not cheap.

6        We knew the plaintiffs would need some valuation on this.

7    I mean, we're cutting-edge.  It's a brand-new technology.  Big

8    TVs and computers were awfully expensive, and the cost comes

9    down and down.  We're the first one out there.  All I can say

10   is I know they're incredibly expensive.  It's proprietary.

11       But we knew the plaintiff and we knew the Court needed

12   some assurance of the minimum value of what it would be.  And

13   so after having discussions with Mr. Lurie, appreciating

14   that -- that you would need information and he would need

15   information, we talked to the business about providing under

16   oath some assurance about a minimum value.  It may, in fact, be

17   well above that.

18       But it is proprietary.  And just frankly, Your Honor, for

19   business and other competitive reasons, we simply did not want

20   to get into that.  But we knew you needed assurance that there

21   was a minimum value.

22       I can't comment on the report of their expert.  All I can

23   comment on is the declaration we provided and that it's a

24   minimum of 10 million.

25            THE COURT:  Okay.

 1          MR. CAULEY:  Your Honor, if I may -- do you have

 2    another question about that?  If I may, I had a chart I wanted

 3    to show you.

 4          THE COURT:  Show it to Mr. Lurie first, then my

 5    courtroom deputy will pick it up.

 6          MR. KOZINSKI:  Can I see one?

 7          MR. CAULEY:  Your Honor, I'm going to give one to --

 8          THE COURT:  You may.

 9          MR. CAULEY:  Your Honor, this -- as everyone has

10    said, this is -- it is incredibly new technology.  Nissan was

11    the first to have one of these affordable vehicles.  It wants

12    it to succeed.  Customer satisfaction was important.  Resolving

13    this lawsuit was important.

14        And if the -- the green at the top is put in there to

15    really point out that this really is a new warranty.  It was

16    the first of its kind.  I'm still not aware of any battery

17    capacity warranty that's out there.  When the car was sold as

18    new, it came like every other car, with a defects and materials

19    and workmanship warranty.  If there is a defect, it will be

20    repaired within the warranty limits.

21        Specifically, as shown at the bottom of the green area,

22    "Loss of battery capacity due to or resulting from gradual

23    capacity loss is not covered under this warranty."  So when

24    these vehicles were purchased, while there was a warranty

25    against defects in the battery, there was not a warranty about

1    performance.  This is essentially a performance warranty.

2        It's going to -- regardless of whether the battery is

3    performing in Arizona in 120 degrees temperature with somebody

4    driving 40,000 miles a year, regardless of whether it's

5    performing exactly like lithium-ion batteries do, we're still

6    going to repair that vehicle.  So it's a performance assurance.

7    Frankly, it's a performance assurance that Nissan wanted to

8    provide to its customers and Mr. Lurie wanted to provide to the

9    class members.

10       So this really is unique.  So when you look at the

11   additional coverage, we provided something that was actually

12   excluded and not covered in the warranty at the time these

13   vehicles were sold.

14       I think that's quite significant and unique, that we've

15   given you a list of lots of cases where warranties were

16   extended for longer times and longer mileages as part of class

17   action settlements.  This actually is something that's brand

18   new and was provided.  So I think that -- I think that is an

19   important point about the value.

20       The other thing that I think dovetails with some of the

21   questions about confirmatory discovery and things of that

22   nature, you know, we didn't offer a coupon.  We didn't offer

23   $50 toward a repair.  We didn't offer a repair with a

24   deductible.  We basically offered something that didn't exist,

25   and it's essentially a guarantee.  We take the risk.

1          THE COURT:  Unconditional.

2          MR. CAULEY:  I'm sorry.  It's a -- yes, it's an

3     unconditional guarantee if you have the warranty.  If you fall

4     below those nine bars, we're going to get you back -- we're

5     going to get you back to nine bars even if you've had this

6     battery four or five years.

7       I -- I think that is -- I think that is important because

8     we're taking the risk.  We're saying we don't think this is a

9     big problem, candidly, Your Honor.  We think it is -- and as

10    we've said publicly a number of times, we think that it is an

11    issue that's focused in the desert southwest, primarily Arizona

12    and a few other very hot states.

