Ian Otto, SBN: 284756
**OTTO & GUILLEN, a Professional Corporation**
553 Pilgrim Drive, Suite A-1
Foster City, CA 94404
Tel: (650) 341-0300
Fax: (650) 341-0302

Attorneys for Objector,
**MANDANA KHOSRAVI**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| **HUMBERTO DANIEL KLEE AND DAVID WALLAK, INDIVIDUALLY and on behalf of a class of similarly situated individuals,** ) ) ) | **Case No.: CV12-08238 DDP (PJWx)** |
| ) ) | |
| Plaintiffs, ) ) | **OBJECTION TO CLASS ACTION SETTLEMENT** |
| vs. ) ) | |
| **NISSAN NORTH AMERICA, INC., and NISSAN MOTOR CO., LTD.** ) ) | |
| ) | |
| Defendant. ) | |

## I.   SUMMARY OF OBJECTIONS.

Mandana Khosravi objects to the terms of the proposed settlement as set forth in the Amended Settlement Agreement, because the settlement provides little to no value to Ms. Khosravi and similarly situated class members who leased 2011-2012 model year Leaf vehicles. ("Lessees.")  Ms. Khosravi and other Leaf Lessees will have to return, or may already have returned, their vehicles to Nissan North America, Inc. ("Nissan") either before, or shortly after, the settlement is approved, and before Nissan incurs any obligation thereunder to correct the product defects that are the subject of this action.  Nissan's defective batteries have deprived Ms. Khosravi and the other Leaf Lessees of the essence of their lease, the right to use a certain amount of miles in exchange for their lease payments.  Consequently, neither Ms. Khosravi, nor similarly situated class members, will benefit from the proposed settlement before expiration of their lease terms, while Nissan will receive a windfall gain

1    because, due to the fact that Lessees use of their vehicles was limited by battery charge and range

2    limitations, Nissan, and/or its affiliated dealerships, will receive many Leaf lease returns with much

3    greater resale value due to these vehicles' exceptionally low mileage.

4         The proposed settlement also allows Nissan and its dealers to unfairly manipulate the Leaf

5    Lessees and still escape liability for having leased them something of significantly less value than

6    what they were promised under the terms of their leases.  The proposed settlement predicates Nissan's

7    duty to replace batteries on the number of charging bars that appear on Leaf vehicles' dashboard

8    charge indicator—rather than on actual vehicle range—which allows Nissan to manipulate their own

9    settlement obligations by simply "reprogramming" Leaf charge indicators.  The proposed settlement

10   of Leaf battery charge and range limitations is tantamount to leaving the, "fox in charge of the

11   henhouse," and raises fundamental questions regarding the value and fairness of the entire proposed

12   settlement.  As discussed in detail below, Nissan has already demonstrated a willingness to cunningly

13   circumvent their warranty and settlement obligations by denying Leaf Lessees, (and Leaf owners),

14   relief they were entitled to, or promised.  This is amply evidenced, (as discussed in detail below), by

15   Ms. Khosravi's inability to get Nissan to honor its warranty duties over the past year and a half,

16   **despite** Nissan's pledge to extend the terms of the battery warranty even before the settlement

17   agreement was preliminarily approved.  Nissan's behavior during the course of the settlement approval

18   process raises grave doubts about their commitment to actually remedying the battery problems with

19   class members' Leafs, and regarding Nissan's actual willingness to perform its obligations under the

20   Amended Settlement Agreement.

21        Finally, Nissan and its dealers have manipulated the settlement process in an attempt to deprive

22   class members of their due process rights.  Review of a the chronology of Ms. Khosravi's dealings

23   with Nissan, (which is set forth in detail below),  provides an excellent example of the substantive and

24   procedural due process deprivations Nissan, through the class settlement under consideration, is

25   attempting to impose on class members.  Specifically speaking, review of the date that Ms. Khosravi

26   leased her Leaf, the date that settlement of the instant action was preliminarily approved, the dates on

27   which deadlines for class members to object or opt out were set, and the date when Ms. Khosravi's

28

**OBJECTION TO CLASS ACTION SETTLEMENT**

vehicle's range became unacceptable, demonstrates that Ms. Khosravi and many other Leaf Lessees were deprived of the ability to object to, or opt out of, the settlement before it became apparent that they would receive no benefit under the proposed settlement.

Additionally, because the proposed settlement purports to release all, "Related Parties," "in the chain of distribution"—an ambiguous definition likely to lead to further litigation but one that Nissan presumably seeks in order to include its independent dealerships—the settlement works a manifestly unfair result on Leaf Lessees by stripping them of any recourse against the very dealerships that leased them the vehicles and steadfastly refused, and/or continue to refuse, to repair or otherwise redress the profound, and well documented, problems with Leaf vehicles. These consequences were unclear in the notice of the proposed settlement. At the very least, given the passage of time between preliminary settlement approval and pending final settlement approval, and given the highly illustrative evidence set forth below, which amply demonstrates Nissan's manipulation of the settlement approval process to its advantage, and to Leaf Lessees' detriment, new notice explaining the advantages of the settlement for purchasers versus Lessees, along with another opportunity to opt out, is in order. Otherwise, the proposed settlement, even in its amended form, treats class members disparately, providing the purchasers with tangible benefits while leaving Lessees, who under the terms of their lease agreements paid for miles they were unable to use (and will ultimately have to surrender to Nissan upon expiration of their leases), without benefit, recourse, due process, or justice. Just as a recent popular cell phone commercial tells consumers to, "reclaim their unused data," Leaf Lessees should have the right to reclaim the miles they were promised, but could not use during their leases due to Nissan's defective batteries.

## II. INFORMATION REQUIRED BY CLASS ACTION NOTICE.

(1) The name of the lawsuit is in the caption.

(2) Objector is:
Mandana Khosravi
828 Blaisdell Court
San Jose, CA 95117

(3) Ms. Khosravi ("Objector") is currently leasing a 2012 Nissan Leaf  which she leased as a

3

new vehicle from Stevens Creek Nissan in San Jose, California on or about September 8, 2012.

(4)   VIN # JN1AZ0CP6CT023114

(5)   The current odometer reading is **8496** miles

(6)   Ms. Khosravi's objections are set forth and discussed in detail below.

(7)   Ms. Khosravi has not objected to any other class action in the last 5 years.

(8)   The evidence Ms. Khosravi wants the Court to consider will be detailed below during the course of the presentation of her objections and are set forth in her declaration.

(9)   Objector and/or Objector's counsel intends to appear through counsel at the hearing re: Approval of the Amended Settlement Agreement and/or at the Fairness Hearing and/or and the hearing re: Final Approval.

(10)   Objector, through counsel, intends to call witnesses to testify regarding the inherent unfairness of the proposed settlement to Ms. Khosravi, to other class members who leased their 2011 and 2012 Leaf vehicles ("Leaf Vehicles"), and to all class members.   Objector's witnesses may include Ms. Khosravi and/or her boyfriend Chris Inners who will testify regarding the fact that the proposed settlement will have little or no value to Ms. Khosravi, or to similarly situated current and/or former lessees of Leaf Vehicles, and/or to many other members of the class.  Objector also reserves the right to call counsel for Plaintiffs, and counsel for Nissan North America, to testify regarding the details concerning settlement negotiations, discovery, and other matters pertaining to the conduct of the lawsuit.

(11)   Objectors and Objector's counsel's signature appears on the last pages of this document.

**III.    STATEMENT OF FACTS**

1.  Factual Overview

Ms. Khosravi resides in San Jose, California and works as a Polysomnographic Technician in Sunnyvale, California.   [*See* Declaration of Mandana Khosravi, ("Khosravi Decl.") ¶ 1.]   On September 8, 2012 Ms. Khosravi leased a 2012 Nissan Leaf from Stevens Creek Nissan in San Jose, California and Nissan Motor Acceptance Corporation based in significant part on Nissan and Stevens Creek Nissan advertisements and statements indicating that Leaf vehicles had a range of over 100

1  miles on a single charge.   [Khosravi Decl." ¶ 2: Lease Agreement; Exhibit ("Exh.") A.]   Ms.

2  Khosravi's primary purpose for leasing her Leaf was to make the 18-mile round trip from her home in

3  San Jose to her workplace in Sunnyvale and back.   (Khosravi Decl. ¶ 3.)   Ms. Khosravi's Leaf was

4  initially able to make this trip without problem.   (*Id.*)

5      Over a ten-month period after she leased her Leaf Ms. Khosravi noticed that her vehicle's

6  range and the number of charge bars that appeared on her vehicle's dashboard were declining.   (*Id.* at ¶

7  4.)   Ms. Khosravi was concerned about this problem, but in June of 2013 she received notification

8  from Nissan indicating that the warranty on Leaf batteries regarding charge capacity loss below "nine

9  bars" was now under warranty for 60 months or 60,000 miles. Ms. Khosravi felt reassured because she

10 believed that if her Leaf's range continued to deteriorate Nissan would repair or replace her battery.

11 (*Id.*)

12     On July 9, 2013 Ms. Khosravi brought her Leaf to Stevens Creek Nissan for scheduled

13 maintenance and mentioned her Leaf's inability to fully charge and the vehicle's deteriorating range.

14 Stevens Creek Nissan personnel thereupon "reprogrammed" Ms. Khosravi's Leaf.   (*Id.* at ¶ 5; July 9,

15 2013 Service Invoice; Exh. B.)   When Ms. Khosravi picked up her vehicle she noticed that her Leaf's

16 dashboard charge indicator now showed that the vehicle was fully charged.   (*Id.* at ¶ 6.)   Nonetheless,

17 the vehicle's deteriorating range problem had not been resolved.   (*Id.*)      Ms. Khosravi was still not

18 overly worried about range issues at this point because she believed that Nissan would repair or

19 replace her vehicle's battery if her vehicle's range continued to decline.   (*Id.*)

20     On July 10, 2013 the settlement of the instant action received preliminary approval.

21     On July 16, 2013 Ms. Khosravi brought her Nissan Leaf to Stevens Creek Nissan and

22 mentioned again that her vehicle's range and charge capacity had deteriorated.   (*Id.* at ¶ 7.)   Stevens

23 Creek Nissan personnel admitted that there was a possible "range factor issue," but refused to do

24 anything to repair or replace the battery.   (*Id.*)   Despite the preliminary approval of the proposed

25 settlement regarding the batteries and Nissan's earlier action extending the terms of the battery

26 warranty for Leafs, Stevens Creek Nissan personnel did not inform Ms. Khosravi that the range issues

27 she was experiencing were widespread in Leaf vehicles, nor did they offer her with any services,

28

**OBJECTION TO CLASS ACTION SETTLEMENT**

1  repairs, or battery replacement pursuant to Nissan's extended warranty regarding battery issues. (*Id.* at

2  ¶ 8.)

3      On or around September 9, 2013 Notice of the Proposed Settlement was sent to class members

4  and dates when class members had to object or opt out were respectively set for October 13, 2013 and

5  October 28, 2013.

6      By November 30, 2013, (approximately one year and two months after Ms. Khosravi

7  purchased her Leaf and **after** the deadline to object to or opt out of the class action settlement had

8  passed), Ms. Khosravi's Leaf, even when fully charged according to the "reprogrammed" dashboard

9  charge indicator, was unable to make the 18-mile roundtrip journey from Ms. Khosravi's residence in

10  San Jose, California to her workplace in Sunnyvale, California. (*Id.* at ¶ 9.)  Ms. Khosravi's brought

11  her Nissan Leaf back to Stevens Creek Nissan and complained that the vehicle's range was markedly

12  below the performance promised by Nissan and continuing to deteriorate. (*Id.* at ¶ 10.)    Stevens

13  Creek Nissan personnel claimed that there was "no problem" with Ms. Khosravi's vehicle and

14  recommended that she refrain from using heating, air conditioning, or other powered accessories

15  whenever driving the Leaf. (*Id.*)  Stevens Creek Nissan personnel did not offer or provide Ms.

16  Khosravi with any services pursuant to Nissan's extended warranty regarding battery issues. (*Id.*)

17      Over the next year and a half Ms. Khosravi repeatedly contacted Defendant Nissan and

18  Stevens Creek Nissan regarding her vehicle's deteriorating range and requested that her battery be

19  repaired or replaced. (*Id.* at ¶ 11.)  In each such instance neither Nissan, nor Stevens Creek Nissan,

20  ever even offered, agreed, or attempted to repair or replace Ms. Khosravi's vehicle's battery or

21  otherwise repair her vehicle. (*Id.*)  Nissan and Stevens Creek Nissan personnel instead told Ms.

