1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA
10

11  HUMBERTO DANIEL KLEE and        )   NO. CV 12-08238 AWT (PJWx)
    DAVID WALLAK individually, and  )
12  on behalf of a class of similarly )  **ORDER GRANTING FINAL**
    situated individuals,           )   **APPROVAL OF CLASS ACTION**
13                                  )   **SETTLEMENT and AWARDING**
            Plaintiffs,             )   **ATTORNEYS' FEES** [140] [141]
14                                  )
    vs.                             )
15                                  )
16  NISSAN NORTH AMERICA, INC.,     )
                                    )
17          Defendant.              )
                                    )
18  _____  )
19

20                      **I. INTRODUCTION**

21         Plaintiffs filed this class action against Defendant Nissan North America,

22  Inc. ("Nissan"), on behalf of all current owners or lessees of 2011-2012 Nissan

23  LEAF vehicles in the United States, alleging seven causes of action related to

24  misrepresentations about the LEAF's driving range and battery capacity.  Shortly

25  after the case was filed, plaintiffs and Nissan agreed to settle.  On July 10, 2013,

26  the court preliminarily certified the class and approved the settlement. A final

27  fairness hearing was held on November 18, 2013.  On March 24, 2014, while

28  plaintiffs' motion for final approval was pending, the parties agreed to participate

in mediation.  The mediation sessions ultimately led to amended settlement terms that increased the settlement benefit for class members.  Plaintiffs now renew their previous motion and seek final certification of the class, final approval of the settlement, and separately, move for an award of attorneys' fees, expenses, and incentive payments for the named plaintiffs.

## II. BACKGROUND

The Nissan LEAF is an electric car powered by an electric motor with a rechargeable lithium-ion battery.  First Amended Complaint at 1 ("FAC") (Doc. 22).  This action arises out of Nissan's alleged misrepresentations about the LEAF's driving range and battery capacity.  The LEAF's battery capacity is measured in bars on a capacity gauge, with 12 bars indicating full capacity.  *See id.* at 4-5.  The named plaintiffs, Daniel Klee and David Wallak, a lessee and owner of Nissan LEAFs, respectively, both experienced battery loss a short time after leasing and purchasing their vehicles.  *Id.*

On September 24, 2012, plaintiffs filed the instant class action against Nissan. Complaint (Doc. 1).  Plaintiffs asserted seven causes of action related to the LEAF's battery capacity loss and sought primarily injunctive relief on behalf of all owners and lessees of 2011-2012 model year Nissan LEAF vehicles.[1]  FAC at 22-33.

---

[1]     Plaintiffs asserted:   (1) Violations of California Consumer Legal Remedies Act, Cal. Civ. Code. § 1750, *et seq.*; (2) Violations of California's Unfair Business Practices Act, Cal. Bus. & Prof. Code § 17200, *et seq.*; (3) Breach of Implied Warranty pursuant to the Song-Beverly Consumer Warranty Act, Cal. Civ. Code. § 1792, *et seq.*; (4) Breach of Implied Warranty pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; (5) Breach of the Implied Warranty of Merchantability; (6) Negligent Misrepresentation; and (7) Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat.§ 55-1521, *et seq.*  FAC at 22-33.

On December 5, 2012, the parties agreed to a settlement.  The terms were memorialized in the Term Sheet, and made up the original proposed settlement agreement.  *See* (Doc. 73, Attach. 5) ("Term Sheet"); (Doc. 34, Attach. 2) ("Original Settlement Agreement").  The Term Sheet stated that Nissan agreed to modify the New Electric Vehicle Limited Warranty for all 2011-2012 Nissan LEAFs by adding "coverage against capacity loss below nine bars of capacity [roughly 70%] as shown on the vehicle's battery capacity level gauge for a period of 60 months or 60,000 miles, whichever comes first."  Term Sheet at 1.  The new coverage would "cover any repairs or replacement needed to return battery capacity to a level of nine remaining bars on the vehicle's battery capacity level gauge."  *Id.*  In exchange for the new coverage, plaintiffs agreed to the release all of class members' claims against Nissan related to the LEAF's driving range or battery capacity. *Id* at 2*.*

Nissan publicly announced the extended warranty on December 27, 2012, in a letter from Nissan's Executive Vice President posted on an online forum.  Lurie Decl., Ex. G (Doc. 66, Attach. 1).  The letter explained the warranty extension but did not mention the class action, nor did it condition the coverage on settlement approval.  *Id.*  On June 7, 2013, Nissan mailed letters to LEAF owners confirming the warranty expansion.  Lurie Decl., Ex. I at 33 (Doc. 66, Attach. 1).  The June letter did not mention the class action or condition coverage on settlement approval.

On July 8, 2013, the parties executed a formal settlement agreement – with the terms contemplated by the Term Sheet – and filed a motion for preliminary approval.  Motion for Settlement Approval of Preliminary Class Action Settlement. ("Motion for Preliminary Approval") (Doc. 34).  Judge Dean Pregerson granted the motion on July 10, 2013, before recusing himself on November 11, 2013. (Doc. 36, 69).  Pursuant to the court's order, on September 9, 2013, notice of the

settlement was mailed to 19,398 class members.  Cudworth Decl. at 2 (Doc. 57).

The court received 14 objections[2] which were subsumed in a comprehensive

objection filed by Objectors Kozinski and Tiffany.  *See* Lurie Decl. at 1 (Doc. 72,

Attach. 1).  One hundred and twenty -one class members[3] submitted requests to

opt-out.  Supplemental Cudworth Decl. at 1 (Doc. 66, Attach. 2).  Plaintiffs filed a

motion for final settlement approval on November 4, 2013, and a final fairness

hearing occurred on November 18, 2013, before Judge Beverly Reid O'Connell.