13         THE COURT:  California being one of them.

14         MR. CAULEY:  Well --

15         THE COURT:  Not today.

16         MR. CAULEY:  Not Los Angeles, but --

17         THE COURT:  Palm Springs is pretty hot.

18         MR. CAULEY:  Palm Springs is.  We think -- and I

19    think the folks in Palm Springs would be upset with me lumping

20    that together with -- with Arizona, but it is the desert

21    southwest.  They're both very hot places.

22      We think it is a small issue.  But if we're right, the

23    class is still getting a benefit and the cost will not be as

24    great to us.  If we're wrong, it's going to be really expensive

25    for us.  But the risk is ours, and it's not the class's.

1        And so not only have we come up with something that never

2   existed before and, to my knowledge, still doesn't with any of

3   the other electric vehicles -- and you combine that with the

4   risk being all on us, I see that as -- I think that is

5   significant consideration for -- for the class and frankly

6   consistent -- you know, significant consideration and assurance

7   for our customers because we wanted the customers to know we

8   believe in the battery.  And if you have the capacity loss that

9   you're concerned about having and it slips down to this point,

10   you're going to get protection.

11        THE COURT:  Let's talk about the argument for a

12   moment about your unilateral giving of this warranty.  You sent

13   everybody a sticker.  And 2013 had modifications; 2011-2012 you

14   sent the stickers.  And how is that in lacking -- how does that

15   not lack consideration for the settlement?

16        MR. CAULEY:  Your Honor, it frankly wasn't

17   unilateral.

18        THE COURT:  Okay.

19        MR. CAULEY:  It was -- and I will -- I'm going to

20   walk through it.

21        THE COURT:  Okay.

22        MR. CAULEY:  In fact, can I do another chart to

23   address that issue?

24        THE COURT:  You most certainly may.

25        MR. CAULEY:  All right.

1        Your Honor, if I may, I -- that is a -- that's a pretty

2   easier to understand version.  I have a more detailed one that,

3   I think, in fairness should be given too so it's not just so

4   abbreviated.

5              THE COURT:  Okay.

6              MR. CAULEY:  Your Honor, we've cited a number, I

7   think, of cases in our briefing that consideration is judged

8   at -- at the time of the formation of the contract.

9        Here's -- here's what we did.  And I believe all the

10  communications make sense, and I believe there's a very good

11  reason why the June communication did not look anything like

12  the class settlement notice.  And I can walk through those.

13             THE COURT:  Please do.

14             MR. CAULEY:  First, we -- right after we negotiate

15  for two days, we enter into a Term Sheet.  The Term Sheet is

16  December the 5th.  The Term Sheet, which is an exhibit to

17  Mr. Menges's deposition, specifically contemplates that.  As

18  Mr. Lurie has indicated to you, he was interested in getting

19  relief to the class quickly.  Frankly, Nissan was interested in

20  getting relief to the class quickly.

21       So we specifically contemplated that Nissan was going to,

22  in very short order, make a public announcement about the

23  warranty applying to 2011 and 2012 vehicles and would

24  specifically indicate that that announcement was a part of our

25  efforts to address customer concerns, including those of the

1  plaintiffs in this lawsuit.

2      Now, that forum of the entire electric vehicle community

3  is quite different.  These are forward-thinking people.  These

4  are generally sophisticated new innovators.  They're willing to

5  take a chance on new technology because they believe in it.

6  They communicate on forums all the time.  You'll see in the

7  records information on mynissanleaf.com.  It's not our forum.

8  It's a forum for owners, but it's a way that Nissan regularly

9  communicates.  It's just the way that things are now.

10     And so that was the venue.  We had previously communicated

11 the -- the Carla Bailo open letters from July and September had

12 gone on the Nissan -- on that forum.  So Andy Palmer, a high-up

13 executive at Nissan, went on the forum to announce that there

14 was going to be a warranty.  The Q and A, as part of that post,

15 contained the exact language that we had discussed with

16 Mr. Lurie, indicating that it was part of -- it was part of the

17 effort to settle the lawsuit and to address customer concerns.