22  Khosravi that there was nothing wrong with her vehicle, refused to repair or replace her vehicle's

23  battery, and continued to suggest that she drive without using the Leaf's heater or air conditioner. (*Id.*)

24  They also recommended that she always drive in "Eco Mode," which reduces a Leaf's acceleration,

25  torque, and speed to the point where normal merging onto a highway can quickly become a life-

26  endangering experience. (*Id.*)

27  ///

28

**OBJECTION TO CLASS ACTION SETTLEMENT**

On February 10, 2014 Ms. Khosravi wrote an e-mail to Eric West of Nissan stating that her Leaf had range limitations that were substantially below performance parameters advertised and promised by Nissan, and noted that Nissan and the dealer Stevens Creek Nissan had admitted that these issues could not be corrected even though Ms. Khosravi's Leaf was still under warranty. (*Id.* at ¶ 12; Ms. Khosravi's February 10, 2014 e-mail to Eric West of Nissan North America. Inc.; Exh. C.) Ms. Khosravi's e-mail concluded by requesting that Nissan repurchase her Leaf. (*Id.*)

On February 19, 2014 Eric West of Nissan North America, Inc. responded to Ms. Khosravi and summarily refused to repurchase Ms. Khosravi's Leaf. *Id.* at ¶ 13; Eric West's February 19, 2014 e-mail to Mandana Khosravi; Exh. D.) Mr. West's letter did not suggest that Ms. Khosravi seek battery repair or replacement pursuant to Nissan's original or extended warranty, or mention anything about the proposed settlement in this case. (*Id.*)

Around the this time Ms. Khosravi contacted the California Bureau of Automotive Repair ("BAR") regarding range deficiencies regarding her Nissan Leaf. (*Id.* at ¶ 14.) On February 28, 2014 the BAR wrote to Ms. Khosravi and indicated that were unsuccessful in getting Nissan or Stevens Creek Nissan to repair the range problems with Ms. Khosravi's Leaf. (*Id.* at ¶ 14; February 28, 2014 Correspondence from the California Bureau of Automotive Repair to Mandana Khosravi; Exh. E.)

On June 30, 2014 Ms. Khosravi filed a complaint in the Santa Clara County Superior Court against Stevens Creek Nissan and Nissan Motor Acceptance Corporation, the holder of her lease for various violations of California law. (*Id.* at ¶ 15.)   Both the Stevens Creek Nissan and Nissan Motor Acceptance Corporation demanded arbitration pursuant to the lease, Stevens Creek Nissan and NMAC subsequently filed a Motion to Compel Arbitration and ultimately Ms. Khosravi's attorneys, Otto & Guillen, PC stipulated to arbitration with JAMS. (*Id.* at ¶ 15.)

On January 14, 2015 Ms. Khosravi had her Leaf towed to Premier Nissan in San Jose, (Premier Nissan had purchased the dealership that initially leased Ms. Khosravi her Leaf), and informed personnel at that dealership that her Leaf's battery life had deteriorated to an unacceptable degree and she wanted Nissan or the dealership to repair or replace her vehicle's battery. (*Id.* at ¶ 16.) Ms. Khosravi told Premier personnel that she knew she was entitled to battery repair or replacement under

OBJECTION TO CLASS ACTION SETTLEMENT

1  Nissan's extended battery warranty. (*Id.* at ¶ 16; January 15, 2015 Premier Nissan Work Order; Exh.

2  F.) "Jaime," at Premier Nissan told Ms. Khosravi that Nissan had experienced many problems with

3  the 2012 Leaf and that Premier needed to communicate a complaint to Nissan before they were

4  allowed to service these vehicles. (*Id.* at ¶ 17.)

5        On January 17, 2015 Premier Nissan informed Ms. Khosravi that they would not repair or

6  replace the battery in her vehicle. (*Id.* at ¶ 18.)   Premier personnel told Ms. Khosravi that loss of

7  capacity and range is expected with Lithium Ion batteries like the one in Ms. Khosravi's Leaf. (*Id.*)

8  No warranty services would be offered or provided. (*Id.*)

9        Ms. Khosravi's lease regarding her Leaf will reach its conclusion on November 8, 2015.   The

10  terms of her lease allowed 12,000 miles per year (1,000 miles per month) for 38 months. (*Id.* at ¶ 19.)

11  In return, Ms. Khosravi paid $433.14 monthly for the lease. (*Id.*) The residual value of the Leaf, i.e.

12  the amount at which she has the option to purchase it at the end of the lease, is $17,986.90. (*Id.*) The

13  residual value is based on an actuarial projection of the car's value in very good condition assuming

14  the miles promised under the lease have been used. (*Id.*) **As a result of the range limitations on Ms.**

15  **Khosravi's Leaf she has only been able to drive this vehicle 8496 miles during the entire**

16  **duration of her lease**. (*Id.*)

17      2.  Relevant Settlement Terms

18        Because the amended settlement agreement was not posted on the settlement webpage, Ms.

19  Khosravi's counsel relies on the language of the original settlement agreement.

20        The settlement class is defined as:

21          "'Settlement Class'" means all former and current owners and lessees of a 2011-2012

22          model year Nissan LEAF vehicle in the United States and its territories, including
        Puerto Rico. The "Settlement Class" is defined in the same way as the proposed class in

23          the Amended Class Action Complaint in the Lawsuit and includes the same members
        as those in the proposed class in that Complaint." (Emphasis added.)

24
      The settlement purports to release the following:

25

26          "It is agreed that upon the Effective Date of Settlement, Plaintiffs and all Settlement
        Class Members and their heirs, executors, estates, predecessors, successors, assigns,
        agents and representatives shall be deemed to have jointly and severally released and

27          forever discharged Nissan North America and the **Related Parties** from any and all

28          Released Claims, whether known or unknown, and shall be fully and forever barred and

enjoined from instituting or prosecuting in any court or tribunal, either directly or indirectly, individually or representatively, any and all Released Claims against NNA or the **Related Parties**." (Emphasis added.)

"Related Parties" is defined as:

"Related Parties" means NNA and NML and all of their past and present officers, directors, agents, designees, servants, sureties, attorneys, employees, parents, associates, shareholders, general or limited partners or partnerships, subsidiaries, divisions, affiliates, insurers, and all their predecessors or successors in interest, assigns, or legal representatives, as well as any other person, company or entity in the chain of distribution of a Class Vehicle, and any person, company or entity who serviced, maintained or repaired a Class Vehicle prior to the Effective Date of Settlement. (Emphasis added.)

In exchange for the comprehensive releases from the class members of not only Nissan, but of everyone involved in the Leaf "chain of distribution" for all claims related to the defective batteries, Nissan will provide the following consideration.  First, Nissan will only be obligated to replace the Leaf battery if it falls under the "ninth bar" on the dashboard charge indicator.  This "nine bar test" applies without exception or limitation regarding Nissan's ability to "reprogram" the charge indicator. Second, Nissan will extend the length and mileage of the battery warranty to 60 months and 60,000 miles, something it already promised to do before the settlement was preliminarily approved.  Third, the additional consideration provided by the amended settlement is essentially a coupon settlement for EZ-charge cards in the states where EZ-charge is available, and for $50 dollars in states that do not have EZ-charge.

## IV.   LEGAL STANDARD FOR CLASS ACTION SETTLEMENT APPROVAL.

The standards, procedures, and protocols that a Federal Court must apply and employ regarding resolution of a class action are well established.  Federal Rule of Civil Procedure ("FRCP") 23 (e)(1)-(2) provides that:

The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

**(2)** <u>If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.</u>
(Emphasis added)

In regard to the "notice" required by FRCP 23 (e)(1), Rule 23 (2) (B)(v)-(vi)  states that notice must, "clearly and concisely state in plain, easily understood language...that the court will exclude from the class any member who requests exclusion..... [and] the time and manner for requesting exclusion."

In regard to the issue of the "fair, reasonable, and adequate," requirement for class settlements referenced in FRCP 23 (e)(2) it has been held that in determining whether a class wide settlement is "fair" a court must balance a number of factors, including the amount offered in settlement.  See *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026–27 (9th Cir.1998).

The settlement class must also conform to the requirements of FRCP 23(a) and (b), with the exception of the manageability requirement under 23(b)(3)(D).  Thus, the proposed settlement has to satisfy FRCP 23's requirements that the class representative's claims are typical of the class's, that the class representative will fairly and adequately represent the interests of the class, and that class questions of law and fact predominate over any questions affecting only individual members.  FRCP 23(a)(3), (a) (4), & (b)(3).

Moreover, as was the case in the instant action, where a settlement takes place before formal class certification, settlement approval requires a "higher standard of fairness." See *Lane v. Facebook,* 696 F.3d. 811, 819-820.  The reason for more exacting review of class settlements reached before formal class certification <u>is to ensure that class representatives and their counsel do not secure a disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent."</u> (*Id.*) (Emphasis added.)

## V.    **DETAILED OBJECTIONS**

1. <u>The Proposed Settlement is Unfair Because it Provides Little or No Benefit to Lessee Class Members, But a Windfall For Nissan.</u>

The terms of the settlement set forth in the Amended Settlement Agreement are unfair due to the fact that they offer little or nothing of value to Ms. Khosravi, or to other Leaf Lessees because, by the time that settlement benefits become available, many of these individuals' leases will either be

expired or will be about to expire.   On or around September 8, 2012 Ms. Khosravi entered into a 38-month lease agreement with Steven's Creek Nissan for her 2012 Nissan Leaf.  Ms. Khosravi's lease terminates on November 8, 2015.  Given that class counsel Capstone Legal and counsel for Defendant Nissan North America have requested that a Final Approval Hearing be set on June 15, 2015 or later, by the time that Nissan's settlement obligations become operative Ms. Khosravi will have at most five months to obtain and "enjoy" the results of the proposed settlement.  Moreover, Ms. Khosravi's on-going, and thus far futile, attempts to have Nissan and its dealers honor their current promises under the battery warranty, do not augur well for Ms. Khosravi, or for other similarly situated class members, who had hoped that the instant class action would result in a substantive meaningful resolution for the wrongs that the instant action was supposed to remedy.   In fact, many Lessees may realize results inferior to Ms. Khosravi's.  For example, all Lessees whose leases have run their course by June of 2015, and who have already returned their Leaf vehicles to lessor's dealerships, will receive no benefit whatsoever from the proposed settlement.

Ms. Khosravi and other Leaf Lessees who may have some time left on their leases after June of 2015 will still have suffered a substantive wrong without a remedy because, even if battery replacements are provided towards the end of their leases, they will still have been deprived of miles that they were promised under the terms of their lease, that will revert to Nissan, and which will increase the re-sale value of their vehicles, after lease terms expire and these low mileage vehicles are returned to Nissan.  This provides a windfall to Nissan at the expense of the Lessees.  Purchasers of the affected Leafs simply do not have this problem; in fact their Leafs will have increased in value if they choose to sell.  In this manner, Lessees are being treated in a manner vastly inferior to the purchasers because the settlement allows Nissan to misappropriate the value of the leases from the Lessees while cloaked in a court order terminating any liability Nissan and its dealers have for selling Leafs with greatly overstated usable miles.

The disparate treatment between class members means that neither FRCP 23 (a) (3) nor 23 (a)(4) can be satisfied for final approval.  Moreover, even cursory review of the backgrounds of class counsel's two class representatives demonstrates that the proposed settlement is procedurally and

**OBJECTION TO CLASS ACTION SETTLEMENT**

substantively defective. Specifically speaking, Mr. Wallack, who purchased his Leaf cannot properly represent the Lessees because his claims as a purchaser are not typical of a Lessee's claims. On the other hand, the settlement's blatant undervaluing of the Lessees' claims means that the other proposed class representative, Mr. Klee, and his counsel, have done a woefully inadequate job of fairly and adequately protecting the Lessees' interest in this action.

These failures by the class representatives and their counsel are magnified by the events unfolding before and during the settlement approval process. Nissan's and its dealerships' actions are particularly disturbing in this regard because the class representatives and their counsel had to be aware of some, if not all of the issues discussed herein. In addition to all of the defects of the proposed settlement and inadequate representation provided by the class representatives there is a fundamental problem concerning the adequacy of the consideration that supposedly supports the settlement agreement. Specifically, Nissan contacted class members and extended their battery warranty before preliminary approval of the proposed settlement. The fact that Nissan provided this to class members prior to preliminary or final approval renders the proposed settlement's consideration illusory.

2.  The Proposed Settlement is Unfair Because Nissan's Prior Disregard for Warranty Obligations Predicts Poor Compliance Regarding Its Settlement Obligations and Because the Proposed Settlement Provides No Efficient Enforcement Procedure for Class Members.

Setting aside for the moment that fact that Nissan's promise to extend the warranty rendered the settlement consideration largely illusory, the timing of Nissan's announcement extending the warranty raises other questions. Why announce the extension with the settlement in the works? One would like to believe—as Ms. Khosravi initially did—that Nissan was being a good corporate citizen, but Nissan's frustration of Ms. Khosravi's numerous subsequent attempts to have her battery repaired or replaced pursuant to her vehicle's warranty indicates the possible existence of more nefarious motives.

As explained in more detail, *infra*, Nissan's initial preemptory extension of Leaf vehicles' battery warranty and the subsequent reiteration of this warranty extension via the proposed settlement actually provides Nissan with the opportunity to avoid its obligation to replace batteries in class

**OBJECTION TO CLASS ACTION SETTLEMENT**

members' vehicles.  Battery replacement under the terms of the proposed settlement is dependent on the "nine bar test" of the dashboard charge indicator. This is exactly what happened to Ms. Khosravi: instead of honoring even the original warranty offered on the battery, Nissan's dealership used a Nissan software patch to "reprogram" the charge indicator to show a full charge.   Then Nissan steadfastly refused to address the actual deterioration of the battery **for more than a year and a half**, preferring to make unreasonable and cost-free suggestions to Ms. Khosravi like, "you should drive without using the Leaf's heater, air conditioner, or other powered accessories," while the settlement has been pending approval.  Offering the extended warranty before settlement approval was nothing more than a ruse to entice Lessees and other class members to remain in the settlement class until the settlement terms quietly reduced Nissan's original warranty obligations.