Motion for Settlement Approval of Final Class Action Settlement ("Original

Motion for Final Approval")  (Doc. 66).  Judge O'Connell recused herself on

December 19, 2013, without ruling on the motion for final approval of the

settlement.[4]  (Doc. 102)

On April 28, 2014, pursuant to the parties and objectors' joint agreement to

participate in mediation, the court stayed the pending motion for final approval of

the proposed settlement.  Order Staying Proceedings (Doc. 115).  The first attempt

---

[2]      The objections were filed by Patricia and Mervyn Devine (Doc. 48), Alex
Kozinski and Marcy Tiffany (Doc. 50); Chinh Vo (Doc. 52), John Chun (Doc. 54),
Cody Pelech (Doc. 58), Mark Larsen (Doc. 59), Charles Gregory Smith, Jr. (Doc. 61),
Roberta Friedman and Leslie Kornblum (Doc. 52), Robin Jans (Doc. 49), Coleen and
Jonathan Eckhart (Doc. 51), Robin Jans (Doc. 49),  Clotide Artur-Tamers, Raymond
Carnigan, and Richard Willoughby.  The Artur-Tamers, Carnigan, and Willoghby
objections were rejected by the court for failure to comply with the court's filing
procedures.  (Doc. 44).
        Plaintiffs' counsel represented that three objectors withdrew their objections:
Roberta Friedman and Leslie Kornblum, Robin Jans, and Eric Fisher.  Lurie Decl. at
1 (Doc. 72, Attach.1).

[3]      Of the 121 opt-out requests, 92 were deemed valid.  *Id.*

[4]      After Judge O'Connell recused herself and several other district judges
subsequently declined the assignment, presumably because objecting class member
Kozinski,  who appeared at the hearing before Judge O'Connell, was the then-Chief
Judge of the Ninth Circuit, the case was assigned to the undersigned judge.

1    at mediation was conducted by the Honorable Edward A. Infante and occurred on

2    June 23, 2014, between the parties and Objector Kozinski.  (Doc. 117). Similar

3    negotiations occurred over the phone on July 25, August 4, August 19, and August

4    29.  (Doc. 118, 121).

5           On January 8, 2015, the parties jointly requested that the court lift the stay of

6    proceedings so that the parties could move for final approval of the settlement

7    which had been modified to provide additional benefits to the class.  (Doc. 122).

8    On January 9, 2015, the court granted this request and lifted the stay.  (Doc. 123).

9    Under the amended settlement, Nissan agreed that for capacity loss below nine

10   bars, Nissan will *replace,* rather than repair, the vehicle's battery with the 24 kWh

11   lithium-ion battery currently used in the 2015 model year LEAF (or the most

12   current model year 24kW battery at the time of the replacement).  *See* Amended

13   Settlement at 5 (Doc. 140, Attach. 2).  Furthermore, for class members residing in

14   states where "No Charge to Charge" ("NCTC") is available, Nissan will provide

15   ninety days free access to participating DC fast charging stations via an EZ-Charge

16   card.[5] *Id.* at 6. Class members will have ninety days from the mailing of the EZ-

17   charge card in which to establish and/or activate accounts.  *Id.*  Upon the

18   establishment or activation of an account within such period, the ninety-day free

19   access period shall begin.  *Id.*  Class members residing in NCTC states who are

20   former owners of a 2011 or 2012 LEAF as of the date of final approval by the

21   court, will receive a check for $50 if they can establish that they no longer own or

22   lease their LEAF and return their non-activated EZ-Charge card within 30 days of

23

24

25

26           [5]      EZ-Charge allows drivers to carry a single access card to charge their
     vehicles on multiple charging networks.  EZ CHARGE, https://www.ez-charge.com
27   (last visited June 23, 2015).

28                                              - 5 -

1   the original mailing of the EZ-Charge card.[6]  *Id.*  Class members not residing in

2   states where NCTC is available will receive a check for $50.  *Id.* at 7.

3       On March 11, 2015, notice of the amended settlement was sent to the 92

4   individuals who previously opted out of the settlement, along with an opt-in form.

5   Cudworth Decl. (Doc. 146 at 1-2).  As of May 21, 2015, 42 of the 92 individuals

6   who initially opted out had opted back in to the settlement.  *Id.* at 2.

7       On March 27, 2015, Mandana Khosravi, a member of the class who had not

8   objected to nor opted out of the original settlement, objected to the amended

9   settlement.  Objection to Class Action Settlement ("Khosravi Obj'n") (Doc. 137).

10  On May 5, 2015, Objectors Kozinski and Tiffany filed a notice of withdrawal of

11  their objection. (Doc. 139).

12      On May 11, 2015, plaintiffs filed a renewed motion for final settlement

13  approval and a renewed motion for attorneys' fees.  Renewed Motion for Final

14  Approval (Doc. 140); Renewed Motion for Att'y Fees (Doc. 141).  Khosravi

15  subsequently filed a renewed opposition to the amended settlement on May 26,

16  2015, which largely replicated her original objections.  Opposition to Motion for

17  Final Approval of Class Action Settlement Opposition ("Khosravi Opp'n") (Doc.

18  147).  The final fairness hearing took place on June 9, 2015.

19                          **III.  LEGAL STANDARD**

20      When a settlement occurs prior to class certification, final approval requires

21  two inquiries:  whether a class exists and whether the settlement is fair.  *Staton v.*

22  *Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). When approving a settlement, the

23  Court must ensure that notice of the settlement is made in a "reasonable manner to

24  all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

25

26      [6]    It was clarified at the hearing that the class includes only those

27  current/former owners at the time the *notice* was issued in 2013.

28                                  - 6 -

# IV.  DISCUSSION

## A.      Certification of the Class

"When, as here, the parties have entered into a settlement agreement before the district court certifies the class, reviewing courts must pay undiluted, even heightened, attention to class certification requirements . . . ." *Staton*, 327 F.3d at 952 (internal quotations omitted).  "The party seeking class certification has the burden of affirmatively demonstrating that the class meets the requirements of Federal Rule of Civil Procedure 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  Rule 23(a) provides that a class action is available where:  (1) the class is so numerous that joinder is impracticable; (2) common question of law or fact exist; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the class interests.  In addition, Rule 23(b)(3) requires the court to find that common questions of law or fact predominate over individual questions.

### 1.  Numerosity

Plaintiffs originally estimated the number of eligible class members to be 18,588, and notice was ultimately sent to 19,332 class members.  Lurie Decl. at 4 (Doc. 34, Attach. 1); Cudworth Decl. at 2 (Doc. 57). " There is no specific number requirement" to establish that joinder of all members is "impracticable." *True v. Am. Honda Motor Co.*, 749 F.Supp.2d 1052, 1063 (C.D. Cal. 2010).  Instead, "the court may examine the specific facts of each case." *Id*.  Given the size of the class, the court finds that plaintiffs have satisfied the numerosity requirement.