18     But the Palmer letter -- the Palmer announcement went even

19 further.  It said we don't have the terms of the warranty yet,

20 the one I've just announced to you and talked to you about.

21     We think that's going to be coming out in the -- toward

22 the spring of 2013.  That's when -- pursuant to this new

23 announcement that did reference the class action lawsuit,

24 that's when we're going to be announcing the specific terms.

25     We didn't get it done by -- well, the announcement to the

1    dealers went out at the very end of the spring.  I think it was

2    May the 30th.  We barely made it, announcing the warranty.

3         So, in other words, just like we had said following the

4    Term Sheet, just like we indicated in the announcement of late

5    December, we -- Nissan then went out with the announcement of

6    the warranty once the specific terms were in place.  It takes a

7    delay.  This is indicated in the materials.  We didn't have the

8    capacity to take care of these repairs at that time, and that's

9    normal.  You've got to build up the capacity to get repairs

10   done.

11        So we said the announcement is going to be spring of 2013.

12   We, in fact, announced it to the dealers spring of 2013.  We

13   announced it to the consumers June of 2013.

14        In the letter that we sent out, I think in the first

15   paragraph, first or second paragraph somewhere near the top it

16   specifically says, "As we announced to you back in December" --

17   that announcement, which came right after and pursuant to the

18   settlement agreement, "as we announced to you back in December,

19   here are going to be the terms of this warranty."  Clearly we

20   implemented it before we had final approval, as -- I think

21   we've given you a number of examples of other cases where that

22   has been done.

23        We did not -- and I think, Your Honor, upon reflection, it

24   would not make sense for us to do it because we know a class

25   notice is coming.  There's a lot of body of law out there and a

1   lot of guidance that the class notice needs to be clear.  It

2   can't be confusing.  It can't make people wonder, well, what

3   are these letters we're getting?

4        If we had discussed the class action, even talked about

5   opt-outs, opt-ins, et cetera, before we even had preliminary

6   approval, we now run the risk that here's some unilateral

7   letter on our part that's going -- that may be confused by some

8   people to look like the class notice, and we'd be criticized

9   later.

10        The logic of all the communications made sense.  The June

11   letter tied back to everything we had said before, but we knew

12   we couldn't -- this could not look like a class notice or it

13   would undermine the effectiveness of the class notice that went

14   out, or some could say that.

15        And so, you know, I wish that everything in life I did I

16   didn't have to look back on and say, Gee, could I have been a

17   little clearer or could I have done something different?  Could

18   my client have done something different?  But I think if you

19   look at the chronology and you look at the communications, you

20   can see that the effort in -- and intent was to have all of the

21   communications in sequence make sense.  Every communication was

22   exactly what we told them we were going to do at each step of

23   the way.

24        So it all ties back to the original Term Sheet,

25   Your Honor, and that's the time consideration is judged.

1          And we -- you know, obviously we were hopeful there would

2     be final approval.  We thought this was a terrific deal for our

3     customers.  Mr. Lurie felt it was a terrific deal for Nissan

4     LEAF customers because it was a performance guarantee.  And

5     it -- candidly, Nissan knew it was taking the risk to go out

6     there and offer that warranty at the time because you might not

7     approve it.  And we recognize that.  We -- we hope you will.

8     We hope you will because we think it is good for our customers

9     and we think it's good for the class.

10          THE COURT:  So tell me about the opt-out procedure.

11     If you've already sent these stickers, is the way that

12     Mr. Lurie explained it accurate, that there is a sticker on

13     someone's warranty book, whatever it is, they go to the Nissan

14     dealership -- they opted out, they go to the Nissan dealership

15     and say I have seven bars.  I want nine.  And what -- what does

16     Nissan do then?  They have the ability to deny it?

17          MR. CAULEY:  They have -- they have the ability to

18     deny it.  They have lots of things they can do.  Those people

19     specifically -- in my view, specifically had a notice that said

20     if you opt out, you don't get the benefit and chose to opt out.