At least with respect to the Lessees, it is highly unlikely that Nissan will perform its promised duties under the Amended Settlement Agreement properly, and in good faith, because a simple "reprograming" can help Nissan avoid millions of dollars of liability to the Lessees while depriving them of their mileage allowances under the terms of their leases.  Nissan's utter contempt for Ms. Khosravi's rights under the terms of Nissan's original vehicle warranty, and under the terms of the expanded battery warranty provided to all owners of 2011 and 2012 Leafs on or around June 30, 2013 renders the value of the settlement to Ms. Khosravi and other Lessees suspect.  Given Nissan's history of disregarding their warranty obligations, Ms. Khosravi objects to the proposed settlement because it is unlikely that Nissan will properly perform their settlement obligations and because the Amended Settlement Agreement deprives her and the Lessees of all rights against Nissan and other parties to remedy their damages and/or to efficiently enforce their rights if, in the highly unfortunate event that the proposed settlement is approved, Nissan avoids their settlement obligations by, (as discussed in more detail below) reprogramming vehicles and/or by giving consumers a run-around about "charge bars," when what they have actually been harmed by is inadequate, and deteriorating, vehicle range.

3.  <u>The Proposed Settlement is Unfair Because the Terms of the Amended Settlement Agreement Improperly Allow Nissan to Control the Extent and Cost of Their Settlement Obligations.</u>

The value of the settlement to Ms. Khosravi and to all members of the class is also of questionable value because the, "below nine bars," threshold that, under the terms of the Amended

**OBJECTION TO CLASS ACTION SETTLEMENT**

Settlement Agreement, triggers Nissan's duty to replace 2011 and 2012 Leaf batteries will not offer Ms. Khosravi or other class members any assurance whatsoever that their vehicle's range problems will actually result in battery replacement.  In fact it is entirely possible that, per Ms. Khosravi's experience, Nissan could evade most, if not all of their settlement obligations by reprogramming class members' vehicles to indicate that they can hold charges of nine bars or better.  As discussed above, on July 16, 2013, when Ms. Khosravi initially brought her Leaf in for ordinary scheduled maintenance at Stevens Creek Nissan and complained about her vehicle's deteriorating range, Stevens Creek Nissan personnel "reprogrammed" Ms. Khosravi's Leaf so that the charge bar dashboard display indicated that the vehicle could be fully charged.  Yet the range deficiencies, which are at the heart of Ms. Khosravi's, and the class' claims against Nissan, had not been, and were never, resolved.

There is nothing in the Amended Settlement Agreement that would prevent Nissan from reprogramming class members' vehicles so that the class members' vehicles' dashboards indicate that they can be charged to nine bars or above.  Under the terms of the Amended Settlement Agreement once this had been accomplished Nissan would have no duty to replace any batteries for any class members. This makes the terms of the Amended Settlement Agreement unfair because they do not condition Nissan's settlement duties on the presence of range deficiencies. This "loophole" is especially detrimental to Lessees because it allows Nissan to string along actual replacement of the batteries in leased Leafs until they are back in Nissan's hands (after Leasees' leases have expired), for resale as "really low mileage" certified pre-owned vehicles. The proposed settlement is fundamentally unfair because it allows Nissan to control and decide the extent of its own settlement obligations, and Ms. Khosravi's experience demonstrates, leaves the "fox is charge of the henhouse."

4. <u>The Amended Settlement Agreement Deprives Leasees of Procedural and Substantive Due Process Because They Have Been Denied a Real Choice to Object or Opt Out of the Settlement and Because Notice Was Inadequate.</u>

Ms. Khosravi also objects to the proposed settlement because, based on the date she leased her vehicle, the date that settlement of the instant action was preliminarily approved, the dates on which deadlines for class members to object or opt out were set, and the date when her vehicle's range became unacceptable, Ms. Khosravi, and many similarly situated individuals, were effectively deprived of their ability to object to, or opt out of, the settlement.

14

Ms. Khosravi leased her Leaf on September 8, 2012.  Settlement of the instant action received preliminary approval on July 10, 2013, notice of the settlement was sent out in September of 2013, and the dates upon which class members in the instant action had to object or opt out of the settlement were respectively set for October 13, 2013 and October 28, 2013.  However, Ms. Khosravi's vehicle did not become manifestly defective (i.e. unable to make the 18 mile roundtrip from Ms. Khosravi's home to work and back), until November 30, 2013, after the cut-off dates for her to object to the settlement or to opt out of the settlement had passed.  This fundamental due process problem was exacerbated when Nissan provided class members with notice, (both via their extension of class members' battery warranty prior to preliminary approval, and via notice of the settlement), that it had extended the warranty on the batteries on Leaf Vehicles, including Ms. Khosravi's.  Nissan's actions in this regard caused Ms. Khosravi, and in all likelihood, many other class members to refrain from objecting to or opting out of the proposed settlement.  Yet, despite all of Nissan's promises to Ms. Khosravi and to the other class members regarding extension of the battery warranty and regarding the pending settlement, Nissan refused to honor Ms. Khosravi's original warranty and refused to repair or replace her battery.  The detrimental reliance Nissan's actions induced, effectively deprived Ms. Khosravi and other class members of their right to object or opt out of the proposed settlement because they were unaware of important facts that would have caused them to object or opt out of the proposed settlement, until after the deadline to object or opt out had passed.  Moreover, in the case of the Lessees, Nissan's statements and subterfuge kept Lessees unaware of the fact that the purported benefits to the class would either be unavailable to them or would do them little good.

The nature of the proposed settlement under consideration in conjunction with the timing and manner in which the battery warranty extension that was provided prior to preliminary approval, and the way the notice of the class action settlement was provided, effectively trapped Lessees into an outcome where they face losing all their potential claims against Nissan, and any other entity, without receiving any real compensation. The comprehensive release imposed on the class members not only absolves Nissan, but everyone involved in the Leaf's, "chain of distribution" for all claims related to the defective batteries.  The fact that the proposed settlement includes Nissan's dealerships, as well as

15

other vendors selling the Leafs secondhand, was obscured in the notice sent to the class members. This point, however, is essential to understanding the ramifications of the proposed settlement on Lessees' and other class members' rights, because the settlement purports to deprive Lessees of all claims under state law that would allow them to recoup the lost value of their unused miles as a result of the defective batteries.

Finally, the terms of the Amended Proposed Settlement provides no value to the Lessees and amounts to nothing more than a "coupon" settlement for those class members who reside in states where EZ-charge is available.  Under the Class Action Fairness Act ("CAFA"), a coupon settlement such as this must be vetted with greater scrutiny because there are attorneys' fees proposed. Moreover, there is no evidence that the defendants complied with their obligations to notify the attorneys general of the states in which the settlement will be effective regarding these "amendments," to the settlement.

## VI.   **CONCLUSION**

Based on all of the facts recounted above Objector Mandana Khosravi hereby requests that this Court:

(1)  Reject the settlement proposed in the Amended Settlement Agreement.

(2)  Deny without prejudice certification of the class and any sub-classes, finding class representatives Humberto Klee and David Wallak, and their counsel, inadequate representatives of the Lessees' interests.

(3)  Appoint Ms. Khosravi as the new class representative, and appoint her counsel as new class counsel for Lessees' separate and distinct interests for the remainder of this litigation.

(4)  Require supplemental notice to the class members regarding the amended terms of the proposed settlement, with new dates to object and opt out of the proposed settlement.

Dated: March 26, 2015          **OTTO & GUILLEN, a PC**

By: _____

Ian Otto
Attorneys for Plaintiff,
MANDANA KHOSRAVI

16

Date: March 26, 2015

Mandana Khosravi

## VII.   DECLARATION OF MANADANA KHOSRAVI

I, Mandana Khosravi, declare:

1.      I currently reside, and at all times relevant to the claims herein have resided, in San Jose, California. I currently work, and at all times relevant to the claims asserted herein have worked, as a Polysomnographic Technician in Sunnyvale, California.   I have personal knowledge of the facts set forth below and, if called upon to do so, could and would testify competently thereto.

2.      On September 8, 2012 I leased a 2012 Nissan Leaf ("Leaf") from Stevens Creek Nissan and Nissan Motor Acceptance Corporation ("NMAC") in San Jose, California based in significant part on Nissan and Stevens Creek Nissan advertisements and statements indicating that Leaf vehicles had a range of over 100 miles on a single charge. Attached hereto as **Exhibit A** is a true and correct copy of my Lease Agreement regarding my 2012 Leaf.

3.      My primary purpose for leasing my Leaf was to make the 18-mile round trip from my home in San Jose to my workplace in Sunnyvale and back which my Leaf was initially able to do.

4.      Over a ten-month period after I leased my Leaf I noticed that the vehicle's range and the number of charge bars that appeared on my vehicle's dashboard were declining.  I was concerned about this problem, but in June of 2013 I received notification from Nissan indicating that the warranty on 2012 Leaf batteries regarding charge capacity loss below "nine bars," would now be under warranty for 60 months or 60,000 miles. I felt reassured because I believed that if my Leaf's range continued to deteriorate Nissan would repair or replace my battery.

5.      On July 9, 2013 I brought my Leaf to Stevens Creek Nissan for scheduled maintenance and mentioned the Leaf's inability to fully charge and the vehicle's deteriorating range.  Stevens Creek Nissan personnel thereupon "reprogrammed" my Leaf.   Attached hereto as **Exhibit B** is a true and correct copy of the July 9, 2013 Service Invoice regarding the work performed during that visit.

6.      When I picked up my Leaf I noticed that the Leaf's dashboard charge indicator now showed that the vehicle was fully charged.  Nonetheless, the vehicle's deteriorating range had not been

17

1  resolved. I was still not overly worried about range issues at this point because I believed that Nissan

2  would repair or replace my vehicle's battery if the Leaf's range continued to decline.

3      7.      On July 16, 2013 I brought my Nissan Leaf to Stevens Creek Nissan and mentioned

4  again that the vehicle's range and charge capacity had deteriorated. Stevens Creek Nissan personnel

5  admitted that there was a possible, "range factor issue," but refused to do anything to repair or replace

6  the battery.

7      8.      Stevens Creek Nissan personnel did not inform me that the range issues I was

8  experiencing were widespread in Leaf vehicles, nor did they offer me any services, repairs, or battery

9  replacement pursuant to Nissan's extended warranty regarding battery issues.

10      9.      By November 30, 2013, my Leaf, even when fully charged according to the

11  "reprogrammed" dashboard charge indicator, was unable to make the 18-mile roundtrip journey from

12  my residence in San Jose, California to my workplace in Sunnyvale, California.

13      10.      I brought my Nissan Leaf back to Stevens Creek Nissan and complained that the

14  vehicle's range was markedly below the performance promised by Nissan and continuing to

15  deteriorate. Stevens Creek Nissan personnel claimed that there was "no problem" with my vehicle and

16  recommended that I refrain from using heating, air conditioning, or other powered accessories

17  whenever driving the Leaf. Stevens Creek Nissan personnel did not offer or provide me with any

18  services pursuant to Nissan's extended warranty regarding battery issues.

19      11.      Over the next year and a half I repeatedly contacted Defendants Nissan and Stevens

20  Creek Nissan regarding my vehicle's deteriorating range and requested that my battery be repaired or

21  replaced. In each such instance neither Nissan, nor Stevens Creek Nissan, ever even offered, agreed,

22  or attempted to repair or replace my vehicle's battery or otherwise repair my vehicle. Nissan and

23  Stevens Creek Nissan personnel instead told me that there was nothing wrong with my vehicle,

24  refused to repair or replace my vehicle's battery, and continued to suggest that I drive without using

25  the Leaf's heater or air conditioner. They also recommended that I always drive in "Eco Mode,"

26  which reduced my Leaf's acceleration, torque, and speed to the point where normal merging onto a

27  highway became a frightening and life-endangering experience.

28

**OBJECTION TO CLASS ACTION SETTLEMENT**

12.     On February 10, 2014 I wrote an e-mail to Nissan North America, Inc. stating that my Leaf had range limitations that were substantially below performance parameters advertised and promised by Nissan, and noted that the dealer Stevens Creek Nissan had admitted that these issues could not be corrected even though my Leaf was still under warranty.   My letter concluded by requesting that Nissan North America, Inc. repurchase my Leaf.   Attached hereto as **Exhibit C** is a true and correct copy of my February 10, 2014 e-mail to Eric West of Nissan North America. Inc.

13.     On February 19, 2014 Eric West of Nissan North America, Inc. responded to my e-mail and summarily refused to repurchase my Leaf.   Mr. West's letter did not suggest that I seek battery repair or replacement pursuant to Nissan's original or extended warranty, or mention anything about the proposed settlement in the instant class action.   Attached hereto as **Exhibit D** is a true and correct copy of Eric West of Nissan North America. Inc.'s February 19, 2014 letter to me.