### 2.  Commonality

"[T]he commonality requirement is interpreted to require very little . . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *True*, 749 F. Supp. 2d at 1063 (internal quotations omitted).  All of the

class members bought or leased a 2011-2012 model-year LEAF, and thus experienced the same alleged deficiencies related to the LEAF's battery system. This factual commonality is sufficient to satisfy Rule 23's commonality requirement.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality prerequisite is fulfilled if the representative parties' claims are "reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The Rule 23 typicality requirement is thus "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (quoting *Marisol v. Giuliani*, 126 F.3d 372, 376 (2nd Cir. 1997)), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005). Plaintiffs' claims are typical of the class' claims in that they arise from the same underlying conduct: Nissan's conduct in addressing the deficiencies alleged in the LEAF battery system. As a result, the typicality requirement is satisfied.

### 4. Adequacy of Representation

Rule 23(a)(4) permits the certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class." To satisfy this standard, the Court must ask two questions: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class." *Staton*, 327 F.3d at 957. "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and

- 8 -

absentees." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 562 (C.D. Cal. 2012) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)).

The representative plaintiffs do not appear to have any conflicts of interest with other class members.  Furthermore, despite the fact that this case settled relatively early in litigation, the record indicates that plaintiffs and counsel have acted with the requisite vigor.  Prior to filing the complaint, counsel researched publicly available materials and information and subsequent to the negotiation of settlement terms, counsel conducted five months of confirmatory discovery.  Lurie Decl. at 3-8 (Doc. 47).

Moreover, the mediation was overseen by a highly qualified mediator and there is no evidence in the record of collusion between the parties.  The record also clearly establishes that plaintiffs' counsel are experienced and qualified.  Lurie Decl. at 5-12 (Doc. 34, Attach. 1).  As a result, this Court finds that the representative parties fairly and adequately represented absent class members.

**5. Predominance of Common Questions of Law or Fact and Superiority of Class Action**

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2), or (3)." *Hanlon*, 150 F.3d at 1022.  Plaintiffs assert that the class is maintainable under Rule 23(b)(3) because common questions predominate over any questions affecting only individual members, and class resolution is superior to other available methods.

The court finds that common factual issues predominate because class members' claims hinge on their assertion that the LEAF batteries are defective and that defect was not properly disclosed to consumers.  These claims require common proof of the existence of the defect and Nissan's knowledge of it.

1   Furthermore, common legal issues predominate because plaintiffs assert that

2   uniform law, namely California law, applies to the nationwide class.

3   　　　　Class resolution is also likely superior to other available methods.  If

4   brought individually, many of these claims would face serious challenges.  "Even

5   if efficacious, these claims would not only unnecessarily burden the judiciary, but

6   would prove uneconomic for potential plaintiffs.  In most cases, litigation costs

7   would dwarf potential recovery." *Hanlon*, 150 F.3d at 1023.  As a result, "[a] fair

8   examination of alternatives can only result in the apodictic conclusion that a class

9   action is the clearly preferred procedure in this case." *Id.*

10  　　　　Accordingly, the proposed class meets Rule 23's requirements, and

11  certification is appropriate.  Pursuant to Federal Rules of Civil Procedure 23(a) and

12  23(b)(3), the court hereby certifies, for settlement purposes only, the following

13  class:

14  　　　　All former and current owners and lessees of a 2011-2012 model year
       Nissan LEAF vehicle, at the time the original notice was issued in 2013, in
15  　　　　the United States and its territories, including Puerto Rico.

16  　　**B.   Notice**

17  　　　　"Adequate notice is critical to court approval of a class settlement under

18  Rule 23(e)." *Id.* at 1025.  Notice must be "reasonably calculated, under all the

19  circumstances, to apprise interested parties of the pendency of the action and afford

20  them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank*

21  *& Trust Co.*, 339 U.S. 306, 314 (1950).

22  　　　　The parties provided adequate notice of the original settlement terms to all

23  class members. As required by the notice plan that was approved by the court,

24  Nissan provided the settlement administrator with the Vehicle Identification

25  Numbers ("VIN") for all 2011-2012 LEAF vehicles.  Cudworth Decl. at 1 (Doc.

26  57).  The settlement administrator used the VIN numbers to send notice packets to

27  19,332 class members.  *Id.* at 2.  Throughout the process, the settlement

28  　　　　　　　　　　　　　　　　　- 10 -

administrator also maintained a toll-free phone number, an e-mail address, and a website for class members to obtain information about the settlement.[7]  *Id.*

 After the parties amended the settlement, the court approved a supplemental notice plan requiring notice of the amended settlement only to those class members who had previously opted out, affording them the opportunity to opt back in to the settlement.  (Doc. 131).  On May 21, 2015, the Plaintiffs confirmed that notice of the amended settlement was sent to the 92 individuals who previously opted out of the settlement, along with an opt-in form.  Cudworth Decl. at 1-2  (Doc. 146).  As of May 21, 2015, 42 of the 92 individuals who initially opted out had opted back in to the settlement.  *Id.* at 2. Courts have recognized that when a settlement is amended to make it more valuable, it is unnecessary to give additional notice to those class members that received adequate notice of the original proposed settlement and decided not to opt out.  *E.g.*, *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1304-05 (S.D. Fla. 2007); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 186 (D. Me. 2003); *In re Prudential Ins. Co. Of Am. Sales Practices Litig.*, 962 F. Supp. 450, 473 n.10 (D.N.J. 1997).  Because the amended settlement simply supplements the original settlement by adding the battery replacement requirement, as well as the EZ-Pass or cash replacement, it is unlikely that a class member who chose not to opt out of the original settlement would choose to opt out of the amended settlement.  As a result, the court finds that notice was adequate.

## C.    Fairness, Reasonableness, and Adequacy of Settlement

---

[7]     The settlement administrator also provided the notices required by the Class Action Fairness Act of 2005, Pub. L. 109-2 (2005), including the notices to the U.S. Department of Justice and to the Attorneys General of all States in which class members reside, as specified in 28 U.S.C. § 1715.  *Id.* at 1.

Rule 23(e) requires the district court to determine whether a proposed settlement is fundamentally "fair, reasonable, and adequate."  The Ninth Circuit has stated that "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *In re Syncor ERISA Litig*, 516 F.3d 1095, 1101 (9th Cir. 2008).  The parties assert that the settlement is presumptively fair because it was negotiated with the involvement of a respected mediator.  Renewed Motion for Final Approval at 9.  As noted, the amended settlement was reached after several mediation sessions between the parties before an experienced mediator.  (Doc. 117, 118, 121).  Furthermore, there is no evidence of collusion.  As a result, the court concludes that "the settlement is a product of informed, arms-length negotiations, and is therefore entitled to a presumption of fairness."  *In re Toys R Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 450 (C.D. Cal. 2014) ("*In re Toys R Us*").