21          Would we -- and, frankly, it's hypothetical and

22     speculation on my part.  But would -- would Nissan let those

23     people opt back in and get the coverage and sign a release?

24     They sure might do that.

25          When you opt out, now you're back in the position of a

1  litigant.  You're back -- you haven't released anything.

2  You're back in the position of a litigant.  You may sue us.  We

3  may have to defend it.  We don't want to do that.  We don't

4  want unhappy customers.  I hope if they come to me, if they

5  come to a Nissan dealer and they say, you know, I didn't think

6  I was going to need this or I didn't really appreciate

7  everything, what will you do for me?

8      Nissan's in the business to have happy customers, not

9  upset customers.  You know, if there's a way to make it work to

10  let them opt back in in exchange for a release or -- do what we

11  do with unhappy customers all the time, but it's going to have

12  to be done on a case-by-case basis because, you know, true to

13  the notice of the -- the entitlement to a warranty was provided

14  by the class settlement.

15      And so the procedure is in place, and it needs to be

16  because that's what the class notice said and we've got to

17  honor the class notice.  But does that mean it's the end of the

18  road for those folks?  No.  All I know is they're litigants and

19  we'll have to deal with them as litigants.

20          THE COURT:  They can litigate as well.

21      All right.  Anything else you wish to explain to me,

22  Counsel?

23          MR. CAULEY:  Your Honor, if I may just check my

24  notes real quick.

25          THE COURT:  Sure.

1          MR. CAULEY:  I think I only want to address the --

2     the usage comment in the Magnuson-Moss argument, if I could.

3          THE COURT:  Okay.

4          MR. CAULEY:  Magnuson-Moss just deals with

5     warranties.  It says -- it says warranties have to meet certain

6     requirements.  It's -- you know, it's a written promise made in

7     connection with the sale of a consumer product.  And it says if

8     you do that, there are certain requirements.  You can't -- you

9     can't do trick evade warranties.  You've got to be clear.  If

10    they're limited, you've got to say they're limited.  You --

11    if -- you've got to put that information in a clear form for

12    consumers.  That's really what it deals with.

13         Number one, this disclosure is not a warranty.  It is a

14    disclosure, an unprecedented disclosure at that, but it still

15    is a disclosure.  But more importantly, just to address the

16    factual argument, Your Honor, the chart I gave you, the one on

17    the warranties shows that we've got all kinds of warranties on

18    this vehicle.

19         Some are based on -- some -- seat belts are lifetime.

20    There is no limit on seat belts.  That's common, I think,

21    for -- for all Nissan vehicles.  The basic warranty, 36 months

22    or 36,000 miles, time and usage.  Power train, 60 months and

23    60,000 miles.  A lithium-ion battery -- and I think it says it

24    in the disclosure, it says it in the owner's manual, it says it

25    all over the place.  You know, batteries can lose power,

 1   candidly, sitting there.  The battery in your flashlight may

 2   not work if you haven't used the flashlight for three years.

 3        Lithium-ion batteries are the same way.  If you don't even

 4   use your battery, just the passage of time is going to reduce

 5   your capacity somewhat.  Certainly the more you use your

 6   lithium-ion battery, the -- the more usage you give to it --

 7   just like the rest of your car, the more usage you put to it,

 8   the less time it's going to last and the more capacity it's

 9   going to lose.

10        And that -- you know, you give a disclosure, you think

11   it's clear as can be, and then somebody reads it in a way you

12   never intended, and so the next time you try to make -- you try

13   to make the disclosure more clear.

14        But we clearly said it -- with age, because we're trying

15   to communicate, even if you don't use it, you're going to lose

16   some capacity.  But also, your driving habits and your usage

17   are going to cause the capacity to go down.

18        We provided an estimate.  It is, as I understand it -- and

19   I think, as we've said a number of times publicly, it's not a

20   flat line.  It's -- it's more of a curve line, so you lose a

21   little bit more capacity in the first few years, then it starts

22   to flatten out.  That's why the estimates were 80 percent after

23   five years and 70 percent after ten years.  You can see that's

24   not a flat line.  That started -- it's not a straight line.