14.     Around this time I contacted the California Bureau of Auto Repair ("BAR") through their website regarding range deficiencies regarding my Nissan Leaf.   On February 28, 2014 the BAR wrote back and stated that they were unsuccessful in getting Nissan or Stevens Creek Nissan to repair the range problems with my Leaf.   Attached hereto as **Exhibit E** is a true and correct copy of the California Bureau of Auto Repair's February 28, 2014 letter to me.

15.     On June 30, 2014 I filed a complaint in the Santa Clara County Superior Court against Stevens Creek Nissan and Nissan Motor Acceptance Corporation, the holder of my lease for various violations of California law.   Both Stevens Creek Nissan and Nissan Motor Acceptance Corporation demanded arbitration pursuant to the lease.   Stevens Creek Nissan and NMAC filed a Motion to Compel Arbitration and ultimately my attorneys at Otto & Guillen stipulated to arbitration with JAMS.

16.     On January 10, 2015, due to my concerns with whether my vehicle's range would be sufficient to get it to take it for a trip of any significant duration, I had my Leaf towed to Premier Nissan ("Premier") in San Jose (Premier had purchased the dealership that initially leased me my Leaf) and informed personnel at that dealership that her Leaf's battery life had deteriorated to an unacceptable degree and that I wanted Nissan or the dealership to repair or replace my vehicle's

**OBJECTION TO CLASS ACTION SETTLEMENT**

battery.  Attached hereto as **Exhibit F** is a true and correct copy of Premier Nissan January 10, 2015 Work Order.

17.    I told Premier personnel that I knew I was entitled to battery repair or replacement under Nissan's extended battery warranty.  "Jaime," an employee at Premier Nissan told me that Nissan had experienced many problems with the 2012 Leaf and that Premier needed to communicate a complaint to Nissan before they were allowed to service these vehicles.

18.    On January 17, 2015 Premier Nissan informed me that they would not repair or replace the battery in my vehicle.  Premier personnel told me that loss of capacity and range is expected with Lithium Ion batteries like the one in my Leaf.  No warranty services were offered or provided.

19.    My lease regarding my Leaf will reach its conclusion on November 8, 2015.  The terms of my lease allowed 12,000 miles per year or an average of 1,000 miles per month, for the lease term which was 38 months.  I paid Nissan Motor Acceptance Corporation $433.14 monthly for the lease. The residual value of the Leaf, i.e. the amount at which I have the option to purchase it at the end of the lease, is $17,986.90.  As a result of the range limitations on my Leaf I have only been able to drive this vehicle 8496 miles during the entire duration of my lease.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on March 25, 2015 in San Jose, California.

Date:  March 26, 2015

Mandana Khosravi

**OBJECTION TO CLASS ACTION SETTLEMENT**

# EXHIBIT A



***Signature*LEASE'**                                                                         **NISSAN MOTOR ACCEPTANCE CORPORATION**

**MOTOR VEHICLE LEASE AGREEMENT WITH ARBITRATION CLAUSE — CALIFORNIA**

## 1. PARTIES

*Lessor*

| STEVENS CREEK NISSAN | 4089835900 | 9/8/2012 |
|---|---|---|
| NAME OF LESSOR (DEALER) | LESSOR TELEPHONE NUMBER | LEASE DATE |
| 4855 Stevens Creek Blvd | Santa Clara, CA, 95051 | |
| STREET ADDRESS | CITY, STATE, ZIP CODE | NMAC DEALER NUMBER |

*Lessee & Co-Lessee*

| MANDANA KHOSRAVI | N/A | N/A |
|---|---|---|
| NAME OF LESSEE | NAME OF CO-LESSEE | NAME OF DRIVER (IF LESSEE IS A BUSINESS) |
| 828 BLAISDELL COURT | SAN JOSE, CA, SANTA CLARA | 95117 |
| LESSEE STREET ADDRESS | CITY, STATE, COUNTY | ZIP CODE |
| 828 BLAISDELL COURT | SAN JOSE, CA | 95117 |
| LESSEE MAILING ADDRESS (IF DIFFERENT FROM ABOVE) | CITY, STATE, COUNTY | ZIP CODE |
| 828 BLAISDELL COURT | SAN JOSE, CA, SANTA CLARA | 95117 |
| VEHICLE GARAGING ADDRESS (IF DIFFERENT FROM ABOVE) | CITY, STATE, COUNTY | ZIP CODE |

"You" and "your" refer equally to the Lessee and Co-Lessee (if any) signing this Lease. "We", "us" and "our" refer to the Dealer, to Nissan-Infiniti LT ("NILT") and any other assignee, if this Lease is assigned. "Vehicle" refers to the Motor Vehicle described below, including attachments, equipment, the battery and accessories, including any charging accessories included with the Vehicle. You agree to lease this Vehicle from us under the terms in this Lease. You understand that this is a Lease. You do not own this Vehicle, unless and until you exercise your option to purchase this Vehicle.

**THERE IS NO COOLING OFF PERIOD**

California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this Lease simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this Lease only with the agreement of the lessor or for legal cause, such as fraud.

## 2. DESCRIPTION OF LEASED PROPERTY

| YEAR | MAKE | MODEL | BODY STYLE | VEHICLE IDENTIFICATION NUMBER (VIN) |
|---|---|---|---|---|
| 2012 | NISSAN | LEAF | 5DR HB SL | JN1AZ0CP6CT023114 |

☒ New   4          N/A N/A
☐ Used   ODOMETER READING   COLOR/KEY CODE #   LICENSE NO.   ☒ Charging Accessories   Primary Use  ☐ Commercial  ☒ Personal, Family or Household

## 3. CONSUMER LEASING ACT DISCLOSURE BOX

| Amount Due At Lease Signing or Delivery | Monthly Payments | Other Charges* (Not part of your monthly payment) | Total of Payments |
|---|---|---|---|
| (From Section 4, itemized below) | Your first monthly payment of $433.14 is due on signing, followed by 38 payments of $433.14 due on the 8th of each month, beginning on 10/8/2012. The total of your monthly payments is $16,892.46. | a) Disposition Fee (if you do not purchase the Vehicle)   $395.00<br>b)   + $ N/A<br>c)   + $ N/A<br>d) Total   = $395.00<br>*In addition, you may have to pay excess wear and use and mileage, if any. | (The amount you will have paid by the end of the Lease.)<br><br>$29,354.32 |
| $12,500.00 | | | |

## 4. ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY

**Amount Due at Lease Signing or Delivery**

| | | |
|---|---|---|
| a) Capitalized Cost Reduction including any net trade-in allowance | $ 10,718.16 | k) California Tire Fee   + $ 7.00 |
| b) First Monthly Payment | + $ 433.14 | l) N/A   + $ N/A |
| c) Refundable Security Deposit | + $ N/A | m) N/A   + $ N/A |
| d) Title Fees | + $ N/A | n) N/A   + $ N/A |
| e) Registration Fees | + $ 342.00 | o) N/A   + $ N/A |
| f) Tax on Capitalized Cost Reduction | + $ 897.50 | p) Total   = $ 12,500.00 |
| g) Sales Tax Paid in Advance | + $ 6.70 | **How the Amount Due at Lease Signing or Delivery will be Paid** |
| h) Document Processing Charge (not a governmental fee) | + $ 80.00 | I) Net Trade-In Allowance   $ N/A |
| i) DMV Electronic Filing Fee (not a governmental fee) | + $ 15.50 | II) Rebates and Non-Cash Credits   + $ 7,500.00 |
| j) Emissions Testing Charge (not a governmental fee) | + $ N/A | III) Amount To Be Paid in Cash   + $ 5,000.00 |
| | | IV) Total   = $ 12,500.00 |

## 5. YOUR MONTHLY PAYMENT IS DETERMINED AS SHOWN BELOW

| | |
|---|---|
| a) **Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ 35,636.00 ) and any items you pay over the lease term such as taxes, fees, service contracts, insurance and any outstanding prior credit or lease balance. If you want an itemization of this amount, please see Section 7.   $ 41,985.00 | e) **Depreciation and Any Amortized Amounts.** The amount charged for the Vehicle's decline in value through normal use and for other items paid over the lease term.   = 13,279.89 |
| | f) **Rent Charge.** The amount charged in addition to the depreciation and any amortized amounts.   + 2,304.90 |
| b) **Capitalized Cost Reduction.** The amount of any net trade-in allowance, rebate, non-cash credit or cash you pay that reduces the gross capitalized cost.   – 10,718.16 | g) **Total of Base Monthly Payments.** The depreciation and any amortized amounts plus the rent charge.   = 15,584.79 |
| | h) **Number of Payments in Your Lease**   ÷ 39 |
| c) **Adjusted Capitalized Cost.** The amount used in calculating your base monthly payment.   = 31,266.84 | i) **Base Monthly Payment**   = 399.61 |
| | j) **Monthly Sales, Use or Lease Tax**   + 33.47 |
| d) **Residual Value.** The value of the Vehicle at the end of the lease used in calculating your base monthly payment.   – 17,986.90 | k) **Monthly Luxury Tax**   + N/A |
| | l) **Total Monthly Payment**   = $ 433.14 |

NILT/N 3001-CA-E 7/12

## 6. IMPORTANT TERMS

**Early Termination.** You may have to pay a substantial charge if you end this Lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the Lease is terminated. The earlier you end the Lease, the greater this charge is likely to be. See Section 14.

**Excessive Wear and Use.** You may be charged for excessive wear based on our standards for normal use and for mileage in excess of ____12000____ miles per year at the rate of $.15 cents per mile. See Section 20. ☐ If this box is checked, this mileage includes ____N/A____ miles over the term of the Lease purchased at $.10 cents per mile, which is included in your monthly payment. There will be no refund for unused miles, including any additional miles purchased by you.

**Purchase Option at End of Lease Term.** You have an option to purchase the Vehicle at the end of the lease term for $ 17,986.90 , and a Purchase Option Fee of $300.00. See Section 15.

**Other Important Terms.** This Lease contains additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interest, if applicable.

## 7. ITEMIZATION OF GROSS CAPITALIZED COST

The following items you will pay over the lease term and are in your monthly payment:

| | |
|---|---|
| a) Agreed upon value of the Vehicle | $   35,636.00 |
| b) Up-Front Sales Tax, if applicable | + N/A |
| c) Title, License and Registration | + N/A |
| d) Acquisition Fee | + 595.00 |
| e) Service Contract(s) (See Section 10) | + N/A |
| f) Maintenance Contract(s) (See Section 10) | + 854.00 |
| g) Credit Life Insurance (See Section 10) | + N/A |
| h) Credit Disability Insurance (See Section 10) | + N/A |
| i) Prior Credit or Lease Balance | + 4,900.00 |
| j) Document Processing Charge (not a governmental fee) | + N/A |
| k) DMV Electronic Filing Fee (not a governmental fee) | + N/A |
| l) Emissions Testing Fee (not a governmental fee) | + N/A |
| m) California Tire Fee | + N/A |
| n) N/A | + N/A |
| o) N/A | + N/A |
| p) N/A | + N/A |
| q) N/A | + N/A |
| r) Total Gross Capitalized Cost | 41,985.00 |

## 8. VEHICLE WARRANTIES

This Vehicle is covered by any warranty, extended warranty, service contract or maintenance contract indicated below:

☒ Standard New Vehicle Limited Warranty provided by the manufacturer or distributor of this Vehicle

☐ Mechanical Breakdown Protection (MBP), a service contract for the repairs of certain major mechanical breakdowns of this Vehicle and related expenses

☒ Maintenance Contract, a contract for regularly scheduled care and maintenance of this Vehicle

☐ Used Vehicle Limited Warranty

☐

EXCEPT AS EXPRESSLY PROVIDED UNDER THIS LEASE, WE OFFER NO EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THIS VEHICLE. WE MAKE NO IMPLIED WARRANTY OF MERCHANTABILITY. THE LESSOR UNDERTAKES NO RESPONSIBILITY FOR THE QUALITY OF THE GOODS EXCEPT AS OTHERWISE PROVIDED IN THIS CONTRACT. THE LESSOR ASSUMES NO RESPONSIBILITY THAT THE GOODS WILL BE FIT FOR ANY PARTICULAR PURPOSE FOR WHICH YOU MAY BE LEASING THESE GOODS, EXCEPT AS OTHERWISE PROVIDED IN THE CONTRACT.

## 9. ESTIMATED FEES AND TAXES

The estimated total amount you will pay for official and license fees, registration, title and taxes, including personal property taxes, over the term of your Lease, whether included with your monthly payments or assessed otherwise is $ 3,343.53 . The actual total of fees and taxes may be higher or lower depending on the tax rates in effect or the value of the leased property at the time a fee or tax is assessed.