Nonetheless, the court must balance the following relevant factors to determine whether the settlement is fair:  "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of the class members of the proposed settlement."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("*In re Bluetooth*").

### 1. Strength of the Plaintiff's Case

"An important consideration in judging the reasonableness of a settlement is the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement."  *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 488 (E.D. Cal. 2010) (quoting *Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.*, 221

F.R.D. 523, 528 (C.D. Cal. 2004).  At the same time, settlement approval "is not to be turned into a trial or rehearsal for trial on the merits."  *Officers for Justice v. Civil Serv. Com'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). Plaintiffs' claims rely on allegations that Nissan misrepresented, or failed to disclose, information about the LEAF's driving range and battery capacity limitations.  *See* FAC at 22-33.  These claims face many legal hurdles recognized by the parties.  For example, Nissan maintains that it "took extraordinary steps to inform its customers about the [driving] range they could expect."  Defendant's Response to Objectors at 26 ("Def's Resp. To Objectors") (Doc. 73).  Specifically, Nissan conspicuously placed labels on each vehicle that stated that the LEAF's available driving range as 73 miles per charge, not 100 miles as plaintiffs allege. *Id.*; DeBardelaben Decl. at 2 (Doc. 75, Attach. 3).  Nissan also required customers to sign a disclosure form that explained the LEAF's driving range and provided examples of possible ranges under various conditions of actual use.  DeBardelaben Decl. at 1-2.

The parties also agree that similar problems plague plaintiffs' claims about the LEAF's battery capacity limitations.  Nissan's 2011 and 2012 LEAF disclosures notified LEAF owners that the rate of capacity loss could not be guaranteed and varied depending on the owner's use.  *Id.* at 2-3. These disclosures were not mentioned in plaintiffs' complaint and would likely impede plaintiffs's ability to recover at trial.  Given the obstacles plaintiffs would face were this case to proceed to trial, the court finds that this factor weighs in favor of final approval of the settlement.

## 2. Risks Associated With Further Litigation

The parties contest liability, and this settlement arises very early in the litigation, before any motions practice or class certification.  Had the parties litigated this action, it could have consumed significant party and court resources –

- 13 -

potentially requiring briefing, hearings, and decisions on issues such as class certification, pre-trial motions, and discovery.  Given the early stage of proceedings, there is significant uncertainty and risk for both sides.  *See Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM, 2008 WL 8150856, at *6 (C.D. Cal. July 21, 2008) ("Because both parties faced extended, expensive future litigation, and because both faced the very real possibility that they would not prevail, this factor supports approval of the settlement."); *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, at *3 (N.D. Cal. Mar. 28, 2007) ("Because this litigation has terminated before the commencement of trial preparation, factor (2) also militates in favor of the settlement.").  As a result the court finds that this factor weighs in favor of settlement.

### 3.  Risk of Maintaining Class Action Status Throughout Trial

Although the class is certifiable for settlement purposes, if litigation continued Nissan intends to oppose class certification for litigation purposes. Specifically, Nissan argues that class certification would fail under Fed. R. Civ. Pro. 23(b)(3) because "most of the issues involved in the case are individual rather than common."  Def's Resp. to Objectors at 31.

For example, Nissan argues that Plaintiffs' misrepresentation claims require individual proof of reliance, which is not a question common to all class members. *Id.*; *see Mazza*, 666 F.3d at 596 (noting that common questions of fact did not predominate where plaintiff would have to prove reliance by individual class members).  Nissan also argues that, even if plaintiffs' claims do not require individual proof of reliance, plaintiffs would still need to establish actual injury for each class member.  *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011).  Nissan argues that these issues – reliance and actual injury – are questions that require individual determinations; therefore, that questions of fact

- 14 -

1    common to all class members could not predominate.  Def's Resp. to Objectors at

2    30-31.

3            Nissan's arguments are not watertight.  *See, e.g.*, *Keegan v. Am. Honda*

4    *Motor Co., Inc.*, 284 F.R.D. 504, 529-37 (C.D. Cal. 2012) (holding that common

5    questions predominated plaintiffs' claims under California's Consumer Legal

6    Remedies Act, Unfair Practices Act, and express and implied warranty statutes).

7    But they are also not baseless, and they introduce at least some risk of failing to

8    maintain class certification.  *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 392

9    (C.D. Cal. 2007) (noting that class certification "undeniably represents a serious

10   risk for plaintiffs in any class action lawsuit").  As a result, the court finds that this

11   factor weighs in favor of settlement.

12       **4.  Amount Offered in Settlement**

13           "As the Ninth Circuit has noted, 'it is the very uncertainty of outcome in

14   litigation and avoidance of wasteful and expensive litigation that induce

15   consensual settlements.  The proposed settlement is [thus] not to be judged against

16   a hypothetical or speculative measure of what *might* have been achieved by the

17   negotiators.' Rather, 'the very essence of a settlement is a compromise, a yielding

18   of absolutes and an abandoning of highest hopes.'" *In re Toys R US*, 295 F.R.D. at

19   453 (quoting *Officers for Justice*, 688 F. 2d at 624-25) (alteration and emphasis in

20   original).

21           The initial settlement agreement provided class members with a 60-

22   month/60,000-mile extended warranty against lithium-ion battery capacity loss in

23   their 2011-2012 model year LEAFs.  Term Sheet at 1.  Under the warranty, if the

24   vehicle's battery exhibited capacity below nine bars within 60 months or 60,000

25   miles, Nissan agreed to repair or replace the battery.  *Id.*

26           Under the amended settlement agreement, the repair option was removed

27   and Nissan agreed to replace the battery with the 24kWh lithium-ion battery, the

28                                          - 15 -

1    current OEM in the 2015 model year LEAF (or the current model year equivalent).

2    Amended Settlement at 5.  In addition, under the amended settlement agreement,

3    class members residing in states where NCTC is available, will receive three

4    months (90 days) of free access to DC Fast charges via an EZ-Charge card.  *Id.* at

5    6.  Class members who are either (a) former owners of a 2011 or 2012 LEAF as of

6    the date of final approval by the Court, or (b) not residing in state where NCTC is

7    available will receive a check for $50.  *Id.* at 6-7.

8          On its face, the extended warranty seems fair.  First and foremost, it "is

9    directed at repairing the alleged harm."  *Kearney v. Hyundai Motor Am.*, No.