25   It's starting to flatten out.

1          You know, we're trying to communicate that.  But the

2     battery's no different than any other component.  It's going to

3     wear with usage, it's going to wear with time, and that's why

4     we say -- we mentioned both age and usage in our one paragraph

5     disclosure about battery capacity.

6          And so I -- I think it was as clear as can be.  I don't

7     think the Magnuson-Moss Act even applies to that disclosure.

8     But even if it did, certainly in evaluating the merits of the

9     case and the risk that the class faced, that has to be taken

10    into consideration.

11         I'm happy to answer any other questions you may have, but

12    I'll sit down for now if you don't have any at this time.

13              THE COURT:  I don't have any further questions for

14    you, Counsel.  Thank you.

15         Mr. Lurie, you can close it out.

16              MR. LURIE:  Thank you, Your Honor.  Just a few

17    points.

18         I would just stress that, as this Court is aware, the

19    standard for approving a settlement is whether it's fair,

20    adequate, and reasonable, not whether it's perfect and not

21    whether it could be better under other circumstances.

22         There should be no doubt to the Court that this is a fair,

23    adequate, and reasonable settlement despite the objections

24    because we have refuted every point that's been raised.

25         With respect to the consideration argument and the June

1    letter, I think we've explained it.  If the Court has any

2    questions about any of these issues, we'll be happy to answer

3    them.

4         The fact that there could have been additional terms of

5    the warranty, it could have been 100,000 miles, it couldn't.

6    We negotiated the best possible warranty under the

7    circumstances.  Class members got it, they're going to be able

8    to benefit from it.  And, frankly, under some of the material

9    that was filed under seal, they're not just getting a repair of

10   the battery.  Okay?  They're getting even much, much better

11   than that.

12        I'm also a little concerned what happens if the Court

13   doesn't approve the settlement, from a policy point of view.

14   What does that mean?  That means that any defendant now having

15   settled with plaintiffs in a consumer car case and having

16   achieved a settlement that includes a new warranty can't send

17   out a statement beforehand, has to get pre-approval of the

18   Court to send out an interim notice before there's notice; that

19   if you follow all the rule -- all the procedures that we set

20   forth in the Term Sheet, which we thought were fairly clear and

21   it was clear that it was all pursuant to the settlement,

22   somehow defendants would be handcuffed from entering into

23   warranties?  It doesn't work that way.  It's never worked that

24   way in the history of settling car cases.  And the defendants

25   have presented the Court with a chart.  It just simply doesn't

1    work that way.

2              THE COURT:  But I'm not a rubber stamper either.

3    This whole thing is not a farce for you agree, I approve.

4              MR. LURIE:  Of course not.

5              THE COURT:  But on the one hand --

6              MR. LURIE:  Of course not.  But the -- the fact

7    is -- no, of course not, Your Honor.  And the Court should be

8    absolutely convinced after reading all the papers that the

9    settlement is fair, adequate, and reasonable or it won't

10   approve it.

11        But the fact is that from -- just from a practical point

12   of view, having sent out an interim notification to consumers

13   about what they are going to get should not in and of itself

14   tank a settlement.  It should not derail a settlement.  And if

15   it does, then what we've essentially done is we've tied the

16   hands of counsel and parties in these cases whereby we say, You

17   know what?  We have really great relief.

18        Look, I really believe that this was the best possible

19   relief we could have gotten in this case and we got it

20   absolutely the best way possible.

21        We knew -- we knew what needed to be done here and we did

22   it and we got it, and the defendants agreed that they would

23   even give it earlier than final approval.  Should I -- I guess

24   I should apologize for not having done that.  I just can't see

25   how that makes sense.  I just can't see how that makes sense.

1        So now we've come to the Court at final approval and we're

2    faced with a really preposterous situation.  We've settled the

3    case, we got great relief, they sent it out earlier, and now it

4    can't be approved because they did what they should have done.

5    I find that hard to believe.

6        And there may be some legal technicality, but that's not

7    even true either because the defendants have refuted that on a

8    legal basis.  And we've demonstrated to the Court that final

9    approval of the settlement and final approval of something that

10   the defendants did voluntarily in the interim before final

11   approval has value.  And the Court's signing and sealing it

12   means it can't be rescinded, modified, or withdrawn.