## 10. OPTIONAL INSURANCE, COVERAGES, AND WARRANTIES

These products are not required to enter into this Lease and will not be provided unless you sign below. If insurance, coverages and/or warranties are purchased by you, these are shown in a notice given to you at this date. These products may not be available in some states.

| | | |
|---|---|---|
| a) *Credit Life Insurance* | | $ N/A |
| | | PREMIUM |
| N/A | | $ N/A |
| INSURER | | INITIAL COVERAGE AMOUNT |
| N/A | | |
| INSURER(S) | LESSEE INITIALS | CO-LESSEE INITIALS |
| b) *Credit Disability Insurance* | | $ N/A |
| | | PREMIUM |
| N/A | | $ N/A |
| INSURER | | MONTHLY COVERAGE AMOUNT |
| N/A | | |
| INSURER(S) | LESSEE INITIALS | CO-LESSEE INITIALS |
| c) *Mechanical Breakdown Protection* | | $ N/A |
| | | CHARGE |
| (Covers parts of Vehicle up to sooner of N/A months or N/A miles.) | | |
| N/A | | |
| PROVIDER | LESSEE INITIALS | CO-LESSEE INITIALS |
| d) *Maintenance Contract* | | $ 854.00 |
| | | CHARGE |
| SECURITY PLUS | | |
| PROVIDER | LESSEE INITIALS | CO-LESSEE INITIALS |
| e) N/A | | $ N/A |
| | | CHARGE |
| N/A | | |
| PROVIDER | LESSEE INITIALS | CO-LESSEE INITIALS |
| f) N/A | | $ N/A |
| | | CHARGE |
| N/A | | |
| PROVIDER | LESSEE INITIALS | CO-LESSEE INITIALS |
| g) N/A | | $ N/A |
| | | CHARGE |
| N/A | | |
| PROVIDER | LESSEE INITIALS | CO-LESSEE INITIALS |

***Total Premiums/Charges***          $ 854.00

## 11. TRADE-IN VEHICLE

| | | | | | |
|---|---|---|---|---|---|
| Year | 2009 | Make | DODGE | Model | CHARGER |
| Agreed Upon Value of Trade-In Vehicle | | | | | $ 12,000.00 |
| Amount of Payoff/Lien on Trade-In Vehicle | | | | | $ 16,900.00 |
| Net Trade-In Allowance | | | | | $ N/A |

NILT/N 3001-CA-E  7/12

**Additional Terms and Conditions**

## ENDING YOUR LEASE

### 12. Vehicle Return

When your Lease terminates, whether early or as scheduled, you will return the Vehicle to a Nissan dealer or other location we specify. You will complete a statement of this Vehicle's mileage at termination as required by federal law. If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments, but you agree that you have no right to keep this Vehicle unless you enter into a written agreement with us extending the lease term. You will pay us for any damages we suffer because you failed to return this Vehicle to a Nissan dealer or other location we specify or because you failed to return this Vehicle at the end of the lease term. We may determine our damages in one of the following two ways at our election and in our sole discretion: a) by charging you the Total Monthly Payment for each month the Vehicle is not returned as required plus any other amounts due under Sections 13 and 25; or b) by charging you for amounts due under the formula provided in Section 14 and any amounts due under Sections 13 and 25.

### 13. Scheduled Termination

The scheduled term of your Lease is the number of months corresponding to the number of monthly payments identified in Sections 3 and 5. At the end of the lease term, you will return this Vehicle and pay us immediately:

a) a Disposition Fee equal to the amount disclosed in Section 3; plus
b) all past-due monthly payments, and other charges under this Lease; plus
c) any amounts owed as a result of excessive wear and use, as disclosed in Section 20; plus
d) any Excess Mileage Charge at lease maturity, or an Excess Mileage Charge for the period for which this Lease was in effect pro-rated monthly, as disclosed in Section 6; plus
e) any taxes related to the termination.

### 14. Early Termination

a) Conditions for YOUR early termination. You may terminate this Lease before the end of the lease term, effective on the due date of a monthly lease payment, if you return the Vehicle, you give us at least 30 days prior written notice and you pay us the amount disclosed in Section 14.c).
b) Conditions for OUR early termination. We may terminate this Lease before the end of the lease term under Section 26 or if you are in default as described in Section 25.
c) Amounts you will owe at Early Termination. If this Lease is terminated before the end of the lease term, under Section 14.a) or Section 14.b), then you will pay us:
  i) the amounts disclosed in Section 13 other than excessive wear and mileage charges, plus

  ii) an Early Termination Charge equal to the difference, if any, between the Adjusted Lease Balance and this Vehicle's Realized Value
    or,
    if we do not terminate this Lease under Section 14.b), and if it is less, an Early Termination Charge equal to the sum of the Base Monthly Payments not yet due and excessive wear and mileage; plus
  iii) if you are in default, the amounts disclosed in Section 25.

d) For an electric vehicle, if we abandon our interest in the charging accessories, we may exclude the value of the charging accessories from the determination of Fair Market Wholesale Value.

"Adjusted Lease Balance" is a charge in today's dollars ("today" being the date the Lease is terminated) for Base Monthly Payments not yet due and the Residual Value of the Vehicle. Our method of calculating "today's dollars" is the Constant Yield Method, a generally accepted accounting formula.

"Realized Value" is the wholesale value assigned by us in a commercially reasonable manner in accordance with accepted practices in the automobile industry for valuation of used vehicles as allowed by applicable state law, or by a written agreement as to the Vehicle's value signed by you and us. If you disagree with the value we assign to the Vehicle, you may obtain, at your own expense, a professional appraisal of this Vehicle's wholesale value or comparable value made by an independent third party agreeable to both you and us (the "Professional Appraisal"). After early termination, we will notify you of the date on or after which disposition of the Vehicle will be made. You must complete the Professional Appraisal by the date indicated in such notice.

### 15. Purchase Option

You have the option to purchase this Vehicle "AS IS" from the originating dealer, or other location we specify, in cash for the Purchase Option Price, plus any official fees and taxes, vehicle inspection costs required in connection with the purchase, and a Purchase Option Fee of $300.00, which fees, taxes and costs are not included in the Purchase Option Price agreed to in Section 6. If your purchase the Vehicle at the end of the lease term, the Purchase Option Price will be the Residual Value shown in Section 5.d). If you purchase the Vehicle before the end of the lease term, the Purchase Option Price will be the Adjusted Lease Balance disclosed in Section 14.c). In either case, you must also pay other amounts due under this Lease at the time of purchase.

## VEHICLE INSURANCE, MAINTENANCE, PAYMENTS AND USE

### 16. Insurance

You are responsible for the following minimum types and amounts of coverage ("Required Insurance") during the lease term: a) Comprehensive, including fire and theft insurance if this Vehicle is a car, or fire, theft and combined additional coverage if this Vehicle is a truck, with a maximum deductible of $1,000; b) Collision insurance with a maximum deductible of $1,000; c) Property damage liability of $50,000 per occurrence; and d) Bodily injury liability of $100,000 per person and $300,000 per occurrence. Your insurance policy must name us as loss payee on coverages (a) and (b) and provide us with primary coverage as an additional insured on coverages (c) and (d). You will provide us with proof of insurance at our request. Your insurance policy must provide us with at least 30 days notice of any cancellation, reduction or other material change in coverage. You appoint us as your attorney-in-fact to arrange for and procure payment of insurance loss proceeds directly with your insurance carrier(s) and to endorse, present and collect insurance loss proceeds checks.
**NO PHYSICAL DAMAGE OR LIABILITY INSURANCE COVERAGE FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS IS INCLUDED IN THIS LEASE.**

### 17. Late Charge, Returned Check Charge, Fines, and Fees

If any monthly payment is not received in full by us within 15 days after its due date, you will pay a late charge of 5% of the monthly payment due or $25.00, whichever is less or as allowed by state law, plus any applicable taxes. Payments shall be applied to the most past-due payment first. If any payment (including any electronic funds transfer) you make to us is not honored, or is charged back to us, in addition to any late charge, you will pay us a $10.00 service charge, or such other charge as allowed by law, plus any applicable taxes. You will pay when due any official fee or fine imposed on this Vehicle, such as a toll charge, parking ticket, traffic or toll violation. Should we have to pay any such fee or fine on your behalf, you will pay us the amount of the fine or fee plus a $20.00 administrative charge, or such other charge as allowed by law, plus any applicable taxes.

### 18. Official Fees and Taxes

You will pay when due all official fees and taxes, including registration, title and license fees, and personal property taxes related to this Vehicle or this Lease, which are incurred during the lease term, even if they are assessed after this Lease terminates. Should we have to pay any official fee or tax on your behalf, you will pay us the amount of the official fee or tax, and any interest or penalties assessed. You may also agree to pay personal property taxes in advance of the applicable due date, by mutual settlement of an estimated amount with us.

### 19. Vehicle Maintenance and Use

You agree to maintain this Vehicle at your own expense. You agree to follow the owner's manual and maintenance schedule and to make all necessary repairs and replacement of parts. Failure to properly maintain this Vehicle in accordance with the owner's manual and/or maintenance schedule may result in excessive wear and use charges. This Vehicle may not be used for any illegal purpose or to transport people or goods for hire. Except for occasional and incidental use (not to exceed a total of 5 days in any month) by other licensed, qualified operators with your permission, you shall retain possession of this Vehicle. Except as allowed in this Section, you will not alter or install any equipment upon this Vehicle and will pay our cost to restore this Vehicle to its original condition. You may elect to have an airbag on/off switch installed in the Vehicle, at your expense, if you have received prior written approval from the National Highway Transportation Safety Administration ("NHTSA") and you provide us written notice (including a

copy of the NHTSA approval and the dealer's written confirmation of the installation) within 30 days after installation. The switch must be installed by an authorized Nissan dealer using Nissan parts. If an airbag on/off switch is installed, you release us from any claims, losses or damages resulting from such installation, improper installation or your use or improper use of the switch. For an electric vehicle, you agree that we own the battery and that you may replace it only with our permission and only with a genuine Nissan battery specified for use with the vehicle. Any such replacement battery will be deemed an accession to the vehicle and our property. We may elect to abandon any interest we have in charging accessories. You agree to indemnify us for any loss, liability or expense arising from the use or condition of this Vehicle. You agree to keep this Vehicle free from liens and encumbrances. If you leased this Vehicle in the 48 contiguous United States, you will not remove this Vehicle from these 48 states without our prior consent. If you leased this Vehicle in Alaska, Hawaii, or Guam, you will not remove this Vehicle from that state or territory without our prior consent. If you remove this Vehicle from your state of residence or the garaging address identified in this Lease such that new registration or licensing will be required, you will notify us immediately in writing and will bear all related expenses. You will provide and complete any document necessary to comply with any applicable federal, state or local law regarding this Vehicle or this Lease.

### 20. Excessive Wear and Use

You are responsible for all repairs to this Vehicle that are not the result of normal wear and use. At the end of the lease term, you will pay us the amount it would cost for the repairs. These repairs include, but are not limited to, the costs necessary to:

a) REPAIR: inoperative mechanical parts including power accessories; dents, scratches, chips or rusted areas on the body; mismatched paint; broken windows or inoperative window mechanisms; broken headlight lenses or sealed beams; dents, cuts, scratches or gouges in the bumper; broken grilles or dents in the grilles; single dents or a series of small dents on other trim parts, including headlight and taillight bezels; or seats, seat belts, head lining, door panels or carpeting that are torn or are damaged beyond ordinary wear and use or are burned.
b) REPLACE: any windshield damaged with chips, cracks or bull's-eyes; any tire not part of a matching set of 5 tires (or four with an emergency spare), or tires with less than 1/8" of tread remaining at the shallowest point, or tires which are not a matching set of tires of comparable type and quality to the tires furnished with this Vehicle upon commencement of this Lease; missing parts, accessories and adornments, including bumpers, ornamentation, aerials, hubcaps, chrome stripping, rearview mirrors, radio and stereo components, or emergency spare.

You agree that upon notice from us and as allowed by State law, you will make the Vehicle available to us prior to the scheduled termination of this Lease, at a reasonable time and place to be designated by us, so that we may inspect the Vehicle for purposes of determining excessive wear and use. You agree that any assignee of this Lease is not bound by any statements or representations made by any dealer regarding excess wear and use of the Vehicle condition upon return. You agree that for the purposes of determining excess wear and use the only inspection(s) that will be used is(are) the inspection(s) made by the assignee or its designated inspection contractor. If you fail to adhere to manufacturer maintenance and inspection requirements, we may charge you for any resulting excessive wear and use or damages to the Vehicle, including, but not limited to, any loss in value attributable to any manufacturer cancellation or reduction of warranties.

## ADDITIONAL INFORMATION

### 21. Notices and Communications

Unless you give prior notice of a change in an address, we may send any notices to one or more of the Lessee's addresses shown on this Lease. Any notice will be deemed sufficiently given to a Co-Lessee if sent to the Lessee's address, unless you give us written notice of a separate address. You will notify us within **30** days of any address change. To the extent permitted by law, you consent that we, our assignees, and our agents may contact you at any telephone number we have for you, including any cell phone numbers and any phone numbers listed on this document, by any means we select, including an automatic telephone dialing system, text messaging, and/or an artificial or pre-recorded voice.

### 22. Security Deposit (if collected)

We may use the security deposit to offset any amounts that you owe under this Lease. If you perform all of your obligations under this Lease, the security deposit will be returned to you after lease termination. No interest, increase or profits will accrue or be due to you. We have no duty to segregate the security deposit and do not have a fiduciary duty to you in regards to the security deposit.