10   SACV09 1298 JST, 2013 WL 3287996, at *5 (C.D. Cal. June 28, 2013.)  Second,

11   this court and others have approved settlements including extended warranties with

12   age and mileage restrictions.  *Eisen v. Porsche Cars N. Am., Inc.*, No.

13   2:11 CV 09405 CAS, 2014 WL 439006, at * 7 (C.D. Cal. Jan. 30, 2014)

14   (approving a 10-year/130,000-mile limitation extended warranty); *Trew v. Volvo*

15   *Cars of N. Am.*, No. S 05 1379RRBEFB, 2007 WL 2239210, at *3-4 (E.D. Cal.

16   July 31, 2007) (approving settlement including 10-year, 200,000-mile warranty).

17         It is true that some class members may not benefit directly from the

18   extended warranty.  Specifically, those owners or lessees who no longer possessed

19   the vehicle at the time the extended warranty was announced clearly do not benefit

20   from it.  However, "[i]n evaluating a proposed settlement, '[i]t is the settlement

21   taken as a whole rather than individual component parts, that must be examined for

22   overall fairness."  *True*, 749 F.Supp.2d at 1064 (quoting *Hanlon*, 150 F.3d at

23   1026).  As a result, the fact that some class members may not benefit to the same

24   extent, or at all, from the extended warranty, does not mean the value of the

25   settlement is inadequate.  Furthermore, because *all* former owners and lessees are

26   entitled to $50, no class member is left empty-handed by the settlement.

27   Moreover, to the extent that class members were unsatisfied with the settlement,

28                                          - 16 -

1   they were provided the opportunity to opt out if they desired to seek greater

2   compensation.  *Eisen*, 2014 WL 439006 at *7 ("Federal courts routinely hold that

3   the opt-out remedy is sufficient to protect class members who are unhappy with the

4   negotiated class action settlement terms.").  As a result, the court finds that the

5   amount of the settlement weighs in favor of approval.

6   **5.  Extent of Discovery Completed and the Stage of the Proceedings**

7   In analyzing this factor, courts consider whether "the parties have sufficient

8   information to make an informed decision about settlement."  *Linney v. Cellular*

9   *Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Formal discovery is not

10   required, *id.*, but "[a] court is more likely to approve a settlement if most of the

11   discovery is completed because it suggests that the parties arrived at a compromise

12   based on a full understanding of the legal and factual issues surrounding the case."

13   *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 527.

14   Plaintiffs filed this action on September 24, 2012.  Complaint (Doc. 1).  In

15   November 2012, "the parties began exploring a possible resolution of this action."

16   Lurie Decl. at 2 (Doc. 34, Attach. 1).  In early December, the parties met and

17   agreed to the terms of the proposed settlement.  *Id.*  The settlement agreement

18   occurred very early in litigation – prior to any discovery or motions practice, and

19   even prior to Nissan answering Plaintiffs' complaint.  Notwithstanding the early

20   settlement, plaintiffs argue that they had sufficient information to make an

21   informed agreement.

22   To show that they obtained sufficient information to make an informed

23   decision, plaintiffs represent the following:

24   As part of their pre-filing investigative work, Plaintiffs' Counsel, *inter*

25   *alia*, researched publicly available materials and information from the

26   National Highway Traffic and Safety Administration ("NHTSA");

27   reviewed Nissan manuals and service bulletins regarding the LEAF

28

1    and the alleged defect; reviewed federal regulations and applicable
2    standards regarding electric vehicles and their operation; studied the
3    tracked comments from LEAF owners on websites and blogs; [and]
4    reviewed consumer and LEAF owner complaints and concerns and
5    vetted those concerns through Plaintiffs' engineers and consultants.
6    *Id.* at 1-2.

7    Plaintiffs assert that after the agreement, they conducted over five months of
8    confirmatory discovery, during which time "Nissan provided, and Plaintiffs'
9    counsel analyzed over 4,000 pages of documents and data covering Plaintiffs'
10   contentions in the FAC and a broad range of issues concerning the LEAF battery
11   that could impact the Settlement Terms." *Id.* at 4. "The documents produced
12   included warranty information; customer complaints regarding battery capacity
13   loss; Nissan's communications with Nissan owners; studies and data about the
14   alleged rate of capacity loss; and confirmation that customers are protected from
15   the manipulation of the battery capacity gauge." Original Motion for Final
16   Approval at 23. Given the discovery conducted by plaintiffs and the information
17   acquired, the court finds this factor weighs in favor of settlement.

18   **6.  Experience and Views of Counsel**

19   "The recommendations of plaintiffs' counsel should be given a presumption
20   of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal.
21   1979). This presumption exists because "[p]arties represented by competent
22   counsel are better positioned than courts to produce a settlement that fairly reflects
23   each party's expected outcome in litigation." *Rodriguez v. West Publ'g Corp.*, 563
24   F.3d 948, 967 (9th Cir. 2009).

25   Plaintiffs' counsel is highly experienced and qualified. Lurie Decl. at 5-12
26   (Doc. 34, Attach. 1). Indeed, Judge Pregerson determined at the preliminary
27   approval stage that class counsel "have demonstrable experience litigating,

28

certifying, and settling class actions, and will serve as adequate counsel for the Settlement Class."  Order for Prelim. Approval at 4 (Doc. 36).  The court sees no reason to revisit that finding and finds that this factor favors settlement approval.

### 7.  Presence of a Governmental Participant

No government entity participated in this case.  Under these circumstances, this factor is neutral.  *See, e.g.*, *In re Toys R Us*, 295 F.R.D. at 455.

### 8. Reaction of the Class Members of the Proposed Settlement

"In order to gauge the reaction of other class members, it is appropriate to evaluate the number of requests for exclusion, as well as the objections submitted." *In re Toys R Us.*, 295 F.R.D. at 455.  More than 19,300 notices were mailed to potential class members to inform them of the original proposed settlement. Cudworth Decl. (Doc. 57).  Only 121 class members[8] (0.62% of the class) requested to opt out, and 14 class members (or 0.06% of the class) objected.  *See* Cudworth Supp. Decl. (Doc. 66, Attach. 2);  Lurie Decl. (Doc. 72, Attach. 1).  Of the 92 class members who validly opted-out of the original settlement, 42 chose to opt back in to the amended settlement (or 46% of the original opt-outs).  Cudworth Decl. (Doc. 146 at 1-2).  None of the original objectors renewed their objection in response to the amended settlement, and only one class member objected for the first time to the amended settlement.[9]  Due to the small number of objections and opt-outs, the court finds that this factor weighs in favor of approval.  *See Churchill Vill. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (approving a settlement where "only 45 of the approximately 90,000 notified class members [.05%]

---

[8]     Of the 121 requests to opt-out, 92 were deemed valid.  Cudworth Supp. Decl. (Doc. 66, Attach. 2).