13       So from a policy perspective, I'm not even sure what we do

14   afterwards if this case is not approved.  I just don't even

15   know how the parties would be able to settle these cases going

16   forward.

17       The final point that I would make, Your Honor, is with

18   respect to the valuation issue.  This touches a little bit on

19   the fee.  I don't know if I'm presumptuous about raising the

20   second motion because I don't know whether the Court wants to

21   hear argument on that.

22            THE COURT:  Not yet.

23            MR. LURIE:  But I would say with respect to the

24   valuation, because it did touch on -- it was mentioned in the

25   objection, it was touched on in defense counsel's papers --

1    argument.

2         The valuation in this case -- and again, this is important

3    because it touches on some of the confidential information that

4    was supplied.  We did not feel that we needed -- well, let me

5    step back.

6         When we valued this case for -- for purposes of informing

7    the class what the value was, the $11,000 benefit of the new

8    battery -- or replacement battery or a new battery, defendants

9    didn't want to tell us how much it cost.  And, frankly, that

10   wasn't that important because we were able to find that

11   information from public sources.

12        Once we got it, we did get information from the defendants

13   about what the labor costs were.  And we were able to crunch

14   the numbers.  And this is an $11,000 benefit per class member.

15   That's undeniable.  It's an $11,000 benefit.

16        Our expert was not trying to determine anything about the

17   technical requirements of the battery, how the battery worked.

18   As I argued earlier, that wasn't really the issue in our case

19   since they were given a new battery regardless of the reason,

20   regardless of the cost.

21        The expert calculated what the value of that battery is if

22   it has to be replaced because that was the information that we

23   could easily calculate.  We had a number, and we gave it to the

24   Court.  No matter how you slice it, though, whether you take

25   the most extreme number, which, you know, sounds juicy --

1    right? -- but it's a huge number, assuming every battery --

2    19,000 batteries were replaced, you get to $200 million.  Is it

3    possible?  Sure, it's possible.  Is it likely?  I don't know.

4    Only the defendants would really know.  After five years, we'll

5    know how many batteries were actually replaced.

6        But the reality is that even they agree it was at least a

7    $10 million benefit.  And our expert, even looking at hotter

8    climate states, as it turns out tends to be where a majority of

9    these batteries tend to be, is between 25 and $40 million

10   benefit to the class.

11       So I'm proud of the valuation, and the valuation is

12   accurate.  We don't have a -- and to be clear, the valuation

13   had to do with the benefit conferred.  The valuation didn't

14   have to do with any technical -- any technical functioning of

15   the battery for reasons that we explained.

16       Just one final argument with respect to the Magnuson-Moss

17   Act or any other claim that could have been brought.  My

18   understanding of the Magnuson-Moss Act claim is that it can be

19   resolved, no matter its merit, by simply repairing the product.

20       So even if we had prevailed on a Mag-Moss claim, which

21   apparently some objectors think would have carried the day

22   here, what would we have gotten in the end?  We've got no

23   repair.  We would have gotten a replacement.  It's exactly what

24   we got.  We just got it two or three years earlier.

25       So for all the reasons that we've already suggested,

1    Your Honor, we would ask the Court to approve the settlement as

2    fair, adequate, and reasonable.

3        If the Court has any additional questions after reading

4    the papers or now, we'd be happy to respond to them.

5            THE COURT:  All right, folks.  I'm going to go back

6    and review this.  The matter will be submitted.  You'll hear

7    from me.  Thank you for your time, and I'll let you know if I

8    need further briefing.

9        We'll be in recess.

10           (Proceedings concluded at 11:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1           **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17                  DATED THIS 25TH DAY OF NOVEMBER, 2013.

18

19

20                      /S/ MYRA L. PONCE
                    _____
21                  MYRA L. PONCE, CSR NO. 11544, RMR, CRR
                       FEDERAL OFFICIAL COURT REPORTER
22

23

24

25