### 23. Security Interest

Unless otherwise precluded by applicable law, you give us a security interest in this Vehicle and in proceeds, cancellation refunds or other rights under any contract issued with respect to this Vehicle, this Lease or any addendum to this Lease, including, without limitation, insurance contracts, maintenance contracts, repair contracts and extended warranty or service contracts.

### 24. Assignment

We may assign our interest in this Lease without prior notice and without your consent. YOU AGREE THAT YOU HAVE NO RIGHT TO ASSIGN, TRANSFER OR SUBLEASE ANY OF YOUR RIGHTS UNDER THE LEASE.

### 25. Default and Payments

You will be in default if a) you do not make a payment when due; b) any information on your or a guarantor's credit application is false; c) you do not maintain insurance coverage required by this Lease; d) you do not timely or properly perform any promise under this Lease; e) you or a guarantor become subject to bankruptcy or insolvency proceedings; f) you commit any other act constituting default under applicable law. In the event of default, we may terminate this Lease and, after giving any legally required notice: (i) charge you for any termination liability pursuant to Section 14; (ii) repossess this Vehicle as allowed by law; (iii) charge you for our costs of such repossession, storing, transporting and disposing of this Vehicle, (iv) charge you for our costs of collection, any court costs and attorneys' fees to the extent permitted by applicable law; (v) sue you for damages and to recover this Vehicle; (vi) pursue any other legally permitted remedy; and/or (vii) charge you interest at the rate of **6%** per annum or such other rate as may be allowed by applicable law on any termination liability owed under Sections 13 and 14. Unless otherwise required by law, we are not required to give you prior notice of our termination of this Lease pursuant to Section 14. To the extent permitted by law, you agree that if we accept moneys in sums less than those due, accept payments which are received after their scheduled due dates, or make extensions of due dates of payments under this Lease, doing so will not be a waiver of our right to enforce the Lease terms as written as to any amounts due thereafter. We may accept payments with "Payment in Full," similar language or other restrictive endorsements without being bound by such language or waiving any of our rights.

### 26. Damage, Loss or Potential Loss of This Vehicle

You are responsible for the risk of loss, damage or destruction of this Vehicle during the lease term and until you return this Vehicle to us as required above. If this Vehicle is damaged or destroyed in an accident or other occurrence or confiscated by any governmental authority or is stolen, abandoned or subjected to potential loss, you will immediately notify us and we may terminate this Lease pursuant to the terms of this Lease. If this Vehicle is stolen (and not recovered) or destroyed, we will accept insurance loss proceeds in full satisfaction of your early termination liability if you are in compliance with the following: 1) your insurance obligations under this Lease are satisfied; 2) your policy covers the casualty and you have paid the deductible required by the policy; and 3) your Lease is not in default. If the insurance loss proceeds exceed your early termination obligations, then the excess will not be refunded to you. Any capitalized cost reduction made by you will not be refunded in the event of a total loss. If the Vehicle is a total loss, there is no Purchase Option, and you have no right to retain the Vehicle for salvage. If you owe any past due payments or other amounts under this Lease, we may use your security deposit to offset such amounts. All damages which do not result in a total loss of the Vehicle must be repaired. We may require proof of satisfactory repairs before agreeing to or endorsing the payment of insurance proceeds to you. This may include repairing an inspection of the Vehicle. Repairs which involve severing the Vehicle into two or more parts are not permitted. Only Genuine Nissan parts may be used to repair the Vehicle. Repairing the Vehicle with used parts may void the manufacturer's warranty or any additional warranties, service contracts or maintenance contracts covering the Vehicle. If used parts are installed to repair the Vehicle, the used parts must be Genuine Nissan Remanufactured parts, be of the same model year or newer than the parts being replaced and, if applicable, the mileage of the used part must be the same or less than the mileage of the Vehicle prior to its damage. Used parts must not have been previously damaged or defective. Used body panels cannot replace damaged body panels.

### 27. Indemnity

You agree to indemnify us from, and to pay on our behalf, any claim, loss or liability (including damages, costs, expenses and legal fees) which arises from or is related to the use, maintenance or operation of the Vehicle. This Section will survive termination of this Lease and/or repossession of the Vehicle. Any insurance we provide is secondary to the Required Insurance.

### 28. Vehicle Code Waiver

For purposes of this section, I/we/my/our refer solely to the Lessee/Co-Lessee. I/We waive my/our rights, under Section 1808.21 of the California Vehicle Code, to the confidentiality of my/our resident address(es) in the records of the Department of Motor Vehicles, and authorize the holder of this Lease to request my/our resident address(es) from the Department of Motor Vehicles if required in enforcing this Lease.

LESSEE SIGNATURE                    CO-LESSEE SIGNATURE

### 29. Notices Regarding Assignments

If this Lease and the Vehicle are assigned by the Dealer to NILT, then:
(1) The Dealer is hereby notified that NILT has assigned to Nissan-Infiniti Services Co. (NISC) NILT's rights (but not its obligations) to acquire the Vehicle upon Lease inception; and
(2) The Dealer and Lessee are hereby notified that NILT's rights (but not its obligations) in the sale of the Vehicle, if the Vehicle is subsequently purchased from NILT, will be assigned to NISC immediately prior to the purchase of the Vehicle. If the Lessee is purchasing the Vehicle, the Lease and the Vehicle are sold to a dealer, who will then sell the Vehicle to the Lessee.

### 30. Trade-In Payoff Acknowledgement / Adjustment

You acknowledge that the payoff amount on your trade-in vehicle, to the best of your knowledge, is the amount indicated in Section 11 of this Lease. If the payoff balance and/or lien(s) on your trade-in vehicle is in excess of this amount, you will pay the difference on demand unless other trade-in payoff or sums-advanced options are elected.

### 31. ARBITRATION CLAUSE – IMPORTANT – PLEASE REVIEW – AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE, EXCEPT AS STATED BELOW, BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Except as otherwise stated below, any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this clause and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, lease or condition of this vehicle, this lease agreement or any resulting transaction or relationship (including any such relationship with third parties who do not sign this lease) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Clause shall not apply to such claim or dispute. The claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose one of the following arbitration organizations, and its applicable rules, to conduct the arbitration: JAMS, 1920 Main St., Ste. 300, Irvine, CA 92614 (www.jamsadr.com), the American Arbitration Association, 1633 Broadway, 10th Floor, New York, NY 10019 (www.adr.org), or any other organization subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statutes of limitation. Unless applicable law provides otherwise, the arbitration hearing shall be conducted in the federal district in which you reside unless the Dealer originating this Lease is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service and case management fee, your arbitrator and hearing fee and any arbitration appeal fees you incur all up to a maximum of $5,000, unless the law requires us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims are frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this clause, then the provisions of this clause shall control. The arbitrator's award shall be final and binding on all parties, except that you may appeal any arbitrator's award pursuant to the rules of the arbitration organization, and we may only appeal an award against us exceeding $100,000. Any arbitration under this Arbitration Clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

You retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, and we agree to reimburse your filing fees for such proceedings. You and we retain any rights to self-help remedies, such as repossession. You also retain the right to seek individual injunctive relief in court. Neither you nor we waive the right to arbitrate by using self-help remedies or filing suit. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Clause does not apply to any claim or dispute relating to extensive wear and use, including collection or payment disputes. This Arbitration Clause shall survive any termination, payoff or transfer of this lease. If any part of this Arbitration Clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Clause shall be unenforceable.

**SIGNATURES**

**Electronic Contracting and Signature Acknowledgment**
You agree that (i) this contract is an electronic contract executed by you using your electronic signature; (ii) your electronic signature signifies your intent to enter into this contract and that this contract be legally valid and enforceable in accordance with its terms to the same extent as if you had executed this contract using your written signature; and (iii) the authoritative copy of this contract ("Authoritative Copy") shall be the electronic copy that resides in a document management system designated by us for the storage of authoritative copies of electronic records, which shall be deemed held by us in the ordinary course of business. Notwithstanding the foregoing, if the Authoritative Copy is converted by printing a paper copy which is marked by us as the original (the "Paper Contract"), then you acknowledge and agree that (1) your signing of this contract with your electronic signature also constitutes issuance and delivery of such Paper Contract; (2) your electronic signature associated with this contract, when affixed to the Paper Contract, constitutes your legally valid and binding signature on the Paper Contract; and (3) subsequent to such conversion, your obligations will be evidenced by the Paper Contract alone.

**SignatureDIRECTPAY AUTHORIZATION AGREEMENT (Not required. Please complete and sign if you want this option.)**
You agree to let us debit the payments shown in this contract from your account electronically when they are due. The payments will be debited from the Bank or other financial institution listed below. You also agree to let your Bank honor the debit requests. You agree to continue to make your payments until you are notified by us that the debit payment process is engaged. This agreement will be in effect until all the payments have been made. You can stop the debits at any time by giving us and your Bank written notice to cancel that allows a reasonable period of time for us to act. You acknowledge that we will not send you paper monthly billing statements. You will be able to view your monthly billing statement electronically by logging in and registering at www.nissanfinance.com. You agree to provide us with a voided check that has your Bank name, branch address and account number so we can arrange the debits.

N/A

| | | |
|---|---|---|
| SIGNATURE/DATE (LESSEE OR CO-LESSEE) | SIGNATURE/DATE (BANK ACCOUNT OWNER OR JOINT OWNER IF OTHER THAN LESSEE OR CO-LESSEE) | BANK NAME |

**Lessee**
NOTICE: THIS CONTRACT CONTAINS AN ARBITRATION CLAUSE, PLEASE SEE ABOVE.

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration clause in this lease agreement, you or we may elect to resolve disputes by neutral, binding arbitration and not by a court action. See the Arbitration Clause in Section 31 for additional information concerning the agreement to arbitrate.

Lessee signature: _____     Co-Lessee signature: _____

This Lease is the entire agreement and can only be changed by written agreement between the Lessee, Co-Lessee (if applicable) and Dealer, NILT, or any other assignee, if this Lease is assigned. There are no other written or verbal agreements. Any provision of this Lease which is invalid, illegal or unenforceable shall be ineffective without affecting in any way the remaining provisions. All lessees and guarantors are jointly and severally liable.

By signing below, you acknowledge that:  • This Lease is completely filled out;  • You have read this entire Lease carefully and agree to all of its terms.
CAUTION – – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

**Notices**

A. You have the right to return the vehicle, and receive a refund of any payments made if the credit application is not approved, unless non-approval results from an incomplete application or from incorrect information provided by you.

B. Notice to the Lessee: (1) Do not sign this lease before you read it or if it contains any blank spaces to be filled in; (2) You are entitled to a completely filled in copy of this lease; (3) Warning – Unless a charge is included in this lease for public liability or property damage insurance, payment for that coverage is not provided by this lease.

**YOU HAVE READ THIS ENTIRE AGREEMENT AND RECEIVED A COMPLETED COPY OF THIS LEASE BEFORE SIGNING BELOW.**

| | N/A | N/A |
|---|---|---|
| LESSEE SIGNATURE | BUSINESS NAME | NAME (PLEASE PRINT) |
| LESSEE SIGNATURE | BY (SIGNATURE) | TITLE |

**Guarantor**
For purposes of this section, I/we/my/our/me/us refers solely to Guarantor. I/We jointly, severally and unconditionally guarantee the performance of all payment and other obligations of the Lessee, under this Lease. Upon any default by Lessee, Lessor may, at Lessor's option, proceed immediately against me/us without first proceeding against Lessee, any other guarantor or taking possession of and disposing of the Vehicle. My/Our liability is primary and will be unaffected by any settlement, compromise, extension, renewal or modification of this Lease or by any release or discharge of Lessee or other guarantor. I/We waive all notices and all rights to demands and presentments. This guarantee inures to the benefit of Lessor's successors and assigns.

| N/A | N/A | |
|---|---|---|
| GUARANTOR SIGNATURE | GUARANTOR SIGNATURE | GUARANTOR SIGNATURE |
| PRINT NAME | PRINT NAME | PRINT NAME |

**Lessor**
a) Lessor accepts the terms of this Lease; and
b) Lessor assigns and transfers to Nissan-Infiniti LT ("NILT") all of Lessor's rights, title and interest in and to this Vehicle and this Lease including all amounts payable thereunder, pursuant to the terms of the applicable written Retailer Agreement between Lessor and Nissan Motor Acceptance Corporation ("NMAC"), the benefits of which have been assigned by NMAC to NILT for purposes of leases assigned to NILT. Any guaranty by Retailer is made notwithstanding the terms of the Retailer Agreement.
By signing below, the Lessor accepts the terms and conditions of this Lease.

| STEVENS CREEK NISSAN | | F&I |
|---|---|---|
| LESSOR (PRINT NAME) | LESSOR SIGNATURE | TITLE |

Page 5 of 5

NILT/N 3001-CA-E  7/12

# EXHIBIT B

CUSTOMER #: 16633

**487030**

*INVOICE*

PAGE 1

**STEVENS CREEK NISSAN**
4855 STEVENS CREEK BLVD.
SANTA CLARA, CALIFORNIA 95051
(408) 983-5900
anyauto.com

**NISSAN**

MANDANA KHOSRAVI
828 BLAISDELL CT
SAN JOSE, CA 95117-2503
HOME:408-309-2274  CONT:408-309-2274
BUS:              CELL:408-309-2274

SERVICE ADVISOR: 2265 RON STEPHENS

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
|  | 12 | NISSAN Leaf | JN1AZ0CP6CT023114 |  | 5738/5739 | T8423 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 08SEP12 IS | | | 13:00 09JUL13 | | | CASH | 09JUL13 |
| 08SEP12 DD | | | | | | | |

R.O. OPENED: 07:43 09JUL13   BOOKED: 14:28 09JUL13

OPTIONS:   SOLD-STK:CT023114 DLR:2785
ENG:80KW_AC_SYNCHRONOUS_ELECTRIC_MOTOR

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|

A VOLUNTARY SERVICE CAMPAIGN 2011-2012 LEAF: LI-ION BATTERY CONTROLLER
     AND ON-BOARD CHARGER REPROGRAM
     P3227 VOLUNTARY SERVICE CAMPAIGN 2011-2012 LEAF:
     LI-ION BATTERY CONTROLLER AND ON-BOARD
     CHARGER REPROGRAM                                        (N/C)
         5007    WC                                           0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00   TOTAL LINE A:   0.00
5738 REPROGRAM LITHIUM ION BATTERY CONTROLLER.