[9]     An additional objector, Paul Stroub, appeared telephonically at the June 9, 2015, hearing.  However, the court has no record that Paul Stroub objected to the original, or amended settlement, prior to his telephonic appearance at the hearing.

objected to the settlement" and 500 [.56% of the class] members opted out); *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529 (C.D.Cal.2004) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

### 9. Risk of Collusion

In addition to evaluating the fairness of the settlement terms, the court is required to examine whether "class counsel and the class representatives permitted self-interest to trump their obligation to ensure a fair settlement for the class as a whole." *In re Toys R Us.*, 295 F.R.D. at 457. The Ninth Circuit has identified three signs of collusion:

> "(1) when the settlement terms result in class counsel receiving a disproportionate share of the settlement, or when the class receives no monetary compensation but counsel receives an ample award of attorneys' fees;
> (2) the presence of a clear sailing agreement that carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for . . . accepting an unfair settlement; and
> (3) when the parties arrange for fees not awarded to revert to defendants, rather than being paid into the class fund."

*In re Bluetooth*, 654 F.3d at 947. The third sign of collusion is not present in this case: the settlement agreement does not create a common fund and does not contain a reversion provision.

The first sign of collusion is difficult to assess. Plaintiffs estimated the original settlement to be valued at a minimum of $38 million. Johns Decl. at 6 (Doc. 47, Attach. 1). In their renewed motion for attorney fees, Plaintiffs value the amended settlement at $24 million. Renewed Motion for Att'y Fees at 22 (Doc. 141). This valuation is based on a $6,500 valuation for the battery replacement and incorporates the assumptions regarding the claims rate from Plaintiffs' expert, who, in estimating the value of the original settlement, calculated warranty claims for 25% of the Class Vehicles in "Hot Weather States" and 5% in "non-Hot

- 20 -

Weather States." *Id.*; Johns Decl. at 5.  Plaintiffs' expert provided no explanation whatsoever for the percentages used to calculate the estimated number of warranty claims.  *See* Johns Decl. at 5.  Without any evidence as to when and how frequently the battery capacity loss is expected to fall below nine bars of capacity, the percentages estimated by plaintiffs' expert are nothing more than pure speculation.  However, assuming, without deciding, that plaintiffs' valuation is accurate, the attorneys' fees sought are nowhere near the disproportionate fee award in *In re Bluetooth*, where the attorneys' fees were 83.2% of the total settlement amount.  *In re Bluetooth*, 654 F.3d at 945.

The second sign of collusion is present in this case:  the parties' settlement agreement contains an explicit "clear sailing" provision. "In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *In re Toys R Us*, 295 F.R.D. at 458 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 520 n.1 (1st Cir. 1991)).  The parties' agreement states:

> NNA agrees not to oppose any application for Attorneys' Fees and Expenses of $1,900,000 (one million, nine hundred thousand dollars) or less by Class Counsel.  Original Settlement Agreement at 22.

Despite the presence of a clear sailing agreement, however, the absence of a "kicker provision" stating that all fees not awarded would revert to defendants, weighs against a finding of collusion. *See In re Bluetooth*, 654 F.3d at 947.  As a result, the Court concludes "that the provision at issue here does not raise an inference of collusion that warrants invalidation of the class settlement as a whole." *In re Toys R Us*, 295 F.R.D. at 458.

**10.  Balancing the Factors**

1   Having considered the relevant factors, the court concludes that the

2   circumstances surrounding the settlement weigh in favor of a finding that it is fair,

3   reasonable, and adequate.

4   **D.    Objections**

5   The court next addresses the timeliness and merits of the outstanding

6   objections.  The court first turns to the objection by Alex Kozinski and Marcy

7   Tiffany.  After plaintiffs renewed their motion for final approval, Kozinski and

8   Tiffany withdrew their objection. (Doc. 139).   Pursuant to Rule 23(e)(5), a class

9   member's objection to a proposed settlement "may be withdrawn only with the

10  court's approval."   The Rule does not explain under what conditions approval

11  should be granted, nor is there controlling authority on the issue.  *See Glass v. UBS*

12  *Fin. Servs., Inc.*, No. C 06 4068 MMC, 2007 WL 160948, at *1 (N.D. Cal. Jan.

13  17, 2007).  Kozinski and Tiffany's withdrawal of their objection was in direct

14  response to mediation and the subsequent increased benefits for the entire class;

15  further, there is no evidence of collusion.  As a result, the court approves

16  withdrawal of their objection.  The court finds that the remaining objections to the

17  original settlement have been mooted by the amended settlement or lack merit.

18  Objector Mandana Khosravi filed, on March 27, 2015, the only written

19  objection to the revised settlement.   Plaintiffs argue that her objection should be

20  deemed untimely.  The court agrees.  The deadline for filing objections to the

21  original settlement was October 13, 2013.  Because the amended settlement

22  increased the relief available under the original settlement, an additional opt-out

23  and objection period for those class members who chose not to opt-out to the

24  original settlement was not necessary.  As a result, Khosravi's objection is

25  untimely.

26  In addition to being untimely, Khosravi's objection lacks merit.  Khosravi's

27  argument that Nissan will fail to comply with the extended warranty as written, and

28  - 22 -

her concerns about Nissan's ability to comply with their settlement obligations is premised entirely on her own experiences.  Taken at face value, Khosravi's allegations regarding her LEAF's driving range and Nissan's refusal to honor the extended warranty, certainly appear troubling.  However, reading between the lines of her declaration, it appears that her dashboard charge indicator has never fallen below the nine bars necessary to qualify her for the extended warranty.  *See* Khosravi Decl. (Doc. 147, Attach. 1).  Khosravi argues, however, that the reason her charge indicator never dropped below nine bars is because the Nissan dealership she patronized "used a Nissan software patch to 'reprogram' the charge indicator to show a full charge."  Khosravi Opp'n at 21.  Even if Khosravi's accusations are true, given the unique nature of Khosravi's claim, the appropriate recourse was for her to opt-out and pursue the claim, rather than object to the settlement.[10]

Khosravi also repeats Kozinski's and Tiffany's objection, that the settlement lacks consideration because the extended warranty was announced by Nissan in December 2013 without any reference to the settlement.  The court finds it unnecessary to address the merits of this argument because the amended settlement includes additional consideration, *i.e.*, the obligation to *replace*, rather than repair the battery and the inclusion of an EZ-charge card or $50.