B TIRE ROTATION.
     YW60AA TIRE ROTATION.                                    (N/C)
         5007    WMC                                          0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00   TOTAL LINE B:   0.00
5738 PERFORMED 4 TIRE ROTATION.

C PERFORM INSPECTIONS, AXLE & SUSP-BRAKE PADS & ROTORS-DRIVE SHAFT
     BOOTS-FRONT SUSP BALL JOINTS-STEERING GEAR & LINKAGE-STEERING
     LINKAGE BALL JOINTS.
     YW61AA PERFORM INSPECTIONS, AXLE & SUSP-BRAKE
     PADS & ROTORS-DRIVE SHAFT BOOTS-FRONT SUSP
     BALL JOINTS-STEERING GEAR & LINKAGE-STEERING
     LINKAGE BALL JOINTS.                                     (N/C)
         5007    WMC                                          0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00   TOTAL LINE C:   0.00
5738 PERFORMED INSPECTIONS
     ************************************************

D *Maintenance Plan
     MP MAINTENANCE PLAN                                      (N/C)
         5007    IPS                                          0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00   TOTAL LINE D:   0.00
     ************************************************

E *Complimentary Multipoint Inspection ... a $49.97 Value
     EMPI COURTESY MULTI POINT INSPECTION TIRES

| | F | REAR | TIRE PRESSURE |
|---|---|---|---|

| Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By: | Date & Time | Authorization Obtained By: |
|---|---|---|---|---|
| Revised Estimate | | | | |

☐ Tire pressure check/inflation service was performed.
☐ RF____psi LF____psi RR____psi LR____psi
☐ Customer declined tire pressure check/inflation service.

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you.

DATE          CUSTOMER SIGNATURE

☐ Telephone
☐ Fax (See Attached)
☐ e-mail (See Attached)

☐ Telephone
☐ Fax (See Attached)
☐ e-mail (See Attached)

Initials

*HAZARDOUS WASTE DISPOSAL COSTS: We have added this charge to cover costs associated with the handling, management and disposal of toxic wastes or hazardous substances under California and Federal Law.

ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.
☐ Some Parts Not Returnable

AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| WASTE DISPOSAL COSTS * | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

**NOTICE TO CONSUMER: PLEASE READ IMPORTANT INFORMATION ON BACK.**

DealerCAP ©2006 ADP (11/12)   SERVICE INVOICE TYPE 2 - SI2C - "LIMITED WARRANTY" - CALIFORNIA - ENGLISH   B.A.R. REG.# AF194899   EPA# CAD981626252

**CUSTOMER COPY**

CUSTOMER #: 16633

487030

**STEVENS CREEK NISSAN**
4855 STEVENS CREEK BLVD.
SANTA CLARA, CALIFORNIA 95051
(408) 983-5900
anyauto.com

*INVOICE*

MANDANA KHOSRAVI
828 BLAISDELL CT
SAN JOSE, CA 95117-2503
HOME:408-309-2274 CONT:408-309-2274
BUS:          CELL:408-309-2274

PAGE 2

SERVICE ADVISOR: 2265 RON STEPHENS

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|-----------|-----|---------|---------------|-----|
|       | 12 | NISSAN Leaf | JN1AZ0CP6CT023114 |  | 5738/5739 | T8423 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 08SEP12 IS | 08SEP12 DD |  | 13:00 09JUL13 |  |  | CASH | 09JUL13 |

| R.O. OPENED | BOOKED | OPTIONS: SOLD-STK:CT023114 DLR:2785 |
|-------------|--------|---|
| 07:43 09JUL13 | 14:28 09JUL13 | ENG:80KW_AC_SYNCHRONOUS_ELECTRIC_MOTOR |

|  |  | LIST | NET | TOTAL |
|---|---|------|-----|-------|

LINE OPCODE TECH TYPE HOURS

```
          5007   IMP                                         (N/C)
PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE E:  0.00
        *************************************************
F *Complimentary Car Wash   a $12.95 Value
    WASH COURTESY WASH
          99   IPS                                           (N/C)
PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE F:  0.00
        *************************************************
EST: 99.05          09JUL13 07:43  SA: 2265
```

SERVICE DEPARTMENT LABOR AND PARTS WARRANTY
IS 12 MONTHS OR 12,000 MILES WHEN DONE HERE
WITH NEW GENUINE NISSAN PARTS ARE INSTALLED.
SERVICE DEPT HOURS MON-FRI 7:30 AM TO 6:00 PM
          SATURDAY  8:00 AM TO 5:00 PM
THANK YOU FOR USING STEVENS CREEK NISSAN AS
YOUR SERVICING DEALER.

| Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By: | Date & Time | Authorization Obtained By: |
|---|---|---|---|---|
| $ | $ |  |  | ☐ Telegraph ☐ Fax (See Attached) ☐ E-mail (See Attached) |
| Revised Estimate | $ |  |  | ☐ Telegraph ☐ Fax (See Attached) ☐ E-mail (See Attached) |

☐ Tire pressure check/inflation service was performed.
  RF____psi LF____psi RR____psi LR____psi
☐ Customer declined tire pressure check/inflation service.       Initials

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you.

DATE          CUSTOMER SIGNATURE          AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

*HAZARDOUS WASTE DISPOSAL COSTS: We have added this charge to cover costs associated with the handling, management and disposal of toxic wastes or hazardous substances under California and Federal Law.

ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.
☐ Some Parts Not Returnable

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| WASTE DISPOSAL COSTS * | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

**NOTICE TO CONSUMER: PLEASE READ IMPORTANT INFORMATION ON BACK.**

DealerCAP ©2006 ADP (11/12)  SERVICE INVOICE TYPE 2 - S/2C - *LIMITED WARRANTY* - CALIFORNIA 2 DEPTS  B.A.R. REG.# AF194899          EPA# CAD981626252

CUSTOMER COPY

# Multi-Point Inspection

 **NISSAN**

Stevens Creek Nissan
4855 Stevens Creek Blvd Bar Aj127736
Santa Clara, CA 95051

Customer Name: __Mandana Khosravi__   Year/Model: __2012   LEAF__   Date: __07/09/2013__

Mileage: __5738__   VIN: __JN1AZ0CP6CT023114__   Repair Order #: __487030__

Service Advisor: __Ron Stephens__   Technician: __Ramiro Vasquez__

**CHECKED AND OKAY**
MAY NEED FUTURE ATTENTION
REQUIRES IMMEDIATE ATTENTION

### INTERIOR / EXTERIOR

- Check Lights / Warning Lights / Instrument / Brake Lights / Hazard Warning Lights / Exterior Lamps
- Windshield Washer Jets
- Wiper Blades (Inspect for Cracks, Chips or Wear)
- Windows / Dutter / Door Parts / Mirrors / Glass
- Emergency Brake Adjustment
- Horn Operation
- Fuel Tank Cap Gasket
- In-Cabin Microfilter (If Equipped)
- Other / General Inspection

### UNDER VEHICLE

- Shock Absorbers / Suspension
- Steering Gear Box / Linkage and Boots / Ball Joints / Dust Covers
- Muffler / Exhaust Pipes / Mountings
- Engine Oil and/or Fluid Leaks
- Brake Lines / Hoses / Parking Brake Cable
- Drive Shaft Boots / Constant Velocity Boots / U-Joints / Transmission Linkage (if equipped)
- Transmission / Differential / Transfer Case (Check Fluid Level, Fluid Condition and Fluid Leaks)
- Fuel Lines and Connections / Fuel Tank Band / Fuel Tank Vapor Vent System Hoses

### UNDER HOOD

- Fluid Levels, Oil / Coolant / Battery / Power Steering / Brake Fluid / Washer / Automatic Transmission
- Engine Air Filter
- Drive Belts (condition and adjustment)
- Engine Coolant Protection System
- Cooling System Hoses / Heater Hoses / Air Conditioning Hoses and Connections
- Radiator Core / Air Conditioning Condenser (if equipped)

**CHECKED AND OKAY**
MAY NEED FUTURE ATTENTION
REQUIRES IMMEDIATE ATTENTION

### BATTERY PERFORMANCE

- Battery Terminals (Cables / Mountings)
- Check Condition of Battery (Storage Capacity, bes)

☐ Pass   ☐ Recharge Retest   ☐ Fail   Date Code ____

### Brake   ☐ Brake Inspection Not Performed This Visit

| | |
|---|---|
| Left Front Brake Lining | 8 mm |
| Left Rear Brake Lining | 7 mm |
| Right Front Brake Lining | 8 mm |
| Right Rear Brake Lining | 7 mm |

### Tire

| Left Front | | Right Front | |
|---|---|---|---|
| Tire Tread 9 /32nds | | Tire Tread 9 /32nds | |
| Wear Pattern ____ | | Wear Pattern ____ | |
| Tire Pressure 36 psi | | Tire Pressure 36 psi | |
| **Left Rear** | | **Right Rear** | |
| Tire Tread 7 /32nds | | Tire Tread 7 /32nds | |
| Wear Pattern ____ | | Wear Pattern ____ | |
| Tire Pressure 36 psi | | Tire Pressure 36 psi | |

Comments: _____

# EXHIBIT C

**From:** Chris Inners [mailto:chrisinners@comcast.net]
**Sent:** Monday, February 10, 2014 9:25 AM
**To:** 'West, Eric (EXTERNAL)'
**Cc:** evcustomersupport@my-nissan-usa.com; chrisinners@comcast.net; 'Mandy';
jack.ma@stevenscreeknissan.com
**Subject:** Case #12644862

Dear Mr. West:

On January 21, 2014, we spoke by telephone regarding my request for a full refund under the California
Lemon Law statute for my 2012 Nissan Leaf. My Nissan Leaf was first taken in for service July 16, 2013
for driving range issues, which I was told multiple times since by Nissan Service that the vehicle cannot
be repaired. You requested photographs of the vehicle charging conditions on the dashboard display,
which I promptly provided by email January 22, 2014. During our conversation on January 21, 2014, you
specifically told me that I would hear back from Nissan USA within ten business days with resolution to
this matter. Thirteen business days have passed, and I have heard nothing from Nissan. The 'do-nothing'
approach from Nissan Service and Nissan USA will not make me or the problem with my 2012 Nissan
Leaf go away. I demand action now.

This is what I can confidently say about Nissan Service and Nissan USA:

1) Neither are responsive to the customer complaint.
2) Nissan has a problem with my Nissan Leaf, which is under full warranty, and will not stand by
   their product.
3) Nissan expects me to be satisfied with a vehicle that is malfunctioning.
4) Nissan expects me to operate a vehicle that is malfunctioning potentially putting my family's
   safety or another innocent family not related to this problem at risk by probable vehicle failure
   on a public road.
5) Potentially making my family liable to lawsuit for knowingly operating a vehicle that is
   malfunctioning.

I have cooperated with Nissan Service and Nissan USA attempting to resolve this matter with integrity.
Nissan Service and Nissan USA have not.  My 2012 Nissan Leaf must be removed from my driveway by
Nissan and a full refund for the vehicle returned to me within five business days, or I will take immediate
legal action against Nissan.

Warm regards,

Chris Inners
Mandy Khosravi

# EXHIBIT D



**NISSAN NORTH AMERICA, INC.**

Consumer Affairs
P.O. Box 685003
Franklin, TN 37068-5003
Telephone: 1-800-647-7261

February 19, 2014

Ms. Mandana Khosravi
828 Blaisdell Court
San Jose, CA  95117

**Case: 13126278**
**VIN:  JN1AZ0CP6CT023114**

Dear Ms. Khosravi:

We sincerely appreciate you taking the time to contact Nissan regarding your situation. As a company interested in winning lifelong customers, Nissan apologizes for any inconvenience you may have experienced.

Nissan carefully considered your request during a review of all available facts pertaining to your situation.  Unfortunately, Nissan is not in the position to repurchase your vehicle at this time.