For all of the foregoing reasons, the court certifies the settlement class and approves the settlement as fair, reasonable, and adequate.

## IV.  ATTORNEYS' FEES AND INCENTIVE PAYMENTS

The court now turns to class counsel's motion for fees, costs, and incentive payments.  At the conclusion of a successful class action, "the court may award

---

[10]     In fact, Khosravi's claims against Nissan and a Nissan Dealer, most, if not all, of which do not implicate the class allegations and settlement, are currently in arbitration.

1  reasonable attorney's fees and nontaxable costs that are authorized by law or by the

2  parties' agreement."[11]   Fed. R. Civ. P. 23(h). "[C]ourts have an independent

3  obligation to ensure that the award, like the settlement itself, is reasonable, even if

4  the parties have already agreed to the amount." *In re Bluetooth*, 654 F.3d at 941.

5  Plaintiffs seek the originally-negotiated amount of attorneys' fees and expenses of

6  $1.9 million and an incentive payment of $5,000 each to named plaintiffs Klee and

7  Wallak.   Renewed Motion for Att'y Fees at 1 (Doc. 141).

8  **A.     Attorneys' Fees**

9         Courts may use either the lodestar or percentage-of-recovery method to

10  calculate attorneys' fees. *In re Bluetooth*, 654 F.3d at 941-942.  "The lodestar

11  figure is calculated by multiplying the number of hours the prevailing party

12  reasonably expended on the litigation (as supported by adequate documentation)

13  by a reasonable hourly rate for the region and for the experience of the lawyer."

14  *Id.* at 941.  In a percentage-of-the-fund analysis, the court awards a percentage of

15  the class recovery as fees. *In re Toys R Us*, 295 F.R.D. at 460.  The percentage-of-

16  recovery method is more appropriate when a settlement produces a common fund

17  for the benefit of the entire class. *See In re Bluetooth*, 654 F.3d at 942.  Because

18  California law governs the majority of the underlying claims, it also governs the

19  award of fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir.

20  2002); *Sadowska v. Volkswagen Grp. of Am., Inc.*, No. CV 11-00665-BRO AGRX,

21  2013 WL 9600948, at *7 (C.D. Cal. Sept. 25, 2013) (stating that when "state law

22  claims predominate, state law governs the calculation of the award of fees").

23

24

25

---

26  [11]      Plaintiffs seek an award of attorney's fees under the California Consumer
Legal Remedies Act (Cal. Civ. Code § 1780(e)).  Renewed Motion for Att'y Fees at

27  8.

28                                          - 24 -

1   Under California law, a court assessing attorneys' fees begins with calculating a

2   lodestar figure.[12]   *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131-32 (2001).

3   **1.   Reasonableness of Counsel's Hours**

4   "'[A]bsent circumstances rendering the award unjust, an attorney fee award

5   should ordinarily include compensation for *all* the hours *reasonably spent*' in

6   litigating the action to a successful conclusion.  'Reasonably spent' means that

7   time spent 'in the form of inefficient or duplicative efforts is not subject to

8   compensation.'"  *Horsford v. Bd. of Trustees of Cal. State Univ.*, 132 Cal. App. 4th

9   359, 394 (Ct. App. 2005) (quoting *Ketchum*, 24 Cal. 4th at 1132).  *See also In re*

10  *Bluetooth*, 654 F.3d at 994 ("Under the lodestar method, the district court must

11  calculate the lodestar figure based on the number of hours *reasonably* expended on

12  the litigation, adjusting the figure to account for the degree of success class counsel

13  attained, among other factors.").

14  Plaintiffs' counsel state that they have spent 3,095 hours prosecuting this

15  action and securing benefits for the class.[13]   Renewed Motion for Att'y Fees at 10-

16  11.  Plaintiffs' counsel submitted a detailed declaration demonstrating the number

17  of hours spent by month and per task.  Lurie Decl. at 17-25 (Doc. 141, Attach. 1).

18  The tasks listed include:  (1) investigating plaintiffs' claims; (2) preparing the

19

20

21          [12]     This approach is also appropriate under federal law.  *In re Toys R Us*, 295
   F.R.D. at 460 (concluding that the lodestar method is more appropriate when
22  attorneys' fees are paid separately by the defendant and there is no cap on claims for
   relief thus rendering the value of the settlement difficult to calculate); *In re Bluetooth*,
23  654 F.3d at 942 ("Though courts have discretion to choose which calculation method
24  they use, their discretion must be exercised as to achieve a reasonable result.").

25          [13]     Plaintiffs' counsel state that they actually expended 3,504 hours
26  prosecuting this action but have written off 409 hours to match the originally
   negotiated $1.9 million in fees and expenses.  Renewed Motion for Att'y Fees at 11.

27

28                                          - 25 -

complaint and first amended complaint; (3) engaging in lengthy settlement negotiations; (4) fielding and responding to class members' inquiries regarding the warranty information and updating the settlement website; (5) researching the new lithium-ion battery installed in 2014 and 2015 vehicles and evaluating proposal for additional settlement terms; (6) communicating with objectors; (7) attending mediation; and (9) drafting the amended settlement. *Id.* at 16.  The court finds the number of hours and tasks billed to be reasonable.

### 2.  Reasonableness of Rates

Plaintiffs' counsel's hourly rates range from $370 to $695 for senior attorneys.  Lurie Decl. at 12 (Doc. 141, Attach. 1).  Hourly rates are considered reasonable if they are within the range of rates charged by and awarded to attorneys of comparable experience, reputation, and ability for similar work. *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 782-83 (Ct. App. 2002); *Trustees of Const. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006).  Plaintiffs cite a number of cases demonstrating that the hourly rates submitted are comparable to those approved in other cases in Southern California.  *See e.g.*, *Kearney*, 2013 WL 3287996, at * 8 (approving rates between $100 and $800); *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (approving rates between $445 and $675). The court finds that the hourly rates submitted by plaintiffs' counsel are reasonable.  As a result, the final lodestar calculation is $1,885,957.