If you believe Nissan has not satisfactorily addressed the issue with your vehicle, you may request further assistance through Auto Line, a special automotive third party complaint resolution program in which Nissan participates.  The Auto Line program is independently operated by the Council of Better Business Bureaus, Inc. and is available to you at no charge.  To request assistance, either call the BBB at **1-800-955-5100** or write to the following address:

> **BBB Auto Line Dispute Resolution Division**
> Council of Better Business Bureaus, Inc.
> 3033 Wilson Blvd., Suite 600
> Arlington, VA  22201-3843

You will also find additional information in your vehicle's New Vehicle Limited Warranty Information Booklet and Supplement to the New Vehicle Warranty Information Booklet.

Thank you again for taking the time to contact us.

Sincerely,

Nissan Division

*Eric West*

Eric West
Regional Consumer Affairs Specialist
Nissan Consumer Affairs

# EXHIBIT E



DEPARTMENT OF CONSUMER AFFAIRS

**B.A.R**

Bureau of Automotive Repair

STATE OF CALIFORNIA · STATE AND CONSUMER SERVICES AGENCY · GOVERNOR EDMUND G. BROWN JR.

**San Jose Field Office**
6860 Santa Teresa Blvd.
San Jose, CA 95128

408.277.1860 Telephone
408.362.2133 Fax

www.bar.ca.gov



February 28, 2014

MANDANA KHOSRAVI
828 BLAISDELL CT
SAN JOSE, CA. 95117

CASE NUMBER:  SJ2014002234
          RE:  STEVENS CREEK NISSAN

MANDANA KHOSRAVI:

Thank you for your recent complaint concerning STEVENS CREEK NISSAN.  I have attempted to mediate your complaint and have been unsuccessful.

In instances where the repairs have not been performed to the consumer's satisfaction, suggested recourse is through the civil courts – either by use of Small Claims Court or through the use of a private attorney.

Your Correspondence has been made part of our records and will be retained in the business' master file.

Although we are unable to help you in this matter, we are enclosing information which might be useful to you.

Sincerely,

Sabion Savage
Program Representative I

Attachment:

Instructions on how to Subpoena the Bureau's report



DEPARTMENT OF CONSUMER AFFAIRS

Bureau of Automotive Repair

STATE OF CALIFORNIA · STATE AND CONSUMER SERVICES AGENCY · GOVERNOR EDMUND G. BROWN JR.

**Subpoena – PRA Unit**
10949 North Mather Boulevard
Rancho Cordova, CA 95670

855-735-0465   Telephone
855-641-9980   Fax
www.smogcheck.ca.gov



## NOTICE REGARDING RELEASE OF RECORDS

Records related to complaints and investigations of complaints are only released pursuant to a subpoena that is fully compliant with the California Code of Civil Procedure. The procedure below is a general explanation of how to obtain records in a SMALL CLAIMS lawsuit. If your case is outside of the Small Claims Court System, please contact an attorney to assist you. Referrals to attorneys in your area can be obtained from your local Bar Association or from the State Bar Association at 866-442-2529.

1. Subpoenas are only available after you have filed a lawsuit with the court. Because records are usually not available until at least 30 days after a complaint is closed, you may want to wait that long after you have been notified that your complaint has been closed before you file a lawsuit.

**WARNING!** *Only **you** can decide when to file a lawsuit. The Bureau cannot assist you with this decision. There are strict deadlines for filing lawsuits and once such deadlines have passed you may never be able to file. If you have a question about when those deadlines are, you should contact an attorney or the Small Claims Advisor at the court in your area.*

2. When you file your case in court, inform the court clerk that you will need a **Small Claims Subpoena** (Judicial Council Form SC-107). The court clerk should provide you with a form signed by the clerk and bearing the seal of the court. The form will be blank and you will need to fill it out completely. Follow the instructions exactly or the Bureau will reject your subpoena for being defective. If you have access to the Internet you can find a copy of this form at www.courtinfo.ca.gov, fill form SC-107 out on-line and then take the printed copy with you to the court clerk to have it signed and sealed.

3. You should address the subpoena to **"Custodian of Records, Bureau of Automotive Repair, 10949 North Mather Blvd., Rancho Cordova, CA 95670."** You may not fax this document to the Bureau. The Bureau will accept service by mail only for Small Claims cases.

4. You must pay a fee for these records. The fee covers copying of the complaint file and mailing of the complaint file via an overnight express carrier with a tracking service to assure receipt by the court. This fee is authorized by state law and can be found at California Evidence Code section 1563. Generally, the fee is no more than $15.00 ($5.00 to retrieve and copy the complaint and $10.00 mailing costs). You must send the fee with your request before the Bureau will send the records to the court. If the costs will substantially exceed $15.00, the Bureau will notify you before it sends the records. If you have another complaint filed against the same repair shop, and you also want to subpoena the file, you must add $2.00 to the fees mentioned above. **Please make your check/money order payable to the Department of Consumer Affairs.**

5. You must give the Bureau enough time to process your subpoena. State law allows for a minimum of 15 days (Evidence Code section 1560(b)). If you do not allow the Bureau enough time to process your subpoena, the Bureau may reject the subpoena as being deficient.

6. The records will be sent directly to the court. The Bureau **will not** send copies of the records to you, or your attorney, under any circumstances. The Bureau will send the records to the address of the court listed on the subpoena. Therefore you should double check that the address provided is the address where the Bureau should send the records.

7. Once the records are sent to the court, the Bureau will send you a copy of the declaration that it sends to the court with the records. When you receive this declaration you will know that the Bureau has completed processing of your subpoena and that the records should now be in your case file with the court. You can contact the court to confirm.

8. Small Claims subpoenas, which require and call for the appearance of the investigator to appear as a witness in the court case, must be served in person to the investigator or his supervisor, with a **$275.00** witness fee.

If you have questions about how to obtain a subpoena, how to fill out the paperwork, how to serve the subpoena, any other subpoena requirements, or have any other questions about the Small Claims Process, you must contact either an attorney or the Small Claims Advisor at the court in your area. You may also want to read the "The Small Claims Court, A Guide to Its Practical Use" which can be found on the Internet at http://www.dca.ca.gov/publications/small_claims/index.shtml. **Bureau employees cannot assist you with these questions.**

If you want to find out if the Bureau has received your subpoena or if the Bureau has sent the records to the court, you may contact the Subpoena Unit at **855-735-0465.**

COMPLAINT FILE NUMBER: _SS2014 0 0 2234_     Close Date: _2/28/14_

EXHIBIT F

CUSTOMER #: CT023114
MANDANA KHOSRAVI
CHRIS INNERS
828 BLAISDRLL CT
SAN JOSE, CA 95117

461849

WORKORDER
REPRINT
PAGE 1

**PREMIER NISSAN OF SAN JOSE**
1120 Capitol Expressway
San Jose, CA 95136
(408) 978-1234
www.premiernissanofsanjose.com

HOME:
BUS:

CONT:978-495-2193
CELL:978-495-2193

SERVICE ADVISOR: 6855 RAMIREZ,JAIME

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/ OUT | TAG |
|-------|------|------------|-----|---------|------------------|-----|
| BLACK | 12 | NISSAN LEAF | JN1AZ0CP6CT023114 | 6YCH818 | 8478/ | T4422 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | PAYMENT | INV. DATE |
|----------|-----------|------------|----------|--------|---------|-----------|
| 08SEP12 DD | | | 17:00 10JAN15 | 0.00 | CASH | |

| R.O. OPENED | READY | OPTIONS: DLR:5222 ENG:Electric |
|-------------|-------|--------------------------------|
| 10JAN2015 10:52 | | |

LINE OP CODE    TECH... TYPE   DESCRIPTIONS/INSTRUCTIONS

# A   S11                 W     C/S BATTERY IS LOSING CHARGE EXTREMLY FAST, C/S HE
                                CHARGES AT HOME WITH 120 LEVEL ONE CHARGER. PLEASE
                                CHECK AND ADVISE. CLIENT HAS CONTACTED NISSAN CORP.
                                FOR ASST. THE BATTERY LIFE HAS DETERIORATED RAPIDLY
                                AND PERMANENTLY. CUSTOMER WANTS THE BATTERY REPLACED
                                UNDER THE TERMS OF THE CLASS ACTION SETTLEMENT
                                AGREEMENT REGARDING 2012 NISSAN LEAF VEHICLES. SEE
                                ATTACHED PHOTOS INDICATING CURRENT RANGE. CUSTOMER
                                WANTS TESTING DONE WITH CLIMATE CONTROL ON AND IN
                                DRIVE MODE, NOT ECHO MODE. PLEASE RE-VIEW PHOTOS
                                PROVIDED BY CLIENT..

# B   MPI                 IPS   STATE INSPECTION:TIRE PRESSURE RESET TO VEHICLE
                                SPECS PSI         /NISSAN VISUAL MULTI POINT INSPECTION

# C   WASH                IPS   PERFORM COURTESY CAR WASH, VACUUM AND DRESS TIRES (
                                VALUE $ 12.95)

*******************************************************************

Preliminary Estimate : $0.00

*******************************************************************

"By law you may choose another licensed Smog Check facility to perform any needed repairs or adjustments that the Smog Check test indicates are necessary."

"HAZARDOUS WASTE DISPOSAL" such as engine oil, automatic transmission fluid, antifreeze, differential fluid and batteries will be charged out as a separate charge if any of these items were removed for disposal.

TEARDOWN ESTIMATE: I understand that my vehicle will be reassembled within ___ days of the date shown above if I choose not to authorize the services recommended.

ALL PARTS REMOVED WILL BE
DISCARDED UNLESS OTHERWISE
REQUESTED PRIOR TO BEGINNING
WORK.

☐ SAVE PARTS

ALL PARTS SPECIAL ORDERED
NON-RETURNABLE
ALL PARTS ARE NEW UNLESS
OTHERWISE SPECIFIED.

BAR # ARD00259642      SMOG # RC00259642
EPA # CAL000354833

I hereby authorize the repair work herein set forth to be done along with the necessary material and agree that you are not responsible for loss or damage to vehicle or articles left in vehicle in case of fire, theft or any other cause beyond your control or for any delays caused by unavailability of parts or delays in parts shipments caused by the supplier or transportor. I hereby grant you and/or your employees permission to operate the vehicle herein described on streets, highways or elsewhere for the purpose of testing and/or inspection.    Subject to conditions on reverse side of this contract

| HAZARDOUS WASTE DISPOSAL | | | | | |
| $ | | | $ | | |
| TEARDOWN ESTIMATE $ | | This estimate is based on our inspection and does not cover any additional parts and labor which may be required after the work has been opened up. | | | |
| X | | | | | |

| | PH NO. CONTACTED | DATE | TIME | CONTACTED VIA | BY |
|---|------------------|------|------|---------------|-----|
| REVISED EST $ | | | | ☐ PHONE ☐ IN PERSON | |
| REVISED EST $ | | | | ☐ PHONE ☐ IN PERSON | |
| REVISED EST $ | | | | ☐ PHONE ☐ IN PERSON | |

CUSTOMER COPY

**PROOF OF SERVICE**
**KLEE v. NISSAN NORTH AMERICA, INC.**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DISTRICT**
**COURT CASE # CV12-08238 DDP (PJWx)**

I declare that I am a citizen of the United States, that I have attained the age of majority, and that I am not a party to this action. My business address is 533 Pilgrim Drive, Suite A1, Foster City, CA 94404. I am familiar with this firm's practice of collection and processing of documents to be deposited for delivery via the U.S. Postal Service as well as via other methods of delivery. On the date stated below, in the manner indicated, I caused an exact copy the attached document(s) entitled:

**OBJECTION TO CLASS ACTION SETTLEMENT**

to be served on each party, or its attorney of record, in this action by delivery to each addressee, at the address indicated, in the following manner:

By CM/ECF NOTICE OF ELECTRONIC FILING: I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.

VIA MAIL: I caused an envelope, containing an exact copy, with fully prepaid FIRST CLASS postage affixed thereto, to be placed in the U.S. mail at Foster City, California, addressed to:

| PLAINTIFFS, HUMBERTO DANIEL KLEE AND DAVID WALLAK: | DEFENDANTS, NISSAN NORTH AMERICA, INC. AND NISSAN MOTOR AMERICA, LTD: |
|---|---|
| Jordan L. Lurie, Esq. CAPSTONE LAW, APC 1840 Century Park East, Suite 450 Los Angeles, CA 90067 Email: Jordan.Lurie@capstonelawyers.com | E. Paul Cauley, Jr., Esq. SEDGWICK LLP 1717 Main Street, Suite 5400 Dallas, TX 75201 Email: paul.cauley@sedgwicklaw.com |
| **Courtesy Copy:** | **Courtesy Copy:** |
| Hon. Alex Kozinski U.S. Court of Appeals, 9th Circuit P.O. Box 193939 San Francisco, CA 94119-3939 | Marcy Jane Tiffany, Esq. TIFFANY LAW GROUP, P.C. 23670 Hawthorne Boulevard, Suite 204 Torrance, CA 90505 Email: mtiffany@tiffanylawgroup.com |

I declare that I am employed in the office of a member of the State Bar of California at whose direction service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 27, 2015 at Foster City, California.

_Delores McCullum_

Delores McCullum

21

OBJECTION TO CLASS ACTION SETTLEMENT