### 3.  Adjustment of the Lodestar

The lodestar figure "presumptively provides an accurate measure of reasonable attorney's fees."  *In re Toys R Us*, 295 F.R.D. at 460.  However, "once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of representation, the novelty, and complexity of the

issues, the results obtained, and the contingent risk presented." *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 556 (Ct. App. 2009) (citations omitted). The purpose of this analysis is to "fix a fee at the fair market value for the particular action." *In re Vitamin Cases*, 110 Cal. App. 4th 1041, 1052 (Ct. App. 2003) (citations omitted).

" "The most important factor is the benefit obtained for the class." *In re Toys R US*, 295 F.R.D. at 466. The extended warranty provides a substantial benefit for those eligible and "is directed at repairing the alleged harm." *Kearney*, 2013 WL 3287996, at *1. Because the fee requested is reasonable, and plaintiffs' requested a multiplier only if the lodestar was decreased, the court finds that none of the above factors justify an upward or downward departure from the lodestar figure.

### 4.    Percentage-of-the Fund Analysis

"Because the settlement agreement does not create a common fund, the percentage-of-the-fund method is an inappropriate method of calculating fees in this case." *In re Toys R US*, 295 F.R.D. at 468. However,"[i]t may be appropriate in some cases, assuming the class benefit can be monetized with a reasonable degree of certainty, to 'cross-check' of the common fund to ensure that the fee awarded is reasonable and within the range of fees freely negotiated in the legal marketplace in comparable litigation." *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 136. Plaintiffs argue that their fee request is also reasonable based on a percentage of the fund cross-check. Renewed Motion for Att'y Fees at 21.

The actual value of a settlement is inherently difficult to calculate when the relief is made available to all class members, but the percentage of class members who may claim such relief remains unknown. *See Castillo v. Gen. Motors Corp*., No. CIV. 07-2142 WBS GGH, 2008 WL 8585691, at *10 (E.D. Cal. Sept. 8, 2008); *Nguyen v. BMW of N. Am. LLC*., No. C 10-02257 SI, 2012 WL 1380276, at *2 (N.D. Cal. Apr. 20, 2012). As noted, the valuation submitted by plaintiffs was

speculative, at best.  As a result, the court finds the use of the percentage-of-the-fund analysis inappropriate in this case.

Under California law, "[r]egardless of whether attorney's fees are determined using the lodestar method or awarded based on a 'percentage-of-the-benefit' analysis under the common fund doctrine, the ultimate goal . . . is the award of a 'reasonable' fee to compensate counsel for their efforts, irrespective of the method of calculation.'" *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 557-58 (citations omitted).  For the reasons stated above, the court finds that the fee requested is reasonable.  Thus, despite the inability to cross-check the lodestar amount with a percentage-of-the-fund analysis, the court finds the requested award to be reasonable.

## B.  Reimbursement for Costs and Expenses

Plaintiffs' counsel also requests reimbursement for $15,633.25 in litigation expenses as part of the $1.9 million award.  Renewed Motion for Att'y Fees at 23-24.  "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. Proc. 23(h).  As part of the settlement agreement, Nissan has agreed to pay for expenses including:  "costs, litigation expenses, fees, and expenses of experts." *See* Original Settlement at 3, 9-10, 22.  The court has reviewed the cost and expenses submitted by plaintiffs' counsel and finds them to be reasonable.  *See* Lurie Decl. at 30 (Doc. 141, Attach. 1).

These types of expenses are routinely approved.  *In re Toys R Us*, 295 F.R.D. at 469; *Cataphora Inc. v. Parker*, No. C09 5749 BZ, 2012 WL 174817, at *2 (N.D. Cal. Jan. 20, 2012) (interpreting California law to allow for reimbursement of itemized expenses).  Because the settlement agreement

1    anticipated the recovery of these litigation costs, the court approves the request for
2    reimbursement.[14]

3    **C.    Incentive Payments**

4        Plaintiffs also request that the court approve an incentive payment in the
5    amount of $5,000 to be awarded to each named plaintiff.  Renewed Motion for
6    Att'y Fees at 24.  "[I]ncentive awards are fairly typical in class action cases."
7    *Rodriguez*, 563 F.3d at 958.  These awards are "intended to compensate class
8    representatives for work done on behalf of the class, to make up for financial and
9    reputational risk undertaken in bringing the action, and sometimes to recognize
10   their willingness to act as a private attorney general."  *Id.* at 958-59.  Courts have
11   generally found incentive payments up to $5,000 to be reasonable.  *See In re Mego*
12   *Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000); *In re Toys R Us*, 295
13   F.R.D. at 470; *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 535
14   (E.D. Pa. 1990).  In determining whether to approve an incentive award, the court
15   considers the following factors:  "1) the risk to the class representative in
16   commencing suit, both financial and otherwise; 2) the notoriety and personal
17   difficulties encounted by the class representative; 3) the amount of time and effort
18   spent by the class representative; 4) the duration of the litigation [;] and [] 5) the
19   personal benefit (or lack thereof) enjoyed by the class representative as a result of
20   the litigation."  *In re Toys R Us*, 295 F.R.D. at 470 (quoting *Van Vranken v. Atl.*
21   *Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995)).  The court has considered
22   these factors and grants the requested incentive awards.

23

24        [14]    The award fees and expenses calculated based on the lodestar and
25   reimbursable expenses slightly exceeds $1.9 million.  Because plaintiffs seek the
26   originally-negotiated $1.9 million, the court awards the requested amount, rather than
27   the higher amount reached by adding the lodestar to the requested reimbursable
     expenses.

28

## V.  CONCLUSION & ORDER

For the reasons stated above,

**IT IS ORDERED:**

**1.**     The Court hereby certifies, for settlement purposes only, the following class:

> All former and current owners and lessees of a 2011-2012 model year Nissan LEAF vehicle, at the time the original notice was issued in 2013, in the United States and its territories, including Puerto Rico.

**2.**     The Court hereby grants final approval of the amended settlement agreement, finding it fair, reasonable, and adequate.

**3.**     The Court hereby award an incentive payment of $5,000.00 to each of the named plaintiffs, payable by defendant.

**4.**     The Court hereby awards class counsel, Capstone Law, APC, the sum of $1,900,000.00, as reasonable attorneys' fees and expenses, payable by defendant.

**5.**     Judgment shall be entered dismissing this action with prejudice.

Dated this 7th day of July 2015.

_____
A. Wallace Tashima
United States Circuit Judge
Sitting by Designation

- 30 -